The Honorable Marsha J. Pechman

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

DANIEL HOPKINS,

      Plaintiff,

  v.

INTEGON GENERAL INSURANCE
CORPORATION,

      Defendant.

NO.  2:18-cv-01723-MJP

JOINT PRETRIAL ORDER

Parties submits the following Joint Pretrial Order pursuant to the Court's Local Civil Rule 16.1:

## I.    JURISDICTION

Defendant Integon General Insurance Corporation is an insurance company organized under the laws of the State of North Carolina.  Plaintiff Mr. Hopkins is a resident of Washington State.  Plaintiff filed suit in King County Superior Court on October 17, 2018. Defendant removed the case to the United States District Court, Western District of Washington, on November 30, 2018, citing 28 U.S.C. § 1332, § 1441 and § 1446.  Plaintiff has not objected to the jurisdiction of the federal court.  Accordingly, both parties agree that jurisdiction is appropriate based on diversity of citizenship of the parties.

7091053.1

## II.     CLAIMS AND DEFENSES

**Plaintiff will pursue the following claims at trial:**

1.      Claim for insurance benefits under UIM

2.      Negligence

3.      Bad Faith

4.      Violation of the Insurance Fair Conduct Act (IFCA)

5.      Violation of the Consumer Protection Act (CPA)

**Defendant will pursue the following affirmative defenses at trial:**

1.  Plaintiff sustained no extracontractual damages, and all alleged damages were caused by the underlying motor vehicle accident and not by Defendant's conduct.

2.  Plaintiff's claim for breach of contract is barred because Defendant never breached the Policy, and even if some breach occurred, it caused no damages to Plaintiff.

3.  Plaintiff's bad faith claim is barred because Defendant's conduct was reasonable at all times, Defendant did not breach the Policy, or any other duty to him, and even if some breach occurred, Plaintiff did not incur any damages proximately caused by any such alleged breach.

4.  Plaintiff's claim for violation of the CPA is barred because Defendant did not commit unfair or deceptive act or trade practice, and did not otherwise violate any of the applicable Washington Administrative Code provisions, and even if some breach occurred, it did not proximately cause damage to any business or property interest of Plaintiff.

5.  Plaintiff's claim under IFCA is barred because Defendant acted reasonably at all relevant times, did not unreasonably deny coverage or refuse to pay any benefit owed under an insurance policy, and even if some wrongful act occurred it did not proximately cause any damage to Plaintiff compensable under the statute.

6.  Failure to mitigate damages.

7091053.1

7. Set-off for other payments.

## III.   ADMITTED FACTS

1. Plaintiff was the driver when his vehicle was struck by Pavielle Montes on April 23, 2016.

2. Ms. Montes was at fault for the April 23, 2016 accident.

3. Plaintiff was injured in the April 23, 2016 accident.

4. Ms. Montes was insured by Progressive Insurance Company ("Progressive") at the time of the April 23, 2016 accident.

5. The liability limits of Ms. Montes' policy with Progressive was $25,000.

6. Progressive paid $25,000 to Plaintiff for his injuries in the April 23, 2016 accident.

7. Plaintiff's car sustained damage to the rear bumper and spare tire cover.

8. The total cost of repairs to Plaintiff's vehicle was $1,069.31.[*]

9. Plaintiff received $1,069.31 to repair his car from Progressive, and he never made a claim to Integon for property damage from the accident.[*]

10. Mr. Hopkins incurred $10,931.00 in medical expenses, treating from April 2016 through March 2019.[**]

11. $10,000 of those medical expenses were paid by Defendant under Plaintiff's Personal Injury Protection ("PIP") coverage, which had limits of $10,000.[**]  These PIP payments covered all of Plaintiff's medical treatment through July 17, 2018, and paid $60 toward his appointment at Cascade Dizziness & Balance Therapy (Cascade) on September 6, 2018.[**]

---

[*] Plaintiff admits these facts, but objects to their admissibility under FRE 402 and 403 (*See also* Plaintiff's *Motions in Limine* regarding damage to the vehicle).  Plaintiff is not making a claim for property loss.

[**] Defendant objects to Plaintiff's claim for expenses beyond $9,886.00, which were the only disclosed expenses by Plaintiff in this lawsuit in his initial disclosures that were never supplemented. Dkt. #16-1, p. 154. Plaintiff admitted no additional medical expenses beyond $9,886.00 during his deposition. Dep. at 69:16-71:0. Fed. R. Civ. P. 26(a)(1); Fed. R. Civ. P. 37 ("If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless.")

12. Plaintiff's remaining bills beyond the PIP for treatment related to the collision were: $90 for the portion of his September 6, 2018 treatment at Cascade that was unpaid by PIP and two appointments at Swedish Neuroscience Institute (Swedish), on September 11, 2018 ($446) and March 12, 2019 ($395).  In total, Plaintiff Mr. Hopkins was billed $931 in medical costs beyond his PIP coverage.**

13. Plaintiff was insured by Defendant, and made a claim under the Underinsured Motorist ("UIM") provision of his policy.

14. The UIM coverage in the policy contained limits of $250,000.

15. In a letter dated March 26, 2018, Plaintiff demanded $250,000 in UIM coverage under the policy.

16. Defendant received the March 26, 2018 letter on April 3, 2018.

17. In response to Plaintiff's demand for the policy limits of $250,000, Defendant offered $17,340.00 on April 24, 2018.

18. On April 25, 2018, Plaintiff re-confirmed his demand for $250,000 in UIM coverage.

19. Defendant retained a neurologist Dr. Kutsy to review Plaintiff's medical records for the April 23, 2016 accident.

20. On August 24, 2018, Defendant received a report from Dr. Kutsy.

21. On September 19, 2018, Plaintiff submitted a notice of a lawsuit under the Insurance Fair Conduct Act (IFCA).  Defendant's claim notes show that the IFCA notice was received on September 26, 2018.

22. On October 1, 2018, Defendant's claim file notes that it "will increase offer to $40k."  Mary Gordon, the adjustor working on the case, called Plaintiff's counsel and left a message that same day.

23. On October 17, 2018, Plaintiff filed this lawsuit, including IFCA claims.

24. On November 13, 2018, Defendant received a call back from Plaintiff's counsel. Defendant offered Mr. Hopkins' $40,000 to settle his claim.

25. Plaintiff never offered to settle the UIM claim below $250,000.

### III.   ISSUES OF LAW[1]

**Plaintiff's proposed issues of law:**

1. The value of the insurance benefits under the UIM portion of the policy.[2]

2. Whether Defendant is liable for negligence.

3. Whether Defendant is liable for bad faith.[3]

4. Whether Defendant is in violation of IFCA.[4]

5. Whether Defendant is in violation of the CPA.[5]

6. Whether Plaintiff is entitled to fees and costs under RCW 48.30.015 and/or RCW 19.86.090. [6]

### IV.   WITNESSES

**On behalf of Plaintiff:**

| WITNESS | NATURE OF TESTIMONY | STATUS |
|---|---|---|
| Daniel Hopkins<br>c/o PWRFL<br>1501 Fourth Ave, Suite 2800 | Plaintiff Daniel Hopkins will testify concerning the collision, his injuries, as well as any facts that pertain to the claims at issue in this lawsuit. | Will testify |

---

[1] Defendant makes a general objection to Plaintiff's proposed issues of law, as the issues stated are not legal issues but are instead factual.  Defendant submits that the proper statement as to the legal issues are addressed in Defendant's proposed jury instructions and verdict form, which has been circulated to Plaintiff's counsel and will be filed with the Court prior to the Court's deadline.

[2] Defendant objects:  The issue here is the amount of damages sustained by Plaintiff in the April 23, 2016 accident.

[3] Defendant objects: The standard is whether Defendant acted in a manner that was unreasonable, frivolous or unfounded.

[4] Defendant objects: The issues are whether Defendant unreasonably denied a claim for coverage or payment of benefits, and if so, whether Plaintiff sustained actual damages as a proximate cause of such unreasonable denial of claim of coverage or payment of benefits.

[5] Defendant objects: The issues are not just whether Defendant violated the CPA, but also whether Plaintiff sustained damage to 'business or property" as a result of such violation.

[6] Objection.  Award of attorney's fees and costs is for the Court to decide after trial and is not an issue to decide during trial.

7091053.1

| | Witness | Nature of Testimony | Status |
|---|---|---|---|
| | Seattle, WA 98101<br>(206) 624-6800 | | |
| | Irene Hopkins<br>c/o PWRFL<br>1501 Fourth Ave, Suite 2800<br>Seattle, WA 98101<br>(206) 624-6800 | Ms. Hopkins is Mr. Hopkins' wife and will testify regarding damages. | Will testify |
| | Julia Hopkins<br>c/o PWRFL<br>1501 Fourth Ave, Suite 2800<br>Seattle, WA 98101<br>(206) 624-6800 | Julia Hopkins is Mr. Hopkins' daughter and will testify regarding damages. | Will testify |
| | Sarah Hopkins<br>c/o PWRFL<br>1501 Fourth Ave, Suite 2800<br>Seattle, WA 98101<br>(206) 624-6800 | Sarah Hopkins is Mr. Hopkins' daughter and will testify regarding damages. | Will testify |
| | Kevin Moore<br>7001 Seaview Ave NW Suite 160-643,<br>Seattle, WA 98117<br>(425) 443-2896 | Kevin Moore is Mr. Hopkins' neighbor and may testify regarding damages. | May testify |
| | Steven Strzelec<br>Strzelec Consulting Services<br>20719 NE 8th St.<br>Sammamish, WA 98074<br>(206) 427-4322 | Steven Strzelec will testify about claims-handling standards nationally and in Washington. He will testify that Integon failed to meet minimum industry standards for handling UIM claims. He will testify that Integon did not adequately investigate Mr. Hopkins' UIM claim and that Integon did not have adequate support to offer $17,340 in general damages to Mr. Hopkins. He will testify that Integon's offer appears to be based on conjecture and speculation, not a reasonable investigation. He will testify that in determining how the collision and injury has impacted the insured's life, a claim handler needs to determine all of the injuries suffered in the collision, the pain and suffering caused by those injuries, and how those injuries and the | Will testify |

| WITNESS | NATURE OF TESTIMONY | STATUS |
|---|---|---|
| | collision have impacted the insured's life and insured's ability to lead their normal pre-collision life.<br><br>Mr. Strzelec will testify that Integon failed to meet its obligation to treat Mr. Hopkins reasonably. He may also be called to rebut testimony of Defendant's witnesses. | |
| Carolyn Larkin Taylor, MD<br>Swedish Neuroscience Specialists<br>5350 Tallman Ave NW, Suite 400<br>Seattle, WA 98107<br>206-781-6320 | Dr. Taylor will be called as a witness at trial and will testify regarding her care and treatment of Mr. Hopkins. Dr. Taylor will testify that Mr. Hopkins sustained injuries due to the collision. She will testify as to her diagnosis of and prognosis for Mr. Hopkins. She will testify that Mr. Hopkin's care and treatment at Swedish following the collision was reasonable and necessary. She may also be called to rebut testimony of Defendant's medical witness and to testify about the reasonableness and necessity of the medical bills. | Will testify |
| Lisa Eaton, DPT, OCS<br>Cascade Dizziness and Balance PT<br>120 Lakeside Ave, Suite 210<br>Seattle, WA 98122<br>206-925-3762 | Ms. Eaton will be called as a witness at trial and will testify regarding her care and treatment of Mr. Hopkins following the collision, and the reasonableness of such treatment. She may also be called to rebut testimony of Defendant's witnesses and to testify about the reasonableness and necessity of the medical bills. | Will testify |
| Mary Gordon[7]<br>National General Ins. Co.<br>St. Louis, MO | Ms. Gordon was Integon's claims adjustor on the claim. Her deposition testimony was recorded and she lives out of state. Portions of her deposition may be played in Court. | Will testify live and designated portions of her depositions may be played. |

---

[7] Defendant objects to portions of Ms. Gordon's deposition testimony, and asks that these objections be ruled upon prior to trial.

7091053.1

1

2    **On behalf of Defendant:**

3

| WITNESS | NATURE OF TESTIMONY | STATUS |
|---------|--------------------|--------|
| IGIC's Corporate Representative[8]<br>c/o Eliot M. Harris<br>Williams Kastner & Gibbs PLLC<br>601 Union Street, Suite 4100<br>Seattle, WA 98101<br>(206) 233-2977<br>eharris@williamskastner.com | Defendant's corporate representative may testify regarding the allegations contained in the Complaint filed in this matter, including but not limited to, the Policy, the Accident, and Defendant's handling, investigation, and analysis of Plaintiff's UIM claim. | Will testify |
| Mary Gordon<br>c/o Eliot M. Harris<br>Williams Kastner & Gibbs PLLC<br>601 Union Street, Suite 4100<br>Seattle, WA 98101<br>(206) 233-2977<br>eharris@williamskastner.com | Ms. Gordon may testify regarding the allegations contained in the Complaint filed in this matter, including but not limited to, the Policy, the Accident, and Defendant's handling, investigation, and analysis of Plaintiff's UIM claim. | May testify either in person or via video deposition |
| Pavielle Montes<br>2727 NE 125th Street, Apt. 9<br>Seattle, WA 98125<br>(206) 331-9658 | Ms. Montes was a party to the Accident giving rise to Plaintiff's UIM claims. Ms. Montes may testify regarding the Accident. | Possible witness only |
| Melissa Weakland, MD<br>Ballard Neighborhood Doctors<br>5416 Barnes Ave NW<br>Seattle, WA 98107<br>(206) 297-7678 | Dr. Weakland is a medical provider who administered treatment to Plaintiff following the Accident at issue in this matter. Dr. Weakland may testify relating to Plaintiff's claims, injuries and treatment. | Possible witness only |
| Chris Morrow, PT<br>Pacific Balance & Rehabilitation Clinic<br>400 Mercer Street, Suite 302<br>Seattle, WA 98109<br>(206) 448-1906 | Mr. Morrow is a physical therapist who administered treatment to Plaintiff following the Accident at issue in this matter. Mr. Morrow may testify relating to Plaintiff's claims, injuries and treatment. | Possible witness only |
| Julie Grove, MPT<br>Cascade Dizziness PT PLLC<br>120 Lakeside Avenue<br>Suite 210<br>Seattle, WA 98122<br>(206) 925-3762 | Ms. Grove is a physical therapist who administered treatment to Plaintiff following the Accident at issue in this matter. Ms. Grove may testify relating to Plaintiff's claims, injuries and treatment. | Possible witness only |

---

[8] Plaintiff objects to Integon calling an unnamed and previously undisclosed witness. This violates the discovery rules and Defendants' own agreed motions in limine prohibiting calling undisclosed witnesses and admitting never before disclosed evidence. This "representative" – whoever he or she is – should not be permitted to testify.

| WITNESS | NATURE OF TESTIMONY | STATUS |
|---|---|---|
| Lisa Eaton, DPT, OCS<br>Cascade Dizziness PT PLLC<br>120 Lakeside Avenue<br>Suite 210<br>Seattle, WA 98122<br>(206) 925-3762 | Ms. Eaton is a physical therapist who administered treatment to Plaintiff following the Accident at issue in this matter. Ms. Eaton may testify relating to Plaintiff's claims, injuries and treatment. | Possible witness only |
| Bart D. Simons, PT<br>Greenlake Sports Physical Therapy<br>408 NE 72nd Street<br>Seattle, WA 98115<br>(206) 524-5115 | Mr. Simons is a physical therapist who administered treatment to Plaintiff following the Accident at issue in this matter. Mr. Simons may testify relating to Plaintiff's claims, injuries and treatment. | Possible witness only |
| Malorie A. Larson, DPT<br>Greenlake Sports Physical Therapy<br>408 NE 72nd Street<br>Seattle, WA 98115<br>(206) 524-5115 | Ms. Larson is a physical therapist who administered treatment to Plaintiff following the Accident at issue in this matter. Ms. Larson may testify relating to Plaintiff's claims, injuries and treatment. | Possible witness only |
| Jena M. Peterson, ND<br>Full Circle Natural Medicine<br>6869 Woodlawn Avenue NE, Suite 208<br>Seattle, WA 98115<br>(206) 535-8867<br> -or-<br>Evergreen Center for Integrative Medicine<br>2008 NE 65th Street<br>Seattle, WA 98115<br>(206) 729-0907 | Ms. Peterson is a naturopathic practitioner who administered treatment to Plaintiff. Ms. Peterson may testify relating to Plaintiff's claims, injuries and treatment. | Possible witness only |
| Roman L. Kutsy, MD<br>c/o Williams, Kastner & Gibbs, PLLC<br>601 Union St, Ste 4100<br>Seattle, WA 98101 | Dr. Kutsy is a neurologist and his testimony will be based on his education, training, and experience, as well as a review of the pertinent materials in the current case. His testimony will also be based on his findings and opinions provided in his report dated August 21, 2018 and his record review addendum dated September 4, 2019. | Will testify |
| William P. Hight<br>c/o Williams, Kastner & Gibbs, PLLC<br>601 Union St, Ste 4100<br>Seattle, WA 98101 | Mr. Hight is an attorney who consults and testifies as an expert witness on insurance coverage interpretations and good faith handling of property and liability insurance claims. Mr. Hight's testimony will be based | Will testify |

7091053.1

| WITNESS | NATURE OF TESTIMONY | STATUS |
|---|---|---|
| | on his education, training, and experience, as well as a review of the pertinent materials in the current case. His testimony will also be based on his findings and opinions provided in his report, dated September 15, 2019. | |
| Ann Rosato<br>1501 4th Avenue, Suite 2800<br>Seattle, WA  98101<br>Ph. (206) 624-6800 | Ms. Rosato had phone calls and emails with Integon during the negotiation of the UIM claim at issue. | Will testify |

## V.     EXHIBITS

**Plaintiff's and Defendant's list of proposed trial exhibits are listed below.** Pursuant to LCR 16(h)(6) and LCR 16(i)(6), the parties intend to present exhibits to the jury in electronic format. The admissibility and authenticity of the documents listed below shall be discussed at the Conference of Attorneys per CR 16(k).  Prior to the Conference of Attorneys pursuant to CR 16(k), however, the parties shall advise each other with a list stating whether, as to each exhibit, the party will (1) stipulate to admissibility, (2) stipulate to authenticity but not admissibility, or (3) dispute authenticity and admissibility in compliance with LCR 16(j).

| No. | Exhibit | Stipulated Authentic and Admissible | Authenticity Stipulated, Admissibility Disputed | Authenticity and Admissibility Disputed |
|---|---|---|---|---|
| | **Plaintiff's Exhibits** | | | |
| 1. | Integon claim notes | | FRE 402, 403, 802 | |
| 2. | Miscellaneous correspondence | | FRE 402, 403, 802 (Exhibits 2-4, 2-5, 2-6, 2-7, 2-17, 2-29 (Rosato email dated May 4, 2018)) | |

7091053.1

| No. | Exhibit | Stipulated Authentic and Admissible | Authenticity Stipulated, Admissibility Disputed | Authenticity and Admissibility Disputed |
|-----|---------|-------------------------------------|-------------------------------------------------|-----------------------------------------|
| 3. | MetroMile policy | X (in compliance with agreed MIL re permissible portions of policy) | | |
| 4. | Medical records from Cascade Dizziness and Balance | X | | |
| 5. | Medical records from Greenlake Sports Physical Therapy | X | | |
| 6. | Medical records from Swedish Medical Center | X | | |
| 7. | Medical records from Ballard Neighborhood Doctors | X | | |
| 8. | Medical records from Pacific Balance and Rehabilitation | X | | |
| 9. | FRE 1006 summary of bills from Cascade Dizziness and Balance | | FRE 402, 403 | |
| 10. | FRE 1006 summary of bills from Greenlake Sports Physical Therapy | | FRE 402, 403 | |
| 11. | FRE 1006 summary of bills from Swedish Medical Center | | FRE 402, 403 | |
| 12. | FRE 1006 summary of bills from Ballard Neighborhood Doctors | | FRE 402, 403 | |
| 13. | FRE 1006 summary of bills from Pacific Balance and Rehabilitation | | FRE 402, 403 | |
| 14. | FRE 1006 Summary of medical bills from all providers | | FRE 402, 403 | |
| 15. | FRE 1006 Summary of medical visits to all providers | | FRE 402, 403 | |
| 16. | Photos | | | FRE 402, 403 |

| No. | Exhibit | Stipulated Authentic and Admissible | Authenticity Stipulated, Admissibility Disputed | Authenticity and Admissibility Disputed |
|---|---|---|---|---|
| 17. | FRE 1006 Summary of PIP payments without diagnosis | | FRE 402,403 | |
| 18. | FRE 1006 Summary of PIP payments without diagnosis | | FRE 402, 403 | |
| 19. | Illustratives | Reserved | Reserved | Reserved |
| **Defendant's Exhibits** | | | | |
| 200. | Integon's Claim Notes for Plaintiff's claim (INTEGON 003080-3452 (minus redactions)) | 3080-86 only | FRE 402, 403, 803 | |
| 201. | Email to Metromile's/Integon's Jo Ann Munoz from Daniel Hopkins dated April 26, 2016, attaching photos of Pavielle Montes' vehicle (INTEGON 000055-58) | | FRE 402, 403, 803, MIL's regarding photos of car. | |
| 202. | Letter to Plaintiff from Jo Ann Munoz dated April 27, 2016, regarding coverage amounts (INTEGON 000030) | X | | |
| 203. | Letter to Hopkins from Beverly Evans, PIP Claims Rep dated April 28, 2016 regarding explanation of benefits and enclosing an Application for Benefits and Authorization to Disclose Health Information (INTEGON 000044-49) | X | | |
| 204. | Letter to Hopkins from Jo Ann Munoz dated May 4, 2016 (INTEGON 0000060) | | FRE 402, 403, 803 | |

7091053.1

| No. | Exhibit | Stipulated Authentic and Admissible | Authenticity Stipulated, Admissibility Disputed | Authenticity and Admissibility Disputed |
|---|---|---|---|---|
| 205. | Plaintiff application for benefits (INTEGON 000067-69) | X | | |
| 206. | Letter from Ann Rosato to Jo Ann Munoz dated July 20, 2016, regarding representation of Plaintiff and request for PIP insurance documents (INTEGON 000178-81) | X | | |
| 207. | Letter to Ann Rosato dated July 21, 2016 (INTEGON 000181) | X | | |
| 208. | Exchange of letters and emails between Veronica Brouse and Plaintiff's attorneys regarding Plaintiff's IME scheduled for July 20, 2017, scheduling conflicts as a result of Plaintiff being out of town until September 2017, and request by Plaintiff's attorneys to schedule IME when Plaintiff returns (INTEGON 000549-550, 000561-562, 000571, 000573-573, 000575, 000634-637) | 549-550, 571, 573, 575 | 561-562 (illegible); 634-637 (FRE 402, 403, and contains inadmissible reference to Irene Hopkins' case – agreed MIL) | |
| 209. | Letter from Ann Rosato dated November 20, 2017 (INTEGON 000718-19) | | FRE 402, 403, 803 | |
| 210. | Letters to Ann Rosato dated November 21, 2017 (INTEGON 000724-25) | | FRE 402, 403, 803 | |
| 211. | Email from Fajardo dated February 7, 2018 (INTEGON 001001) | X | | |

| No. | Exhibit | Stipulated Authentic and Admissible | Authenticity Stipulated, Admissibility Disputed | Authenticity and Admissibility Disputed |
|---|---|:---:|:---:|:---:|
| 212. | Email from Mary Gordon to Ann Rosato dated February 27, 2018, regarding assignment of Plaintiff's UIM claim to Mary Gordon and request for medical records and other information (INTEGON 001064) | X | | |
| 213. | Demand letter from Ann Rosato to Jo Ann Munoz dated March 26, 2018 (INTEGON 001217-1221) | X | | |
| 214. | Email from Mary Gordon to Richard Chodacki dated April 17, 2018 requesting authority for initial offer of $16,000 with settlement range of $16,000 to $84,000 (INTEGON 001224-1226) | X | | |
| 215. | Email to Ann Rosato dated April 24, 2018 (INTEGON 001227-28) | X | | |
| 216. | Email from Ann Rosato dated April 25, 2018 (INTEGON 01233-1234) | X | | |
| 217. | Email exchange between Ann Rosato and Mary Gordon and Richard Chodacki dated May 4, 2018, May 1, 2018, April 25, 2018, and April 24, 2018 regarding Integon's initial offer, Cascade Dizziness medical record, continuation of negotiation, and securing independent medical review (INTEGON 001252-1253) | X | | |

7091053.1

| No. | Exhibit | Stipulated Authentic and Admissible | Authenticity Stipulated, Admissibility Disputed | Authenticity and Admissibility Disputed |
|---|---|---|---|---|
| 218. | Email exchange between Mary Gordon to Cliff Wilson (SmithFreed) dated June 21, 2018 and June 20, 2018 regarding request to locate expert for dizziness/vertigo issue (INTEGON 001249) | X | | |
| 219. | Email from Ann Rosato dated June 22 and June 28, 2018 (INTEGON 001355-57) | X | | |
| 220. | Email exchange between Mary Gordon and Cliff Wilson dated July 3, 2018 and July 11, 2018 regarding request to locate neurologist or neuropsychologist (INTEGON 001289-1291, 001347-1354) | 1289-91 and 1347-50 only | 1321-54 (FRE 402, 403, 803) | |
| 221. | Email exchange between Ann Rosato and Mary Gordon dated July 27, 2018 to July 31, 2018, regarding status of locating neurologist (INTEGON 001355-1357) | | X Duplicative of Ex. 219 | |
| 222. | Email from Jessica Studebaker to Mary Gordon dated August 1, 2018 regarding request for records review by Dr. Kutsy (INTEGON 002878) | | FRE 402, 403, 803 | |
| 223. | Assignment letter from Mary Gordon to Dr. Kutsy dated August 9, 2018 regarding request for records review and attaching medical records and additional information (INTEGON 002898) | | FRE 402, 403, 803 | |

| No. | Exhibit | Stipulated Authentic and Admissible | Authenticity Stipulated, Admissibility Disputed | Authenticity and Admissibility Disputed |
|---|---|---|---|---|
| 224. | Email exchange between Mary Gordon and Ann Rosato dated August 21, 2018 regarding completion of records review and waiting for completion of report (INTEGON 001582-1583) | X | | |
| 225. | Email from Jessica Studebaker to Mary Gordon dated August 24, 2018 attaching Dr. Kutsy's report, CV, W9, and invoice (INTEGON 001584-1601) | | FRE 402, 403, 803 | |
| 226. | Email from Mary Gordon to Ann Rosato dated November 15, 2018 regarding confirmation of $40,000 to settle UIM claim (INTEGON 003071) | X | | |
| 227. | Transcript of the Recorded Statement made by Jo Ann Munoz to Progressive Claims dated April 25, 2016 | | FRE 402, 403, 803; discovery violation – not disclosed | |
| 228. | Email from Jessica Studebaker (Fry Management) to Mary Gordon dated August 3, 2018 regarding record review with Dr. Roman Kutsy (INTEGON 001360-1366) | | FRE 402, 403, 803 | |
| 229. | Letter from Ann Rosato to Insurance Commissioner & Integon dated September 19, 2018 regarding notice to Integon of lawsuit (INTEGON 001624) | X (but Defendant should use a legible copy) | | |

| No. | Exhibit | Stipulated Authentic and Admissible | Authenticity Stipulated, Admissibility Disputed | Authenticity and Admissibility Disputed |
|---|---|---|---|---|
| 230. | Medical records from the University of Washington Medical Center | | This is 800+ pages of medical records from 2011 collision; FRE 402, 403, 803 | |
| 231. | Medical records from Ballard Neighborhood Doctors | BND 6-7, 12, 17-19, 22-23, 28-31, 36-38, 41-72 (with health insurance information/payments redacted pursuant to agreed MIL regarding collateral source) | BND 0-4, 8-11, 13-16, 20-21, 24-27, 32-35, 39-40 (FRE 402, 403, collateral source rule, agreed MIL regarding health insurance payments) | |
| 232. | Medical records from Cascade Dizziness & Balance Physical Therapy | As to: CDB 2-77-82 (with health insurance information/payments redacted pursuant to agreed MIL regarding collateral source) | CDB 0-1 | |
| 233. | Medical records from Swedish Medical Center | As to: SMG 9-22 | as to: SMG 0, 7, 8, 23-36 (FRE 402, 403, collateral source rule, agreed MIL regarding health insurance coverage/ payments) | |
| 234. | Medical records from Pacific Balance and Rehabilitation | X | | |

7091053.1

| No. | Exhibit | Stipulated Authentic and Admissible | Authenticity Stipulated, Admissibility Disputed | Authenticity and Admissibility Disputed |
|---|---|---|---|---|
| 235. | Medical records from Greenlake Sports Physical Therapy | GSP 2-26, 33 | GSP 0-1, 27-32, 34, 36-73 (FRE 402, 403, collateral source rule, agreed MIL regarding health insurance payments) | |
| 236. | Progressive Direct Insurance's vehicle repair estimate dated May 31, 2016 | | FRE 402, 403, 803 | |
| 237. | Washington State Patrol's Vehicle Collision Report (Report No. M0008582) | | FRE 402, 403, 803 | |
| 238. | Photos of Plaintiff's and Pavielle Montes' vehicles after the accident (INTEGON 001371-1390) | | FRE 402, 403 and MILs | |
| 239. | Other photos of accident | | FRE 402, 403 and MILS | |
| 240. | Plaintiff's Initial Disclosures filed in this action | | FRE 403, 403, 802 | |
| 241. | Plaintiff's Discovery Responses in this lawsuit | | FRE 402, 403, 802 | |
| 242. | Expert report of Dr. Roman Kutsy, MD dated August 21, 2018 (INTEGON 001592-001601) | | FRE 402, 403, 802 | |
| 243. | Addendum to expert report of Dr. Roman Kutsy, MD dated September 4, 2019 regarding records review of Plaintiff's August 2011 motor vehicle accident | | FRE 402, 403, 802 | |
| 244. | Expert report of William Hight dated September 15, 2019 | | FRE 402, 403, 802 | |
| 245. | Declaration of Pavielle Montes | | FRE 403, 403, 802 | |

7091053.1

| No. | Exhibit | Stipulated Authentic and Admissible | Authenticity Stipulated, Admissibility Disputed | Authenticity and Admissibility Disputed |
|------|---------|------|------|------|
| 246. | Deposition transcript of Plaintiff Daniel Hopkins taken April 30, 2019 | | FRE 402, 403, 802 | |
| 247. | Deposition transcript of Stephen Strzelec taken September 23, 2019 | | FRE 402, 403, 802 | |
| 248. | Deposition transcript of Dr. Carolyn Taylor taken August 27, 2019 | | FRE 402, 403, 802 | |
| 249. | Deposition transcript of Dr. Roman Kutsy taken October 3, 2019 | | FRE 402, 403, 703, 802 | |
| 250. | Deposition transcript of William Hight taken October 1, 2019 | | FRE 402, 403, 703, 802 | |
| 251. | Plaintiff settlement agreement in Hyland lawsuit | | FRE 402, 403, 404, 408, 802 | |
| 252. | Plaintiff discovery responses in Hyland lawsuit | | FRE 402, 403, 404, 802 | |
| 253. | Hyland pleadings | | FRE 402, 402, 404, 802 | |
| 254. | Preliminary Estimates to repair Plaintiff's vehicle | | FRE 402, 403, 802, MIL regarding damage to car | |
| 255. | Out of pocket expenses documents | | These are Mrs. Hopkins medical records.  FRE 402, 403, 802, MIL regarding Irene Hopkins | |
| 256. | Photos of vehicle disclosed by Plaintiff in discovery in this lawsuit | | FRE 402, 403, MILs | |
| 257. | Illustratives | Reserved | Reserved | Reserved |

# VI.     DEPOSITION DESIGNATIONS

Plaintiff offers the following portions of the deposition of Mary Gordon, dated May 10, 2019, at trial:

7091053.1

| | | | |
|---|---|---|---|
| 1. | Page 6, lines 15-16 | 12. | Page 34, line 18 to page 41, line 23 |
| 2. | Page 6, line 22 to page 7, line 15 | 13. | Page 42, lines 7-22 |
| 3. | Page 7, line 23 to page 8, line 5 | 14. | Page 42, line 24 to page 43, line 2 |
| 4. | Page 11, line 11 to page 13, line 3 | 15. | Page 43, line 13 to page 44, line 8 |
| 5. | Page 13, line 22 to page 16, line 17 | 16. | Page 44, line 10 to page 45, line 2 |
| 6. | Page 17, line 24 to page 18, line 13 | 17. | Page 45, line 24 to page 46, line 22 |
| 7. | Page 19, line 21 to page 21, line 20 | 18. | Page 47, lines 14-16 |
| 8. | Page 21, line 25 to page 22, line 19 | 19. | Page 48, line 1 to page 52, line 17 |
| 9. | Page 24, lines 9-15 | 20. | Page 54, line 15 to page 55, line 24 |
| 10. | Page 24, line 21 to page 25, line 1 | 21. | Page 57, line 18 to page 65, line 1 |
| 11. | Page 33, line 23 to page 34, line 10 | 22. | Page 69, line 3 to page 70, line 1 |

**Plaintiff offers the following counter-designations of the deposition of Mary Gordon, dated May 10, 2019, at trial:**

A. Page 24, lines 3-8

B. Page 24, lines 16-20

C. Page 57, lines 13-17[9]

A highlighted copy of the deposition transcript accompanies this statement.

**Defendant offers the following portions of the deposition of Mary Gordon dated May 10, 2019, at trial:**

1. Page 10, line 2 to page 11, line 10

2. Page 13 lines 4-21

3. Page 16, line 18 to page 17, line 22

4. Page 18, lines 14-23

5. Page 22, line 20 to page 24, line 2

---

[9] This designation is conditional upon the Court's ruling on Plaintiff's objections to certain testimony designated by Defendant.

7091053.1

6.      Page 41, line 24 to page 42, line 6

7.      Page 43, lines 3-12

8.      Page 45, line 3-15 (waive objection)

9.      Page 46, line 23 to page 47, line 7

10.     Page 52, line 18 to page 54, line 4

11.     Page 55, line 25 to page 57, line 12[10]

12.     Page 65, line 6-20

13.     Page 66, line 15 to page 67, line 10

A highlighted copy of the deposition transcript accompanies this statement.

## VII.    RESERVATION OF RIGHTS

Defendant reserves all objections as noted during Ms. Gordon's deposition. Defendant also reserves the right to call at trial any witnesses identified by Plaintiff and/or witnesses who have been disclosed during deposition or discovery. Defendant reserves the right to amend this statement at any time up to and including the time of trial. Defendant reserves the right to use photos, anatomic diagrams, maps, models, timelines, summary charts, demonstrative exhibits, and other documents at trial. Defendant reserves the right to use as exhibits any of the exhibits identified in Plaintiff's exhibit lists. Defendant reserve the right to use any deposition transcripts disclosed by Plaintiff. Defendant reserves the right to offer any exhibit or document necessary to present its case at trial

## ACTION BY THE COURT

(a) This case is scheduled for trial before a jury on October 5, 2020 at 9:00 am.

(b) Trial briefs shall be submitted to the Court on or before April 28, 2020.

(c) Jury instructions requested by either party shall be submitted to the Court on or before April 28, 2020.

---

[10] Plaintiff's object to this testimony under FRE 402 and 403 and Plaintiff's Motion in Limine No. 13.

(d) Suggested questions of either party to be asked of the jury by the Court on voir dire shall be submitted to the Court on or before April 28, 2020.

This order has been approved by the parties as evidenced by the signatures of their counsel.  This order shall control the subsequent course of the action unless modified by a subsequent order.  This order shall not be amended except by order of the court pursuant to agreement of the parties or to prevent manifest injustice.

DATED this 2nd day of October, 2020.

Honorable Marsha Pechman
United States District Judge

| **PETERSON \| WAMPOLD ROSATO \| FELDMAN \| LUNA** | **WILLIAMS, KASTNER & GIBBS** |
|---|---|
| */s/Michael S. Wampold*<br>Michael S. Wampold, WSBA No. 26053<br>Tomás A. Gahan, WSBA No. 32779<br>Attorneys for Plaintiff<br>1501 4th Avenue, Suite 2800<br>Seattle, WA  98101<br>Ph. (206) 624-6800<br>wampold@pwrfl-law.com<br>gahan@pwrfl-law.com | */s/Eliot M. Harris*<br>Eliot M. Harris, WSBA No. 36590<br>Christine J. Lee, WSBA No. 43231<br>Two Union Square<br>601 Union Street, Suite 4100<br>Seattle, WA 98101-2380<br><br>Email: eharris@williamskastner.com<br>         clee@williamskastner.com<br>Attorneys for Defendant Integon General<br>Insurance Corporation |

7091053.1

# *Gordon, Mary M.*

### *5/10/2019*

**Condensed Transcript**

Plaintiff's Designations

Defendant's Designations

Plaintiff's Counter-Designations

Page 5

1          IT IS HEREBY STIPULATED AND
2  AGREED by and between counsel for the Plaintiff and
3  counsel for the Defendant that this deposition may
4  be taken by Susan J. Pybas, CCR, No. 1446(T), a
5  Certified Court Reporter, thereafter transcribed
6  into typewriting, with the signature of the witness
7  being expressly reserved.
8          VIDEOGRAPHER:  We're on the record.
9  Today's date is May 10th, 2019, and the time is
10  approximately 12:04 p.m.
11          This is the videorecorded deposition
12  of Mary Gordon in the matter of Daniel Hopkins vs.
13  Integon General Insurance Corporation, Case No. 218
14  CV 01723 in the United States District Court,
15  Western District of Washington and Seattle.  This
16  deposition is being held at Alaris Litigation
17  Services in St. Louis, Missouri.
18          The reporter's name is Sue Pybas.  My
19  name is John Niehaus.  I'm a legal videographer.  We
20  are here on behalf of Seattle Deposition Reporters.
21          Will Counsel please introduce
22  yourself for the record.
23          MR. HARRIS:  Eliot Harris --
24          MS. ROSATO:  Ann Rosato.
25          Oh, go ahead, Eliot.

Page 6

1          MR. HARRIS:  Sorry.  Go ahead, Ann.
2          MS. ROSATO:  Ann Rosato for the
3  plaintiff.
4          MR. HARRIS:  Eliot Harris for the
5  defendant.
6          VIDEOGRAPHER:  Will you please swear
7  in the witness?
8              MARY GORDON,
9  of lawful age, having been produced, sworn, and
10  examined on the part of the Plaintiffs,
11  testified as follows:
12      (Start time of deposition: 12:04 p.m.)
13              EXAMINATION
14  BY MS. ROSATO:
15      Q.  Good afternoon, Ms. Gordon.
16      A.  Good afternoon.
17      Q.  Can you hear me okay?  I know we're remote
18  so it can be a little difficult.
19      A.  Yes, I can hear you fine.  Can you hear me
20  all right?
21      Q.  I can.  You're very clear.  Thank you.
22          Could you please state and spell your last
23  name for the record?
24      A.  Mary Gordon, G-o-r-d-o-n.
25      Q.  And, Ms. Gordon, you right now are located

Page 7

1  in St. Louis, Missouri; is that correct?
2      A.  That's correct.
3      Q.  Is that where you live?
4      A.  Yes.
5      Q.  And also where you work from?
6      A.  Yes.
7      Q.  Okay.  Have you been deposed before?
8      A.  Yes.
9      Q.  How many times?
10      A.  I don't know exactly.  At least four or
11  five.
12      Q.  Can you just generally tell me sort of the
13  circumstances under which you have been deposed
14  before?
15      A.  Other claims.
16      Q.  Okay.  Has it all -- have all the
17  depositions been during your employment with the
18  company you currently work for?
19      A.  No.  I've had --
20      Q.  Okay.
21      A.  -- depositions for my former employer as
22  well.
23      Q.  Okay.  And we'll get to your employment
24  background in just a moment, but let me ask you
25  this:

Page 8

1          Have any of those four or five depositions
2  that you've given in the past been related to claims
3  when there's an allegation by the insurance company
4  of failure to act in good faith?
5      A.  Yes.
6      Q.  Okay.  How many of those four or five have
7  had those claims alleged?
8      A.  Just one that I can remember.
9      Q.  Do you remember how long ago you gave that
10  particular deposition?
11      A.  That one was within the past year.
12      Q.  Okay.  The deposition was?
13      A.  Yes.
14      Q.  Did you work for Integon at the time of
15  that deposition?
16      A.  I worked for National General.  I'm not
17  sure which underwriting company it was.
18      Q.  All right.  And you said that that
19  particular deposition involved allegations of bad
20  faith.  Was your claims adjusting at issue in that
21  case?
22      A.  No.
23      Q.  Is -- tell me the role you played in that
24  case; why you were deposed.
25      A.  I was the adjuster who took over handling

Page 9

1 of the claim after a demand was already made.
2      Q.  Do you know the name of the claimant in
3 that case?
4      A.  It was -- the last name was Wunderlich.
5      Q.  Wunderlich?
6      A.  I don't -- I think -- I'm not sure about
7 the first name.  Jeffrey, maybe.
8      Q.  Do you know where that case was filed?
9      A.  Jackson County.
10      Q.  What state?
11      A.  Missouri.  Sorry.
12      Q.  That's okay.
13          Is that case still ongoing, or has it been
14 resolved, if you know?
15      A.  It's been resolved.
16      Q.  Great.  So I'm going to assume, since
17 you've been deposed four or five times, that you
18 know the way this process works and that I don't
19 need to go over that with you.
20          If you need a break at any time, feel free
21 to take one.  Just let me know when you're ready to
22 do that.  I do not take lengthy depositions so
23 you're not going to be there for several hours.  I
24 would expect an hour and a half to two at the most.
25      A.  Okay.  Thank you.

Page 10

1      Q.  You're welcome.
2          Give me, if you would, beginning just with
3 your education, a brief sort of sketch of your
4 educational background beginning with high school
5 and where you graduated from.
6      A.  I graduated from Mary Institute.  It is a
7 school in St. Louis.  I went to Mizzou, which is
8 University of Missouri in Columbia, for one year,
9 and then I transferred to the University of Missouri
10 in St. Louis.  Graduated from there with a
11 bachelor's degree in business administration.
12          Then I -- after I started working in
13 claims, I received an associate in claims and then I
14 started work on a master's and earned my MBA from
15 Webster University here in St. Louis.
16      Q.  And what university did you say?
17      A.  Webster.
18      Q.  The MBA?
19      A.  The MBA, Webster.
20      Q.  Webster.
21          And I'm just going to back up.  What year
22 did you graduate from high school?
23      A.  1979.
24      Q.  And then what year did you get your
25 bachelor's degree in business administration?

Page 11

1      A.  1983.
2      Q.  And what year did you get your MBA?
3      A.  '92.
4      Q.  Okay.  So then you mentioned, after
5 getting your bachelor's degree in business
6 administration, that you started -- did you say
7 working in claims?
8      A.  I did.  I -- I started working in claims.
9 After I started working in claims is when I earned
10 my associate's in claims.
11      Q.  Okay.  Tell me first what was the first
12 company you worked for?
13      A.  I first worked for CF Knight Drug Company
14 after I graduated from college, and then I started
15 working for Crum & Forster personal insurance.
16      Q.  Okay.
17      A.  And then went to Progressive Insurance and
18 then National General.
19      Q.  What year did you get your associate in
20 claims?
21      A.  I'm not really sure.  It was in the late
22 '80s or maybe '90.
23      Q.  When you started working at -- I think you
24 said Crum & Forster?  Do I have that right?
25      A.  Yes.

Page 12

1      Q.  Tell me what you were doing there.
2      A.  I was handling claims there as well.
3      Q.  What kind of claims?
4      A.  Homeowner and auto claims.
5      Q.  And generally give me the basic years that
6 you worked at Crum & Forster.
7      A.  That was from 1985 to 1990.
8      Q.  Did you ever handle any claims in
9 Washington when you located -- or when you worked at
10 Crum & Forster?
11      A.  I don't remember.  I know I handled
12 multiple states, but I don't believe Washington.  I
13 don't think there were any coastal states, or at
14 least not West Coast states.  It's a long time ago,
15 so I don't remember.
16      Q.  Did -- sure.  I understand.
17          When did you start working at Progressive?
18      A.  In 1990.
19      Q.  How long did you work there?
20      A.  Almost 25 years.
21      Q.  And where were you located when you worked
22 at Progressive?
23      A.  Here in St. Louis.
24      Q.  What kind of claims did you work on?
25      A.  I had mobile home claims and auto claims

Page 13

1 and commercial auto claims.
2     Q.   Why did you leave Progressive?
3     A.   I was solicited by National General.
4     Q.   Okay.  What was your job title at
5 Progressive when you left?
6     A.   I was a claims specialist lead.
7     Q.   As a claims specialist lead, were you
8 still day-to-day adjusting your own claims, or were
9 you supervising other adjusters?
10     A.   Yeah, I was strictly handling claims.  I
11 did not have any supervisory capacity.  It was just
12 a job title.
13     Q.   Okay.  And did you have an authority level
14 at Progressive as a claims specialist lead?
15     A.   I did.  I don't recall what that was.
16     Q.   Do you know if it was over $100,000?
17     A.   It was not.
18     Q.   Okay.  So your authority level at
19 Progressive, even after 25 years, was still $100,000
20 or under?
21     A.   Yes.
22     Q.   Okay.  When you were at Progressive for
23 those 25 years -- so until about 2015; is that
24 right?
25     A.   Yes.

Page 14

1     Q.   Okay.  Did you handle Washington claims?
2     A.   No, strictly Missouri claims.
3     Q.   Okay.  Is it fair to say that by 2015,
4 when you left Progressive and went to National
5 General, you had handled very few and maybe no
6 Washington State claims at that point in time?
7         MR. HARRIS:  Object to the form.
8         You can answer.
9     A.   Yes.
10 BY MS. ROSATO:
11     Q.   And then do you -- do you remember
12 generally when you started at National General, like
13 the month?
14     A.   April.
15     Q.   2015?
16     A.   Yes.
17     Q.   Could you explain to me because I don't
18 understand it the -- I've seen paperwork for this
19 claim that says Metromile, National General, and
20 Integon.
21         Can you explain to me the relationship
22 between those three companies?
23     A.   National General purchased other
24 companies.  Metromile was one of them, and they
25 converted those to National General underwriting

Page 15

1 companies.  So Integon is one of the National
2 General underwriting companies.
3         Does that help?
4     Q.   Yes.
5         When did National General purchase
6 Metromile, if you know?
7     A.   I don't know.
8     Q.   Does the name Metromile, does that company
9 still exist and do business?
10     A.   As far as I know, National General
11 purchased it.  That all happened before I started
12 working there, so I really don't know --
13     Q.   Okay.
14     A.   -- how that all transpired.  I think that
15 they -- they no longer exist, except for with
16 National General, but I can't say for sure.
17     Q.   Okay.  Your employer, is that National
18 General?
19     A.   Yes.
20     Q.   That's who writes your paychecks?
21     A.   Yes.
22     Q.   Okay.  When you were hired at National
23 General in April of 2015, what was your job title?
24     A.   Large loss adjuster.
25     Q.   And describe for me generally -- well, let

Page 16

1 me ask you this first.  Is that still your job title
2 today?
3     A.   Yes.
4     Q.   Has there been any change?  Have you --
5 have you had different jobs since you've been at
6 National General?  Has that been the consistent job
7 the whole time you've been there?
8     A.   That's been the job since I've been there.
9     Q.   Okay.  Tell me just generally, as a large
10 loss adjuster, what your job duties are.
11     A.   I handle and pay claims.
12     Q.   Okay.  What types of claims?
13     A.   Casualty claims for personal and
14 commercial auto.  I think I've had one liability
15 claim for homeowners.
16     Q.   So the vast majority of your work, it
17 sounds like, is in auto collision claims?
18     A.   Yes.
19     Q.   Okay.  Do you have an authority level at
20 National General?
21     A.   Yes.
22     Q.   What is that?
23     A.   75,000.
24     Q.   Has that changed since you've been there,
25 or has that been the same authority level the whole

Page 17

```
 1  time you've been there?
 2      A.   Same authority level.  It's tied to the
 3  title to the job.
 4      Q.   Okay.  Tell me -- well, let me ask you
 5  this:  Before the Hopkins claim, while working at
 6  National General, had you ever handled another claim
 7  in Washington?
 8      A.   Yes.
 9      Q.   How many do you think you handled in there
10  -- how long have you been there now, almost -- is it
11  five years?  Is that --
12      A.   Four, four years.
13      Q.   Four years.
14           How many Washington claims do you think
15  you handled in those four years?
16      A.   I really don't know.  Not many.  Maybe a
17  handful.
18      Q.   Less than ten?
19      A.   Probably.
20      Q.   And Mr. Hopkins' claim would be one of
21  those ten?
22      A.   Yes.
23      Q.   Or less?  Okay.
24           Tell me what the large loss unit at
25  National General is.
```

Page 18

```
 1      A.   I'm not sure what you're looking for.
 2  It's a group of adjusters that handle casualty
 3  claims.
 4      Q.   Okay.  By titling it the "large loss
 5  unit," what types of claims go to those adjusters?
 6      A.   They're the ones that are more significant
 7  or -- there's a criteria for claims that come over.
 8  There's a triage criteria that I -- I can't remember
 9  all of the criteria.
10           Our managers will talk to the other
11  managers and -- and accept claims in on transfer or,
12  you know, serious claims will get first notice of
13  loss, like fatalities, things like that.
14      Q.   Who is your manager?
15      A.   My manager right now is Jennifer Currie.
16      Q.   Do you know how to spell the last name?
17      A.   I do.  C-u-r-r-i-e.
18      Q.   Okay.  Has Jennifer been your manager all
19  four years, or have you had other managers?
20      A.   I've had other managers.
21      Q.   Do you remember who your manager was when
22  this claim was assigned to you?
23      A.   It was Richard Chodaki.
24      Q.   Okay.  Where has -- is he still at
25  National General?
```

Page 19

```
 1      A.   No, he is not.
 2      Q.   Do you know where he is now?
 3      A.   I know he's living in Michigan, but other
 4  than that, I don't know.
 5      Q.   Do you know why he left National General?
 6      A.   I believe it wasn't a good fit for him.
 7      Q.   Do you know if he's still working, or did
 8  he retire?
 9      A.   I believe he's -- he's still working or
10  intends to still work if he's not.
11      Q.   Okay.  You said that there is a criteria
12  for claims that go to the large loss unit, and I
13  think you said you don't know exactly what those
14  are.
15           Do you know generally what some of the
16  criteria are?
17      A.   Some of them if they -- they're based on
18  the description of the injury.  They are based on
19  what the reserve might be, complex -- complex
20  liability coverage, things like that.
21      Q.   How many adjusters are in the large loss
22  unit at National General?
23      A.   There are nine or ten.
24      Q.   Who is Christina May?
25      A.   She's another employee at National
```

Page 20

```
 1  General.  I don't know what she does.
 2      Q.   Do -- do you know her title?
 3      A.   No.  I'm a remote employee, so I really
 4  don't know, you know, the other adjusters who work
 5  at National General.
 6      Q.   Okay.  I mean do you know anything about
 7  her, like, what her authority level is, if she's
 8  above you, below you?
 9      A.   I -- I really don't know.  I believe she's
10  another adjuster.  That's all I -- I know.  She
11  might be in the -- injury handler.  I'm not sure.
12      Q.   Okay.  So when you took over the Hopkins
13  claim, did you see any of the claim diary entries
14  that Christina May had made before you took over?
15      A.   I don't typically look at the diaries that
16  other people set when I look at a claim, so probably
17  not.
18      Q.   Why don't you typically do that?
19      A.   It's not something that I typically use in
20  my investigation of a claim.
21      Q.   Okay.
22      A.   I'll look at the claim notes and things
23  like that, but the diaries really don't necessarily
24  mean anything.
25      Q.   Okay.  Did you look at any of Christina
```

Page 21

1  May's claim notes when you took over Mr. Hopkins'
2  claim?
3      A.  I read all the claim notes when I took
4  over handling, so I'm sure I did.  If she -- if she
5  had a note in there, I would have read it.
6      Q.  Okay.  Tell me how you're distinguishing
7  claim notes versus diary notes, because it seems
8  that you made a distinction there.
9      A.  I think that the way the notes come to
10 you, everything is printed out.  There is a -- I
11 think a note in there that says, you know,
12 "Christina May changed the diary" or something like
13 that.  I don't necessarily -- I don't read those
14 because they really have no meaning as far as the
15 investigation of the claim goes.
16      Does that make sense?  Is that what you --
17      Q.  Well, any substantive notes that Christina
18 May would have made about the claim, would you have
19 reviewed those notes?
20      A.  Yes.
21      Q.  Okay.  And for you, they don't appear
22 printed.
23      Do they appear just on a computer screen?
24      A.  Yes.
25      Q.  Okay.  Did you get any training at

Page 22

1  National General regarding Washington State law,
2  statutory law or administrative code about handling
3  claims in the state of Washington?
4      A.  I did not receive any formal training in
5  Washington.
6      Q.  Did -- did National General -- you said
7  you didn't get any formal training in Washington.  I
8  want to make sure you understand my question.
9      Did National General provide to you any
10 training about handling claims in Washington State
11 and complying with Washington law?
12      A.  No.
13      Q.  Have you had any training in your career
14 as an insurance adjuster regarding handling claims
15 in Washington and Washington statutes and
16 administrative code regulations that apply to
17 insurance claims?
18      A.  I haven't received any formal training in
19 those areas, no.
20      Q.  Okay.  So you say "no formal training,"
21 which leads me to think you had some type of
22 training.
23      So describe for me what kind of training,
24 formal or otherwise, that you've had for adjusting
25 claims in Washington.

Page 23

1      A.  In handling of the claims and working with
2  defense counsel, we also have a toolkit tool that
3  will allow us to look at different, you know,
4  factors in Washington like the -- the negligence
5  laws and things like that.  So it's more of a
6  self-study and on-the-job working with -- with
7  others to understand the workings of the law and --
8  and requirements in Washington.
9      Q.  What's the toolkit you're talking about?
10      A.  It's -- it just compiles information of,
11 like I said, about, you know, comparative fault and
12 things like that.
13      Q.  What do you -- what's compiling?  You said
14 "it compiles."  Are we talking about a computer
15 program or --
16      A.  Yes, it's a -- it's a computer site that
17 has information on state information.
18      Q.  And is that something you can access from
19 your computer at National General?
20      A.  Yes.
21      Q.  Okay.  You said it compiles Washington
22 law, and you gave examples of comparative negligence
23 and negligence.
24      Does it also have Washington law for you
25 on fair claims handling practices in the state of

Page 24

1  Washington?
2      A.  Yes.
3      Q.  Have you ever reviewed, in the toolkit
4  you're describing that you can access at National
5  General on your computer, Washington laws regarding
6  fair claims handling?
7      A.  I don't know if I accessed it from toolkit
8  or not, so I can't say.
9      Q.  Do you know if you've ever accessed
10 Washington fair claims handling statutes and
11 administrative code regulations at all?
12      A.  On the computer, I'm not sure if I have.
13 I don't recall.  I know I've seen it in writing
14 before.  I don't recall if I have researched that on
15 the computer or not.
16      Q.  Okay.  Where have you seen it in writing?
17      A.  I had it -- you know, I don't -- I'm not
18 -- I can't really even remember.  I think I may have
19 reviewed it in -- I'm not sure.  I'm sorry.  I don't
20 remember.
21      Q.  Do you know if before you were assigned
22 Mr. Hopkins' claim, you had ever reviewed either on
23 paper, on a computer, Washington law regarding fair
24 claims handling practices in the state of
25 Washington?

Page 25

1    A.   I don't remember if I have or not.
2    Q.   Okay.  Do you feel like, sitting here
3  today, you're familiar with Washington regulations
4  regarding fair claims handling practices in the
5  state of Washington?
6         MR. HARRIS:  Object to the form.
7         You can answer.
8    A.   Okay.  I'm -- I'm familiar with them
9  generally.  I could not cite them or tell you any
10  specifics.
11  BY MS. ROSATO:
12    Q.   If I went over some of those regulations
13  with you, could you tell me, yes, that is a
14  Washington regulation or not?
15    A.   Maybe.
16    Q.   Okay.  Tell me how you are compensated by
17  National General.
18    A.   I get a paycheck.  I'm not sure what
19  you're looking for.
20    Q.   Oh.  Are you a salaried employee?
21    A.   Yes.
22    Q.   Okay.  And you get a paycheck every two
23  weeks or 15 days; is that right?
24    A.   Every two weeks.
25    Q.   Okay.  In addition to your salary, does

Page 26

1  National General provide any additional compensation
2  in the form or bonuses, anything like that?
3    A.   There is a bonus at the end of the year,
4  yes.
5    Q.   Okay.  How is the bonus -- what are the
6  factors that are taken into consideration for that
7  bonus?
8    A.   I really don't know.  The only thing I
9  know about that is there was one year there was a
10  reserving issue where we had to post a lot of
11  reserves, and that reduced the amount of the bonus.
12  Other than that, I think it's discretionary on our
13  managers.  I really don't know.
14    Q.   Okay.  Have you ever -- have you ever seen
15  a list of criteria that National General uses to
16  determine how bonuses are calculated?
17    A.   No.  I don't even know if one exists.
18    Q.   Okay.  Do you know or has anyone at
19  National General ever told you that there's any
20  financial incentive based on how claims are resolved
21  for you personally?
22    A.   No.
23    Q.   You don't know, or you've just never been
24  told?
25    A.   I've never been told that my -- anything

Page 27

1  of that nature affects my bonus at all.
2    Q.   Okay.  Thanks.
3         I'm going to ask you -- I'm going to
4  follow up on the topic I just ended with, and I'm
5  going to ask you about a few Washington regulations,
6  and let me know -- I'll ask you questions as I go.
7         Do you understand that in Washington,
8  there is a statute that requires an insurance
9  adjuster to acknowledge and act reasonably promptly
10  upon claim communications?
11    A.   Yes.
12    Q.   Okay.  Did -- do you know that in
13  Washington you have to respond to claim
14  communications within ten days?
15         MR. HARRIS:  Object to the form.
16    A.   Would you repeat that, please?
17  BY MS. ROSATO:
18    Q.   Sure.  Do you know whether there's a
19  regulation in Washington that requires you to
20  acknowledge and respond to claim communications
21  within ten days?
22         MR. HARRIS:  Object to the form.
23    A.   I do -- I do know you need to respond if
24  the communication requires a response, but I didn't
25  know there was a ten-day requirement.

Page 28

1  BY MS. ROSATO:
2    Q.   Okay.  Do you know if there's a regulation
3  in Washington that requires an insurance adjuster to
4  attempt in good faith to make prompt, fair, and
5  equitable settlements when liability is reasonably
6  clear?
7         MR. HARRIS:  Object to the form.
8    A.   Yes.
9  BY MS. ROSATO:
10    Q.   You do that?
11    A.   I believe so, yes.
12    Q.   Okay.
13    A.   You know, I -- it is a reasonable
14  requirement.  Whether I have read that before or
15  know it's specific to Washington, I guess I do not
16  know that.
17    Q.   Okay.  Fair enough.  Thank you.
18         Do you know whether there's a regulation
19  in Washington that requires an insurance adjuster to
20  communicate the results of an investigation timely?
21         MS. ROSATO:  Object to the form.
22    A.   I believe that makes sense, but I don't
23  know the specific --
24  BY MS. ROSATO:
25    Q.   Okay.  Do you know -- okay.  Do you know

Page 29

1 whether there's a -- a requirement in Washington for
2 an insurance company to treat its own policy
3 holders' interests with equal regard to the
4 insurance companies' interests?
5          MR. HARRIS:  Object to the form.
6     A.  I am not certain that is written, but
7 again, it makes sense that it would be.
8 BY MS. ROSATO:
9     Q.  Okay.  Okay.  Can you tell me -- other
10 than meeting with your attorney to prepare, tell me
11 everything that you did to prepare for today's
12 deposition.
13     A.  I -- I met with our attorney and we
14 reviewed notes, but that's the only thing I did.  I
15 didn't look at the claim independently.
16     Q.  Okay.  When you met with your attorney --
17 and I don't want to know anything you talked about
18 -- but when you met with -- and I assume you're
19 referring to Mr. Harris; is that right?
20     A.  Yes.
21     Q.  Okay.  When you met with Mr. Harris and
22 you reviewed notes, did you review the claim notes
23 that were essentially printed out?
24     A.  I reviewed a portion of them, but I didn't
25 review all of them.

Page 30

1     Q.  Okay.  Do you know what portion you
2 reviewed?
3     A.  I reviewed a portion of them that applied
4 to my handling.
5     Q.  Okay.  Do you know if when you reviewed
6 those claim notes pertaining to your handling that
7 you were looking at claim notes that had what I'll
8 call "redacted areas," so parts that were blacked
9 out?
10     A.  Yes.
11     Q.  Okay.  Were there any parts that you
12 looked at that were blacked out and you needed to be
13 able to be prepared for today to go look at the
14 non-blacked-out areas?
15          MR. HARRIS:  Object to the form.
16     A.  We did look a couple of those.  I don't
17 think we looked at all of them.
18 BY MS. ROSATO:
19     Q.  Okay.  And did -- did looking at those
20 help prepare you for today's deposition?
21     A.  Possibly.
22     Q.  Did it help refresh your recollection
23 about things that had happened earlier last year?
24     A.  Yes.  I don't know if those specific ones
25 did, but, yeah, looking at the claim notes refreshed

Page 31

1 my memory in -- in the areas of some of the
2 handling.
3     Q.  Okay.  But it sounds like at least in a
4 few instances, or maybe even only one, you did need
5 -- you noticed there was something blacked out and
6 you needed to go look at the non-blacked-out
7 material to help get prepared for today.
8          MR. HARRIS:  Object to the form.
9     A.  I looked at it.  I don't know whether it's
10 going to be helpful or not.
11          Does that make sense?  I mean, I don't
12 know what you're going to ask.  So I -- I did look
13 at it.
14 BY MS. ROSATO:
15     Q.  Okay.  Okay.  Fair enough.
16          Did you talk with anyone -- not including
17 Mr. Harris, did you talk with anyone at National
18 General to prepare for today?
19     A.  No.
20     Q.  Okay.  And it sounds like you didn't, on
21 your own without Mr. Harris present, review anything
22 in writing to prepare for today; is that right?
23     A.  That's right.
24     Q.  Okay.  Did you look at any National
25 General policies, procedures, anything like that to

Page 32

1 prepare for today?
2     A.  No.
3     Q.  Let me ask you this:  Does -- you've
4 mentioned toolkit.  Does National General have
5 written guidelines, policies, procedures for
6 adjusters like you to review that relate to
7 adjusting claims?
8     A.  Yes.
9     Q.  Okay.  Where are those maintained, if you
10 know?
11     A.  I know they are on our intranet, National
12 General intranet.  There's a claims procedure manual
13 there.
14     Q.  Okay.  Do you know if within that claims
15 procedure manual there are guidelines or policies or
16 procedures pertaining to adjustment of underinsured
17 motorist claims?
18     A.  There are claims handling guidelines, and
19 there would be, yes, guidelines for that.
20     Q.  Okay.  Is that something you were trained
21 on as part of your employment at National General,
22 just generally, those policies and procedures?
23     A.  Yes.
24     Q.  So I -- when you started at National
25 General, I assume -- you let me know if I'm wrong --

Page 33

1 that there's sort of like a general couple-day or
2 week training period where you sort of learn the
3 National General system; is that fair?
4      A.   I met with the manager who hired me for a
5 couple days, and I read the -- you know, the
6 handling guidelines as part of that.
7      Q.   Okay.  Got it.  One of the things I saw in
8 the claim file was something called a "claim
9 director score."  Are you familiar with that?
10      A.   No.
11      Q.   Do you know anything about what a claim
12 director score is?
13      A.   I have no idea.  I've never heard that.
14      Q.   Okay.  Did you notice in reviewing the
15 claim file here that there was a document entitled
16 "claim director score"?
17      A.   I did not see that, no, I --
18      Q.   Okay.  So if I -- if I were to tell you
19 that there was a document that said the Hopkins
20 claim got a score of 847, would that mean anything
21 to you?
22      A.   No.
23      Q.   Okay.  Okay.  I want you to walk me
24 through -- and I want to just first start with your
25 investigation.

Page 34

1           So my understanding is you were assigned
2 Mr. Hopkins' underinsured motorist claim in kind of
3 mid-to-late February of last year.  Does that sound
4 right?
5      A.   That sounds right.
6      Q.   Okay.  When you -- and the other thing I
7 noticed -- and let me know if -- if this is correct
8 or not -- is that the Hopkins claim was assigned to
9 you because you were in the large loss unit, right?
10      A.   Probably, yes.
11      Q.   Do you know what about the Hopkins claim
12 made it get assigned to the large loss unit?
13      A.   I don't remember what that was.  I didn't
14 review that note.
15      Q.   You don't remember?
16      A.   I didn't review that note.  So I really
17 don't remember why that was assigned to us.
18      Q.   Okay.  Sitting here today, can you tell me
19 why you think the Hopkins claim was assigned to the
20 large loss unit?
21      A.   Probably because we were told there was a
22 closed head injury or something like that.  That
23 would qualify as transfer so that's -- I'm assuming
24 that's probably what it was.
25      Q.   Okay.  So when you were assigned this

Page 35

1 claim back in February of 2018, I want you to walk
2 me through everything you did to investigate Mr.
3 Hopkins' underinsured motorist claim.
4           MR. HARRIS:  Object to the form.
5           Go ahead.
6      A.   I can try and do that.  I don't have any
7 notes in front of me, and I would need them really.
8 So I'll do the best I can.
9 BY MS. ROSATO:
10      Q.   Well, let me ask you this:  Do you have
11 the claim file there with you?
12      A.   I do not.
13      Q.   Okay.
14      A.   I didn't -- I didn't --
15           MS. ROSATO:  Eliot, do you have the
16 file for her?
17           MR. HARRIS:  No.
18 BY MS. ROSATO:
19      Q.   Okay.  But you reviewed it to prepare for
20 your deposition, correct?
21           MR. HARRIS:  Object to the form.
22           Go ahead.
23      A.   I reviewed a -- I didn't review all the
24 notes.  I reviewed a portion of them.  So I -- I can
25 lead you through it as best I can, based on my

Page 36

1 memory.
2 BY MS. ROSATO:
3      Q.   Okay.  Great.  Okay.  Go ahead.
4      A.   The claim would have come in.  I would
5 have read, you know, all the notes.
6           I know that we had -- I remember seeing an
7 email yesterday when I was reviewing the claim that
8 I responded, I think, to your demand.  I would have
9 read your information that you provided to us, and I
10 think I asked for some prior information, his prior
11 medical.
12           And then I know that we had some
13 discussions about what we felt the value of the
14 claim was, and that's when we had a -- a discussion
15 about, you know, what -- the causation of the
16 injury.  We involved a neurologist, got that report.
17 So those are the types of investigation
18 that we did.
19      Q.   Okay.  Let me -- let me ask you some more
20 specific questions.
21      A.   Sure.
22      Q.   So did your investigation essentially
23 begin once you received the demand?
24      A.   No.  I would have -- once I got the file
25 transferred to me, that's when I would have begun my

1 investigation.
2    Q.   All right.  So as part of your
3 investigation, did you go through and read the
4 claim -- the notes already in the claim file, like,
5 for example, Christina May's notes?
6    A.   Yes.
7    Q.   Okay.  Did you note that Christina May had
8 looked at the claim and she recommended that it be
9 reserved at $100,000?
10    A.   I don't recall.  I would have read that,
11 but I don't remember that as I sit here today, that
12 that was her recommendation.
13    Q.   Okay.  Do you remember that she had a note
14 in the claim file that said it was very possible
15 that Mr. Hopkins' claim could be worth the $250,000
16 policy limit?
17    A.   No, but that would explain why it came
18 over, if she had that -- that belief.
19    Q.   Okay.  Did you note that Christina May
20 also noted that it would be important to take into
21 account Mr. Hopkins' being an eggshell?
22       MS. ROSATO:  Object to the form.
23    A.   I would have seen that, but I don't recall
24 as I sit here today that she wrote that.
25 BY MS. ROSATO:

1    Q.   Okay.  Do -- do you dispute that she wrote
2 those three things I just went over in the claim
3 file?
4       MR. HARRIS:  Object to the form.
5    A.   No.
6       THE WITNESS:  Oh, sorry.
7    A.   No.
8 BY MS. ROSATO:
9    Q.   When you hear that another adjuster wrote
10 a claim note describing Mr. Hopkins as an
11 "eggshell," what does that mean to you?
12    A.   That means to me that he is more
13 susceptible to injury than perhaps somebody else.
14    Q.   Okay.  Did you have any reason to disagree
15 with that assessment by Christina May?
16    A.   Not just by reading her note.  I had no
17 reason to.
18    Q.   Well, after you got his demand and you
19 reviewed all of his medical records, at that point,
20 did you have any reason to disagree that she had
21 described Mr. Hopkins as an "eggshell"?
22    A.   I don't recall whether that was a specific
23 question that I answered about whether he was an
24 "eggshell."  I would have taken into consideration,
25 you know, his condition and the impact and the

1 treatment and what the record said about his injury
2 rather than labeling him as an "eggshell," if that
3 makes sense.
4    Q.   Okay.  When you got Mr. Hopkins' demand,
5 did you review all of the medical records that were
6 provided?
7    A.   Yes.
8    Q.   Did you review all the medical bills that
9 were provided?
10    A.   Yes.
11    Q.   Okay.  Did you do any of your own medical
12 research after reviewing those materials?
13    A.   I don't recall if I did in this case.  If
14 there's anything I don't understand, typically I
15 will.
16    Q.   Okay.  Do you have access to medical
17 research at National General?
18    A.   In term -- in what way are you . . .
19    Q.   Is -- does -- does National General
20 subscribe to anything, for example, UpToDate or, you
21 know, anything that allows you to -- to access
22 medical literature?
23    A.   We have access to the internet, and we do
24 have access to Mitchell Decision Point.
25    Q.   What's Mitchell Decision Point?

1    A.   It's an outside vendor.  They will do
2 billing review, and they have nurses available for
3 review.
4    Q.   Well, what do you mean when you say
5 "billing review"?
6    A.   They will review bills for reasonableness,
7 necessity.
8    Q.   And then what do the nurses do?
9    A.   We can request a nurse's review if we need
10 to, to review the entire demand.
11    Q.   And what would nurse's review be for
12 things beyond just reasonableness and necessity of
13 medical bills, for example, just generally the
14 injuries being alleged and does this make sense?
15    A.   Yes.
16    Q.   Okay.  Have you ever done that before --
17    A.   I think --
18    Q.   -- used the nurses?
19    A.   I've used it maybe two or three times
20 since I've been there.
21    Q.   And is it fair to say you did not do that
22 in Mr. Hopkins' case?
23    A.   That's fair to say.
24    Q.   Okay.  So do you know or do you remember
25 -- I'm not sure you answered this question -- if you

1 did any medical research in Mr. Hopkins' -- for Mr.
2 Hopkins' claim after looking at his medical records
3 and bills?
4     A.  I don't recall whether I needed to do that
5 or not.
6     Q.  If you did need to do that, would that be
7 noted somewhere in the claim file?
8     A.  Maybe.  Maybe not.
9     Q.  Would you do medical research and not note
10 that in the claim file?
11    A.  It's possible.  If I -- if it was a
12 definition of something that I didn't know what the
13 word was, I probably would not note that in the
14 claim file, that I looked it up on the internet.
15    Q.  Okay.  So you reviewed Mr. Hopkins'
16 medical records.  You reviewed his medical bills.
17 You don't know if you did any medical research.
18    Tell me anything else you did in your
19 investigation before you made the first offer to him
20 of $17,340.
21    A.  I'm not certain if there's anything else
22 that I did.  I would need to look at the notes to
23 refresh my memory on that.
24    Q.  And you just can't remember sitting here
25 right now?

1     A.  No.  I think that was almost a year ago,
2 so I don't -- you know, I handle a lot of claims so
3 I'm not sure which ones I do research on.  I know
4 that I reviewed what you sent in and we evaluated
5 it.  I -- I can't say as I'm sitting here today
6 whether I did any additional research.
7     Q.  Okay.  Before you made the offer of
8 $17,340, do you know if you talked to Mr. Hopkins?
9     A.  No.  He was represented, so I did not
10 speak with him.
11    Q.  Did you ever ask to speak with Mr.
12 Hopkins?
13    A.  I don't recall asking that.
14    Q.  Okay.  Why not?
15    A.  I don't -- I would have to look at the
16 notes.  I'm not sure whether I asked to speak with
17 him or not.
18    Q.  Okay.  Do you have any reason to disagree
19 with my statement that you never asked to speak with
20 Mr. Hopkins?
21        MR. HARRIS:  Object to the form.
22    A.  No.
23 BY MS. ROSATO:
24    Q.  Okay.  Do you have any reason to believe
25 you asked to speak with or get sworn testimony from

1 any of Mr. Hopkins' treating medical providers?
2     A.  No.
3     Q.  Why -- why didn't you ask to speak with,
4 interview, or get sworn testimony from any of Mr.
5 Hopkins' treating medical providers?
6     A.  Typically, when a -- an individual is
7 represented, I will go through his attorney.
8     And you provided information and -- and I
9 believe I asked you for some additional evaluation
10 to value his claim.  So I would have possibly asked
11 that later after receiving a full -- his full
12 information.
13    Q.  Okay.  Is -- isn't it true, Ms. Gordon,
14 that you did not ask to speak with any of Mr.
15 Hopkins' treating providers before you made an offer
16 of $17,340?
17    A.  Yes, that's true.
18    Q.  Okay.  Isn't it also true that you said in
19 making that offer that National General was not
20 considering any permanency of Mr. Hopkins' injuries?
21        MR. HARRIS:  Object to the form.
22    A.  I would need to look at my -- my notes to
23 see whether I had that.  I -- I can't -- I don't
24 disagree with you, but -- since you're looking at
25 the notes, but I -- I don't recall making that

1 determination.
2 BY MS. ROSATO:
3     Q.  You don't recall that you made that
4 determination?
5         MR. HARRIS:  Object to the form.
6 Asked and answered.
7         You can answer again.
8     A.  No.
9 BY MS. ROSATO:
10    Q.  Okay.  In making a determination that
11 National General was not considering any permanency
12 of Mr. Hopkins' injuries, what were you relying on
13 to make that determination?
14    A.  I remember looking over a note yesterday
15 where I believe he -- his records indicated his
16 headaches had resolved.  You know, I -- I'm sure I
17 based it -- if I said that statement, I based it on
18 whatever medical records that we had.
19    Q.  What weight did you give in making the
20 $17,000 to Mr. Hopkins' treating neurologist's
21 opinions?
22    A.  I wish I could tell you.  I don't have my
23 notes.  I'd need to look at my evaluation, and
24 that's not something that I looked at in depth
25 yesterday, or I'd have to look at his medical

Page 45

1  records.  So I'm -- I really don't know what weight
2  I gave to that.  It -- It's sure I considered it.
3      Q.   Okay.  If his treating neurologist had a
4  statement in her record that said that his balance
5  issues were permanent, okay, and if you had made the
6  statement that National General was not considering
7  any permanency when you made the $17,000 offer,
8  isn't it true that National General was giving no
9  weight to that treating neurologist's statement?
10         MR. HARRIS:  Object to the form.
11     A.   I don't believe we gave no weight to that
12 statement, but I believe at that point, we still had
13 questions of causation of whether his ongoing
14 balance issues were permanent as a result of this
15 accident.  So there were still causation issues.
16 BY MS. ROSATO:
17     Q.   Okay.  Sitting here today having reviewed
18 your claim file -- did you say yesterday that's when
19 you reviewed your claim file?
20     A.   I reviewed part of it, yes.  Not the
21 entire thing.
22     Q.   Okay.  And that was yesterday?
23     A.   Yes.
24     Q.   Okay.  So sitting here today, having re --
25 reviewed a part of the claim file yesterday, can you

Page 46

1  tell me the basis for offering Mr. Hopkins $17,340?
2      A.   I -- I know I reviewed all of his medical
3  records and I remember that he had a significant
4  prior injury.  And the offer that we made was based
5  on what we believe the -- the records that you
6  provided, what they showed as the appropriate value
7  for the claim based on the injuries from this
8  accident.
9      Q.   Okay.  And can you tell me what
10 consideration you gave to his treating neurologist's
11 opinions as set forth in her records?
12     A.   That was part of the entire picture.  I
13 looked at all the records and took those into
14 consideration with the rest of the materials.
15     I can't -- I don't have a percentage
16 weight.  I don't know what exactly it is you're
17 looking for in terms of how much weight I gave it.
18     Q.   Isn't it true that on the same day that
19 you made Mr. Hopkins the $17,000 offer you had
20 requested and received approval to have the claim
21 reserved at $84,000?
22     A.   Yes.
23     Q.   Okay.  Why didn't you offer Mr. Hopkins
24 $84,000?
25     A.   We feel the offer that was made was

Page 47

1  appropriate, and there is always a range of value.
2      Q.   Okay.  And so why didn't you offer the
3  $84,000 if you had reserved the claim at that
4  amount?
5      A.   Reserving a claim doesn't necessarily
6  reflect the settlement value of the claim.  It's a
7  reserve.
8      Q.   Okay.  I'm going to go through just a few
9  of the -- I want to go through a general timeline
10 with you, a few of the facts, and just make sure --
11 tell me if you agree that that's a fact in the case
12 or tell me if you disagree.  Okay?
13     A.   Okay.
14     Q.   That on April 23rd, 2016, Mr. Hopkins was
15 involved in a rear-end collision; is that correct?
16     A.   Yes, I believe.
17     Q.   And National General --
18     A.   I don't have the date.  I don't have the
19 date in front of me --
20     Q.   Okay.
21     A.   -- but I'm trusting that that's correct,
22 yes.
23     Q.   Okay.  You -- you don't dispute that,
24 right?
25     A.   Right.

Page 48

1      Q.   Okay.  And for this claim, do you agree
2  that the liability of the following driver was
3  clear?
4      A.   Yes.
5      Q.   Okay.  Mr. Hopkins hadn't done anything --
6  he was not at fault in any way causing that
7  collision, right?
8      A.   Not that I'm aware of.
9      Q.   Okay.  And he was injured in the
10 collision, correct?
11     A.   That's what he tells us.  I wasn't there,
12 so I don't know, but that's -- that's what we
13 understand.  That's what we're being told.
14     Q.   Okay.  Do you have some reason to believe
15 he was not injured in this collision?
16     A.   No.
17     Q.   Okay.  You agree that Mr. Hopkins saw a
18 doctor within a day and he reported balance issues
19 immediately to that first doctor?
20     A.   I will take your word for it.  I did not
21 review the records.
22     Q.   Okay.  Do you have any reason to disagree
23 with that?
24     A.   No.
25     Q.   Okay.  Do you have any reason to disagree

Page 49

1  with Mr. Hopkins' report that his symptoms started
2  the morning after the collision as soon as he woke
3  up?
4      A.  No.
5      Q.  Okay.  You agree, I assume, that he did
6  have a severe traumatic brain injury in 2011?
7      A.  That's what we're told, yes.
8      Q.  Okay.
9      A.  I don't have those records.  So I didn't
10  have the records so I don't know, but that's my
11  understanding.
12      Q.  Well, one of the records that you did have
13  was a record from four years after that collision
14  where he was seeing his doctor and the reports were
15  that he had recovered extremely well from that
16  traumatic -- traumatic brain injury, correct?
17      A.  Okay.  Yes, I'm sure if -- I -- like I
18  said, I do --
19      Q.  Do you remember that record?
20      A.  I don't have an independent recollection
21  of any of the records because I did not review them
22  before I came in here today.  So I will take your
23  word for it that that's -- that we have that because
24  you're the one that provided that to us, so I'm sure
25  we had it.

Page 50

1      Q.  Okay.  And you agree that this particular
2  claim, the at-fault driver paid the $25,000 policy
3  limits to Mr. Hopkins, correct?
4      A.  Correct.
5      Q.  And he concluded that settlement after
6  receiving permission from National General, right?
7      A.  Right.
8      Q.  Okay.  When you evaluated Mr. Hopkins'
9  claim, did you ever look up the Washington --
10  basically, the jury instruction for what his life
11  expectancy was at the time of the collision?
12      A.  I don't remember doing that.
13      Q.  Okay.  Well, why not?  I mean why didn't
14  you do that?
15      A.  I don't remember whether I did or didn't
16  do that.  I . . .
17      Q.  Okay.  If a claimant, a National General
18  insured, is making a claim with a report of a
19  permanent injury, is going to the relevant state and
20  looking up what the life expectancy of that person
21  is that something that's part of your normal
22  practice?
23      A.  Yes.
24      Q.  Okay.  In doing that, is -- when you do
25  that research, is that something that you would note

Page 51

1  in the claim file?
2      A.  Yes.
3      Q.  Okay.  Because you need to know when
4  you're considering a permanent injury what that
5  person's life expectancy is to try and figure out
6  the value of that permanent injury, correct?
7      A.  Correct.
8      Q.  Okay.  So if there are no notes in this
9  claim file about you doing any research about Mr.
10  Hopkins' life expectancy, it's because you were not
11  considering his -- any permanency of his injury,
12  correct?
13          MR. HARRIS:  Object to the form.
14      A.  Correct.  If we did not feel there was a
15  permanent injury, there would be no reason for us to
16  look up his life expectancy.
17  BY MS. ROSATO:
18      Q.  Okay.  At the time you made the $17,000
19  offer to Mr. Hopkins, what information did you have
20  in your investigation to support the notion that
21  this was not a permanent injury for Mr. Hopkins?
22      A.  I had the information that you provided to
23  us.
24      Q.  Okay.  At the moment you made the $17,000
25  offer that did not consider permanency, you had not

Page 52

1  yet had an independent doctor look at this claim,
2  correct?
3      A.  Correct.
4      Q.  Okay.  In evaluating his claim before you
5  made the $17,000 offer, did you have any issue with
6  the reasonableness and necessity of the medical
7  bills he submitted?
8      A.  I don't believe so.  I think that they
9  were paid by PIP.
10      Q.  Correct.  That's right.
11          So you weren't disputing the -- any of the
12  physical therapy, the balance therapy, the neurology
13  appointments, you weren't disputing that any of that
14  was related to the collision, correct?
15      A.  I -- I'm not sure whether I -- I don't
16  think so.  I think that we -- I included that.
17      Q.  Okay.
18      A.  But I'd need to look at my evaluation, and
19  I didn't review that in detail.
20      Q.  Okay.  Tell me why you decided to have a
21  records review done.
22      A.  When we evaluated the claim, I think you
23  and I had a discussion about a physical therapy note
24  where it reflected Mr. Hopkins said he had these
25  issues before the accident, the issues he was

Page 53

1  claiming were as a result of the accident.  We had a
2  disagreement about the value of the claim.  You felt
3  strongly that his condition was related to the
4  accident.
5         I'm not a doctor so I wanted to consult a
6  doctor.  We always, you know, want to make sure that
7  we're evaluating claims fairly so that's why we did
8  that.
9     Q.   Okay.  When Mr. Hopkins reported to you
10  that that one sentence in one physical therapy
11  record was an error, that he had not had balance
12  issues or gravitational vertigo before this
13  collision, what weight did you give to Mr. Hopkins'
14  response?
15     A.   I took it into consideration, but there
16  was pretty much detail in that note, more than just
17  a statement of this is pre-existing.  I think there
18  was more information about it, and because of the
19  dispute, we wanted to give him the benefit of the
20  doubt; and since he disputed it, that's why we went
21  ahead and had the records review.
22     Q.   Other than that one sentence in that
23  record, what other information do you think was in
24  that record or any other records to suggest that his
25  balance issues and gravitational vertigo preexisted

Page 54

1  this collision?
2     A.   I would need to look at the medical
3  records to see what they say.  I -- I'm not -- I
4  can't -- really can't answer that.
5     Q.   But it sounds like you do think that there
6  was something other than that one sentence that led
7  you to conclude this may be pre-existing?
8     A.   Possibly.
9     Q.   Okay.  Do you know one way or another?
10     A.   I don't know one way or another.  I know
11  that I -- that -- I do recall that physical therapy
12  note specifically, but the other records I would
13  have to review to see what else was in there and I
14  didn't do that before today.
15     Q.   Okay.  Tell me how you selected Dr. Kutsy.
16     A.   I contacted one of our panel defense
17  counsel and asked him for somebody to send the
18  records to.
19     Q.   Did you know Dr. Kutsy at all
20  before you selected him?
21     A.   No.  I relied on Defense.
22     Q.   You relied on a defense attorney, right?
23     A.   Correct.
24     Q.   And that was Mr. Wilson in Portland?
25     A.   Yes.

Page 55

1     Q.   Okay.  Is he panel counsel?  Is that how
2  you got ahold of him?
3     A.   Yes.
4     Q.   So other than just Mr. Wilson saying, "Try
5  Dr. Kutsy," there was no other reason that you
6  selected him?
7     A.   Right.  He gave me a few doctors, and I
8  reached out to a -- a few of them and he's the one
9  that was -- that responded and we were able to get
10  the information to more quickly.
11     Q.   Okay.  Did you have any information about
12  Dr. Kutsy's background or his prior forensic work
13  before you selected him to do the records review on
14  Mr. Hopkins' claim?
15     A.   I looked at his CV.  I did not have any
16  other experience with him.
17     Q.   Did you know at the time that you hired
18  him that over 95 percent of his forensic work is
19  done for insurance companies?
20     A.   No.
21     Q.   Did you know at the time you hired him
22  that he makes over $200,000 a year doing forensic
23  work for insurance companies?
24     A.   No.
25     Q.   Okay.  Why did you decide to hire Dr.

Page 56

1  Kutsy to do a records review rather than request to
2  talk to Dr. -- to Mr. Hopkins' treating neurologist,
3  Dr. Taylor?
4     A.   I believe we had Dr. Taylor's notes so we
5  would have had a record of his thoughts and exam.
6     Q.   Okay.  Any reason why you didn't ask to
7  talk with her to ask the same questions that you
8  asked of Dr. Kutsy?
9     A.   I believe the records were clear on what
10  the doctor's opinion was.
11     Q.   Do you remember what that opinion was?
12     A.   I would have to look at the record.
13     Q.   Okay.  Do you recall that Dr. Taylor's
14  conclusion is that Mr. Hopkins has gravitational
15  vertigo and balance issues related to the 2016
16  collision and that those are permanent conditions?
17     A.   I don't recall that that's what's in the
18  record, but I'll take your word for it because I'm
19  sure you do -
20     Q.   Okay.
21     A.   -- you know.
22     Q.   Okay.  Okay.  Did you have some reason to
23  believe when you hired Dr. Kutsy that Dr. Taylor had
24  that diagnosis and her opinions were wrong, that
25  there was something wrong with those opinions?

Handwritten margin notes: Obj. 402, 403. MIL #13 and 14. IC Objection. IF 57:1-3 is allowed

Page 57

1    A.   I must have believed that there was a
2  question about them.  Whether they were wrong or
3  not, I didn't know because I'm not a doctor.  So we
4  wanted to hire a doctor to help us understand that.
5    Q.   Okay.  National General paid Dr. Kutsy, it
6  looks like, $1,500 for his review; is that right?
7    A.   I don't remember, but that sounds right.
8    Q.   Okay.  Why did you send Dr. Kutsy property
9  damage estimate and property damage photos for his
10  review?
11    A.   So he would understand the nature of the
12  impact.
13    Q.   Okay.  Is that something, to your
14  knowledge, that a neurologist typically has when
15  they're evaluating causation of injuries for a
16  patient?
17    A.   I don't know.
18    Q.   Okay.  You agree Dr. Kutsy never saw or
19  met or examined Mr. Hopkins, right?
20    A.   Right.
21    Q.   Right.  He just looked at the records you
22  provided him, correct?
23    A.   Correct.
24    Q.   Okay.  And you got back a report from
25  Dr. Kutsy, right?

Page 58

1    A.   Yes.
2    Q.   And in that report, you agree with me that
3  Dr. Kutsy disagreed with every single one of
4  Mr. Hopkins' treating providers?
5         MR. HARRIS:  Object to the form.
6    A.   I would need to read his report, but I'll
7  take your word for it.
8  BY MS. ROSATO:
9    Q.   Okay.  Well, Dr. Kutsy, he disagreed with
10  Dr. Taylor, the neurologist, right?
11    A.   Okay.
12    Q.   Well, do you agree with that?
13    A.   I -- I would need to read his report.  I
14  didn't read that before I came, so I can't
15  specifically say what his response was to each of
16  the physicians.
17    Q.   Okay.  Do you recall what Dr. Kutsy's
18  opinions were after doing the records review?
19    A.   I believe Dr. Kutsy said that he did not
20  see any reason why he would have sustained a
21  concussion in this accident.
22         I believe he said a soft tissue injury was
23  reasonable, and I believe there was another
24  diagnosis of some type of vertigo and that he said a
25  treatment for three months would be appropriate.  So

Page 59

1    I believe he did give him, you know, some injury
2  from the accident.
3    Q.   Okay.  Do you have any understanding of
4  how often Dr. Kutsy renders the opinion that someone
5  involved in a collision should be better within
6  three months?
7    A.   No.  This is the only report I've ever
8  seen from Dr. Kutsy.
9    Q.   Okay.  And you -- you do have a memory, it
10  sounds like, that one of Dr. Kutsy's opinions was
11  that Mr. Hopkins did not sustain a concussion.
12    A.   Yes.
13    Q.   Okay.  Do you remember what Dr. Kutsy's
14  basis for that opinion was?
15    A.   I believe it was based on his complaints
16  following the accident that weren't consistent with
17  a concussion.
18    Q.   And do you recall that he -- he had
19  actually two primary reasons why he said Mr. Hopkins
20  didn't sustain a concussion?
21    A.   I remember that one.  I don't recall the
22  other one.
23    Q.   Okay.  Do you recall that the first one
24  was that Mr. Hopkins did not have loss of
25  consciousness?

Page 60

1    A.   I'll take your word for that.
2    Q.   Okay.  And do you recall that the second
3  opinion he gave was that basically there's no
4  evidence for the notion that someone that's had a
5  prior head injury is more prone to a concussion?
6    A.   I remember reading that, yes.
7    Q.   Okay.  When you read that no loss of
8  consciousness was evidence that Mr. Hopkins did not
9  sustain a concussion, did you go do any of your own
10  independent research to determine if that was a
11  medically sound opinion?
12    A.   I believe that there were other things he
13  mentioned like nausea or dis -- loss of
14  consciousness was not the only factor he looked at
15  when determining whether he had a concussion, I did
16  not do any of my own research.  You know, you hope
17  that the neurologist is, you know, qualified to make
18  that distinction, and any research I do online, I
19  can't imagine would dispute what he had to say.
20    Q.   How many head injury cases have you
21  adjusted over the years?
22    A.   I am not sure.  Several.
23    Q.   More than ten?
24    A.   Probably.
25    Q.   Do you think more than 100?

Page 61

1      A.   No.
2      Q.   Okay.  And you said you have access to the
3  internet there at National General?
4      A.   Yes.
5      Q.   Okay.  Have you ever -- ever, and with --
6  including with respect to Mr. Hopkins' claim, done
7  research to find out whether or not concussions are
8  usually associated with loss of consciousness?
9      A.   I don't know what you're asking.
10     Q.   Okay.  Well, I'm asking -- you got back a
11 report from Dr. Kutsy, who concluded, contrary to
12 all of Mr. Hopkins' treating providers, that
13 Mr. Hopkins did not suffer a concussion, right?
14     A.   Right.
15     Q.   Okay.  And the lead reason that Dr. Kutsy
16 gave for Mr. Hopkins not suffering a concussion was
17 that he did not lose consciousness.
18         That was the first reason he listed,
19 right?
20     A.   I would need to read what he said.  I
21 believe that was one in a list of factors that he
22 looked at.  It -- that was not a standalone.
23         Just because he didn't lose consciousness
24 doesn't mean he didn't sustain a concussion.  I
25 think there were other factors there.

Page 62

1      Q.   Right, and we just talked about that.
2  There were actually two main factors:
3          The first was that there was no loss of
4  consciousness, right, and the second was that just
5  because Mr. Hopkins had had a prior head injury,
6  that doesn't make him more prone to a later
7  concussion.  Those were his two primary reasons,
8  right?
9          MR. HARRIS:  Object to the form.
10     A.   If you could read to me that sentence
11 where he has the list of items, I would be able to
12 better answer that question.
13 BY MS. ROSATO:
14     Q.   Well, I don't have the sentence in front
15 of me.
16     A.   Okay.
17     Q.   Let me see.
18     A.   I do remember there was a list.  Loss of
19 consciousness was included in the list, so it was
20 not just that from what I remember.
21     Q.   So his conclusion is no concussion
22 was suffered, and his primary reasons are no loss of
23 consciousness and prior concussions don't make Mr.
24 Hopkins more prone.
25         And then he goes on to say, like you said,

Page 63

1  "the diagnosis is minor cervical strain and benign
2  vertigo.  Should have been better in three months."
3  Does that sound right?
4          MR. HARRIS:  Object to the form.
5      A.   Yes.
6  BY MS. ROSATO:
7      Q.   So what I am trying to understand
8  is when Dr. Kutsy gave you a report that disagreed
9  with all of Mr. Hopkins' treating providers and he
10 concluded that there was no concussion and the first
11 reason for that was no loss of consciousness, did
12 you, based on your training, experience, having
13 handled other head injury cases, look at that
14 statement and say, "I'm going to check the medical
15 literature to see if that makes sense"?
16         MR. HARRIS:  Object to the form.
17 That misstates the -- misstates Dr. Kutsy's report.
18     A.   I did not look at that because my
19 recollection is I took that as just one piece in a
20 string of reasons why he felt there was no
21 concussion.  I didn't believe that it was just
22 because there was no loss of consciousness.
23 BY MS. ROSATO:
24     Q.   Okay.  Ms. Gordon, are you aware that the
25 medical literature reports that in the vast majority

Page 64

1  of concussions, there is no loss of consciousness?
2      A.   I am not aware of that, but that is not
3  surprising to me.
4      Q.   Okay.  Did you do any of your own
5  independent research to check the soundness of Dr.
6  Kutsy's conclusion that a prior head injury does not
7  make him more prone to a concussion?
8      A.   No.
9      Q.   Okay.  Would it surprise you to know that
10 the medical literature, for example, the Center For
11 Disease Control website that has facts on brain
12 injury and concussion, is directly to the contrary
13 of that statement by Dr. Kutsy?
14         MR. HARRIS:  Object to the form.
15     A.   Would it --
16         MR. HARRIS:  You can answer if you
17 know.
18     A.   Would it surprise me?  I -- no.  I know
19 that there are a lot of differing reports with
20 injuries and different opinions.  So no, it wouldn't
21 surprise me.
22 BY MS. ROSATO:
23     Q.   Okay.  Would you have any reason to
24 disagree with the Center For Disease Control's facts
25 statement on brain injury and concussion?

Page 65

1    A.  I would not.  I'm not a doctor.
2    Q.  Okay.  Does it make common sense to you to
3  conclude that someone that has had a prior brain
4  injury is not more prone to concussion?
5    A.  Would you say that again, please?
6    Q.  Sure.  Does Dr. Kutsy's opinion that
7  because Mr. Hopkins suffered a prior traumatic brain
8  injury, he is not more prone to concussion, does
9  that opinion make common sense to you?
10    A.  Not necessarily.  I -- you know, I -- I
11  think it depends upon the individual and what kind
12  of injury they suffered.
13        So like I said, I'm not a doctor and I
14  don't know, you know, the different areas, you know,
15  where they would suffer an injury or, I don't know
16  -- didn't know the nature of his prior injury.  So I
17  really don't know.
18        So that -- that doesn't surprise me.  I
19  mean, it's not a surprising statement.  Does that
20  answer your question?
21    Q.  Sure.  Let me just ask you this:
22        When you got Dr. Kutsy's report and you
23  read his opinion that Mr. Hopkins should have been
24  better in three months and had a mild strain and
25  benign vertigo, did that seem reasonable to you?

Page 66

1    A.  It --
2        MR. HARRIS:  Object to the form.
3  Misstates the report.
4        Go ahead.
5    A.  It seemed reasonable that -- based upon
6  the whole picture, that that was a reasonable
7  conclusion.
8  BY MS. ROSATO:
9    Q.  Okay.  Did it seem reasonable to you for
10  Dr. Kutsy to conclude that any ongoing gravitational
11  vertigo or balance issues were because he lived on a
12  boat as opposed to this collision?
13    A.  It -- like I said, he -- I'm not a doctor.
14  He is.  It wasn't a surprising concept.
15    Q.  Okay.  After you received Dr. Kutsy's
16  report, did you increase the offer to Mr. Hopkins?
17    A.  Yes.
18    Q.  Okay.  What did you increase the offer to?
19    A.  To 40,000.
20    Q.  Why did you wait two months after getting
21  Dr. Kutsy's report to make that offer?
22    A.  I believe that I called you right away to
23  talk about it and had in my notes that I was going
24  to extend that offer, and then I don't believe we
25  spoke for that period of time.

Page 67

1    Q.  Okay.  Isn't it true that you only made
2  the $40,000 to Mr. Hopkins after he notified
3  National General that he was going to be making
4  claims for failure to act in good faith?
5    A.  I am not certain.  I believe that the --
6  we had reevaluated the case and were planning on
7  extending that offer before that happened.  I think
8  I left you a message and then didn't hear back from
9  you and I didn't follow up until after the suit was
10  filed.
11    Q.  Okay.  Here's something I need to try and
12  understand from you, and I apologize for the length
13  of this question.
14        When you made Mr. Hopkins the offer of
15  $17,000, at that point in time, you were accepting
16  that all of his medical treatment over an 18-month
17  or almost two-year period had been reasonable and
18  necessary, right?
19    A.  I would have to look at my evaluation, but
20  I'm assuming so.
21    Q.  Okay.  And you then got a report from
22  Dr. Kutsy where he said Mr. Hopkins should have been
23  better and stopped treating after three months,
24  right?
25    A.  Right.

Page 68

1    Q.  Correct?
2    A.  Correct.
3    Q.  Why, then, did you increase the offer to
4  $40,000 when Dr. Kutsy actually disagreed with your
5  PIP adjusters?
6    A.  That's a good question.  I believe -- I
7  would need to look at my evaluation, but perhaps I
8  did not consider maybe all of his physical therapy,
9  or maybe Dr. Kutsy's report made me believe that
10  there was a little more of an injury than what I had
11  considered in my evaluation.  I would need to look
12  at my evaluation and the records again to answer
13  those questions.
14    Q.  Okay.
15        MR. HARRIS:  Counsel, can we take a
16  break when you're ready?
17        MS. ROSATO:  Yeah.  I actually have,
18  like, two more questions --
19        MR. HARRIS:  Okay.
20        MS. ROSATO:  -- if you can believe
21  that.  You -- you can take a break, though, if you
22  want to.  That's completely your prerogative.  Just
23  let me know.
24        MR. HARRIS:  No.  If you have two
25  questions, let's just go ahead.

Page 69

1          MS. ROSATO:  Okay.
2 BY MS. ROSATO:
3     Q.   Ms. Gordon, I want you to assume that
4 Dr. Kutsy's report reached the same conclusions that
5 Mr. Hopkins' treating neurologist, Dr. Taylor, has
6 reached, okay?
7     A.   Okay.
8     Q.   That Mr. Hopkins suffered a concussion,
9 that he has gravitational vertigo and balance issues
10 related to the collision, and that those are -- he's
11 gotten better but he's not going to get all the way
12 better and those are permanent conditions for the
13 remaining 14 years of his life, okay?
14    A.   Okay.
15    Q.   Okay.  How would National General value
16 that claim?
17         MR. HARRIS:  Object to the form.
18    A.   I would probably consult with our defense
19 counsel to see what kind of value to place on that.
20 There are, I think, a lot of factors that would go
21 into that.
22         I would probably look at, you know, his
23 lifestyle and his -- the effect on him and, you
24 know, how he feels about that, how's he able to
25 cope.  So I think there's a lot that goes into that.

Page 70

1         So I really -- you know, I don't -- I
2 can't give you a dollar figure, but I would look at
3 those -- those items.
4     Q.   Okay.  And the fact of the matter is
5 that's not an evaluation you've done at this point
6 in time, is it?
7         MR. HARRIS:  Object to the form.
8         You can answer if you understand.
9         THE WITNESS:  Okay.  I think I
10 understand.
11    A.   Not yet.
12 BY MS. ROSATO:
13    Q.   Okay.
14         MS. ROSATO:  I don't have any other
15 questions.
16         Eliot, do you have any?
17         MR. HARRIS:  I do not at this time.
18         MS. ROSATO:  Okay.  Great.
19         VIDEOGRAPHER:  We're going off the
20 record.
21         MS. ROSATO:  Thank you for your time.
22         VIDEOGRAPHER:  We're going off the
23 record at approximately 1:17 p.m.
24         MS. ROSATO:  You're reserving
25 signatures?

Page 71

1         MR. HARRIS:  Yes, we are.
2         MS. ROSATO:  Okay.  Great.
3 Nice to meet you, Ms. Gordon.  I am
4 always fast.  I try to keep it as painless as
5 possible.
6         THE WITNESS:  Thank you.
7         COURT REPORTER:  And can I get your
8 order real quickly, ma'am?
9         MS. ROSATO:  Yes.  I would like an
10 e-transcript, and I'd also like the video, please.
11 MPEG1, and we will do the syncing.
12         VIDEOGRAPHER:  Okay.  Great.
13         MS. ROSATO:  Great.  Thank you.
14         COURT REPORTER:  How about you?  Sir,
15 how about you?
16         MR. HARRIS:  I will take the e-tran,
17 please.
18         VIDEOGRAPHER:  Do you need the video?
19         MR. HARRIS:  I'll let you know about
20 the video.
21         VIDEOGRAPHER:  Okay.
22         MR. HARRIS:  Probably not, but I'll
23 let you know.
24         (WHEREIN, the proceedings were concluded
25 in the matter at 1:17 p.m.)

Page 72

1         CERTIFICATE OF REPORTER
2
3         I, Susan J. Pybas, CCR, No.
4 1446(T) within the State of Missouri, do hereby
5 certify that the witness whose testimony appears in
6 the foregoing deposition was duly sworn by me; that
7 the testimony of said witness was taken by me to the
8 best of my ability and thereafter reduced to
9 typewriting under my direction; that I am neither
10 counsel for, related to, nor employed by any of the
11 parties to the action in which this deposition was
12 taken, and further, that I am not a relative or
13 employee of any attorney or counsel employed by the
14 parties thereto, nor financially or otherwise
15 interested in the outcome of the action.
16
17
18 _____
19 Susan J. Pybas, CCR
20
21
22
23
24
25