UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT SEATTLE

---

DANIEL HOPKINS,             )
                            ) CASE NO. C18-01723-MJP
          Plaintiff,   )
                            ) Seattle, Washington
v.                          )
                            ) October 14, 2020
                            ) 9:00 a.m.
                            )
INTEGON GENERAL INSURANCE   ) JURY TRIAL via ZOOM
CORPORATION,              )
                            ) Volume 7 of 7
          Defendant.   )
                            )

---

VERBATIM REPORT OF PROCEEDINGS
BEFORE THE HONORABLE MARSHA J. PECHMAN
UNITED STATES DISTRICT JUDGE

---

APPEARANCES:

  For the Plaintiff:     MICHAEL WAMPOLD
                       TOMAS A. GAHAN
                       Peterson Wampold Rosato Feldman Luna
                       1501 4th Avenue, Suite 2800
                       Seattle, WA 98101


  For the Defendant:     ELIOT M. HARRIS
                       CHRISTINE J. LEE
                       Williams Kastner & Gibbs PLLC
                       601 Union Street Suite 4100
                       Seattle, WA 98101


  Reported by:           NANCY L. BAUER, CCR, RPR
                       Federal Court Reporter
                       700 Stewart Street, Suite 17205
                       Seattle, WA 98101
                       nancy_bauer@wawd.uscourts.gov

INDEX

| | PAGE |
|---|---|
| INSTRUCTION EXCEPTIONS | 1029 |
| COURT'S INSTRUCTIONS | 1037 |
| PLAINTIFF'S CLOSING ARGUMENT | 1060 |
| DEFENDANT'S CLOSING ARGUMENT | 1106 |
| PLAINTIFF'S REBUTTAL ARGUMENT | 1153 |

1                          PROCEEDINGS

2      ─────────────────────────────────────────────────

3                  THE FOLLOWING PROCEEDINGS WERE HELD
                    OUTSIDE THE PRESENCE OF THE JURY:
4

5              THE COURT:  We have some things to do this morning.

6      First of all, Mr. Harris has plenty of time to deliver his

7      closing arguments.  You, Mr. Wampold, have 102 minutes left.

8      You asked for 105.  I am graciously offering you the three

9      minutes.  Don't ever say I didn't ever do anything for you.

10             MR. WAMPOLD:  Exactly.  I'll remember it forever.

11             THE COURT:  You should have received a copy of the

12     jury instructions that had some reworking done on them, and so I

13     hope you've all had an opportunity to go through those.

14         It would be my plan for you to take exceptions this

15     morning; put your arguments on the record.  If there is any

16     corrections that need to be done, Ms. Pernell is here.  After we

17     have our final set ready to go, we will be emailing them to our

18     jurors, and Mr. Cogswell will be taking the verdict form and

19     putting it into a fillable PDF so everyone can use it at the

20     time they go to deliberate.

21         So who is going to be taking exceptions for the plaintiffs?

22             MR. WAMPOLD:  I will, Your Honor.

23                      INSTRUCTION EXCEPTIONS

24             THE COURT:  Okay.  Mr. Wampold, first I'd like your

25     exceptions to what it is that I have given, and then exceptions

1    to what I have not given.

2         MR. WAMPOLD:  I'm not taking any exceptions to what

3    you have given.

4         THE COURT:  Then exceptions to what I have not given.

5         MR. WAMPOLD:  I'm going to take exception to not

6    having given our Instruction No. 8, which is based on the

7    *Morella* case, and it's the one that states that -- where an

8    insurer offers to pay a paltry amount not in line with the

9    losses, that -- that that is a denial of benefits, and we think

10   that should be given to create clarity about what happens in the

11   context of a low-ball offer.

12        Do you want me to go on to the next one?

13        THE COURT:  No.

14        I'll just, basically, say I understand your objection.  The

15   instruction offered is not a standard instruction that's taken

16   from case law, and you are certainly free to argue that

17   position, but I don't believe it's necessary to state that in

18   this case.

19        MR. WAMPOLD:  Okay.  Great.  Thank you, Your Honor.

20        And the only other exception, and this is, really, just for

21   our record, and that is excepting to the failure to give

22   Instruction No. 24, which would have instructed the jury on the

23   enhancement of damages.  And I know Your Honor has ruled that

24   that's for the court, but we're just preserving our record and

25   excepting to not having given that to the jury.

1         THE COURT:  All right.  And I take it that there are

2    no exceptions to the verdict form as well.

3         MR. WAMPOLD:  There are no exceptions to the verdict

4    form, that's correct.  Thank you.

5         THE COURT:  Mr. Harris?

6         MR. HARRIS:  Thank you, Your Honor.

7      In terms of the instructions that are given, we take

8    exception to No. 23, which talks about the equal-consideration

9    standard, and that's one that we've discussed previously on

10   multiple occasions.

11     So for those reasons we've discussed previously, we don't

12   think that's an accurate statement of the law with respect to

13   the UIM.  I understand the court has ruled already, but we take

14   exception to that one.

15     The damages instruction, there's indication here about loss

16   or diminished assets or property in the value of money.  I don't

17   think we've heard any testimony about the value of money.  I

18   don't think that that's been establish by the evidence in this

19   case, so I don't think that that is an appropriate instruction.

20     As to the Insurance Fair Conduct Act, the bad faith, and

21   the --

22        THE COURT:  Slow down, Mr. Harris.  Let's make a

23   record here.

24     What you're talking to me about Instruction No. 30?

25        MR. HARRIS:  Correct.

1    THE COURT:  And we're talking about is the paragraph

2    that concerns the Consumer Protection Act, or --

3        MR. HARRIS:  No, Your Honor --

4        THE COURT:  -- oh, I'm sorry.  The Insurance Fair

5    Conduct Act.

6        MR. HARRIS:  Yes.  This is on page 2 of Instruction 30.

7    There's an instruction regarding loss or diminished assets or

8    property and the value of money.  I don't think we've received

9    testimony about how the jury is going to calculate that, about

10   whether he's lost the value of money.  So I don't think there's

11   been testimony to support those instructions in this case.

12       THE COURT:  Mr. Wampold, we haven't had any

13   discounting-to-present-value testimony.

14       MR. WAMPOLD:  No.  It's just the loss of money; I

15   mean, the fact that he didn't have that money.  The $16,000 on

16   Strzelec is clear, and the $931 he had to pay out of pocket

17   because he didn't have the money.

18       THE COURT:  But the jury doesn't have any instruction

19   as to the value of money.  In other words, is the money the same

20   in 2016 as it is in 2020.

21       MR. WAMPOLD:  Yeah, I guess I don't think, in light of

22   what we're talking about, that that's a necessary instruction.

23       THE COURT:  Okay.  Mr. Harris, I'll take that out.  I

24   think you 're correct that there's no -- we don't have any

25   testimony about it.  It would be sheer guesswork as to the value

1  of money, if it's changed over that period of time.

2     So, Ms. Pernell, before this goes out, we will exclude that

3  phrase, "including the value of money," on Instruction 30.

4          MR. HARRIS:  That would be for all three of the tort

5  claims, Your Honor, the IFCA, the bad faith, and the negligence.

6          THE COURT:  Yes, for all three.

7          MR. HARRIS:  All right.  And then in terms of

8  instructions that were not given, I'm just going to repeat our

9  discussion from yesterday in terms of the proposed instructions

10 we provided regarding duplication.

11     We submitted a separate instruction.  We thought that would

12 be appropriate to have a separate instruction rather than where

13 it's indicated in the damage instruction.  Here at the end, the

14 very, very last sentence of Instruction No. 30 does talk about

15 it, but I think it should be set out and made more clear to the

16 jury.  I don't think the jury instructions, as they're worded,

17 clearly indicates that they cannot duplicate damages for

18 multiple claims.

19         THE COURT:  It is contained in Instruction 30, and it

20 is also an explicit instruction in the verdict form as well.  So

21 you think it should be there a third time?

22         MR. HARRIS:  We think it should be set out and set out

23 separately so that it's made clear to the jury.

24         THE COURT:  Well, Mr. Harris, I think it would pass

25 muster if we had one continuous instruction rather than several

1  small ones, so I think that's a distinction without a

2  difference.

3          MR. HARRIS:  Okay.

4     And the last instruction that was not given that we talked

5  about previously is the one about the redactions, Your Honor.  I

6  understand the court's position on that, but I wanted to note

7  that exception for the record.

8          THE COURT:  Okay.  All right.  Anything further,

9  Mr. Harris?

10         MR. HARRIS:  No, Your Honor.

11         THE COURT:  Okay.  Well, then, Ms. Pernell, did you

12  put on your speaker so you can speak to me?

13         THE LAW CLERK:  Yes, I did.  Can you hear me?

14         THE COURT:  Yes, I can.

15    I want you to make those changes to Instruction 30, taking

16  out those phrases.  And then let's push these out to our jurors,

17  so that they have a copy, in an email.  When you push it out to

18  them, you should indicate to them that they should delete the

19  preliminary instructions, and it is the court's final

20  instructions to the jury that will govern.

21         THE LAW CLERK:  Okay.

22         THE COURT:  Okay.  Mr. Wampold, are you all set up?

23  Are you going to be using bullet points and that sort of thing?

24         MR. WAMPOLD:  Yeah, I'll be using PowerPoint.  And I'm

25  just -- I will be all set up.  We're making a couple last-minute

 1  changes, based on the court's ruling on those damages slides, so

 2  we just have to make a few changes, and then I'll be ready.

 3          THE COURT:  Mr. Harris, you're ready to go as well?

 4          MR. HARRIS:  Yes, Your Honor, we're ready to go.

 5          THE COURT:  Mr. Wampold, if you're going to go for 75

 6  minutes, I'm going to let them have a break after about a half

 7  an hour.

 8          MR. WAMPOLD:  Okay.

 9          THE COURT:  So I'll let you either decide when to do

10  that, when you come to a break, or if you keep going past 30

11  minutes, I will find a break for you.

12          MR. WAMPOLD:  Okay.  Sounds good.

13       So what time, approximately, do you want to take the break,

14  do you think?

15          THE COURT:  Well, depending on how long it takes me to

16  read the instructions.  I'd kind of like to take a 15-minute

17  break in between your argument and Mr. Harris's.

18          MR. WAMPOLD:  I thought you wanted a break?

19          THE COURT:  Just a stand-up break.  You can work that

20  into your presentation.

21       Same for you, Mr. Harris.  We can't go for an hour just

22  with the talking heads.

23          MR. WAMPOLD:  Right.

24          THE COURT:  I know you're both more interesting than

25  that, but you want them to stay awake.

 1          MR. WAMPOLD:  Yeah, I understand.  Thank you.

 2          THE COURT:  All right.  Then we have about 20 minutes

 3   before we -- unless we have our jurors already reporting in.

 4   Mr. Cogswell?

 5          THE CLERK:  We do not, Your Honor.

 6          THE COURT:  Okay.  Then I'm going to blank myself out

 7   and do some other things.  You can as well, and we'll be back,

 8   ready to go, promptly at nine o'clock.

 9          MR. WAMPOLD:  Sounds good, Your Honor.  Thank you.

10          THE COURT:  Okay.

11             (Court in recess 8:41 a.m. to 9:03 a.m.)

12          THE COURT:  Mr. Harris, you didn't get a chance to

13   rest in front of the jury yesterday, so after I greet them, I'll

14   give you the chance to do that.  I'll then ask Mr. Wampold if

15   there's any rebuttal; he'll say "no," and then we can go right

16   into jury instructions.

17       Let's bring them in.

18             THE FOLLOWING PROCEEDINGS WERE HELD
                 IN THE PRESENCE OF THE JURY:
19

20          THE COURT:  Good morning.  Would you all unmute for

21   me, please?  Okay.  Everybody is ready to go to work this

22   morning?

23          JUROR:  Yes.

24          THE COURT:  Okay.  One of the first things that's

25   going to happen this morning is, I want you to delete the

1    previous jury instructions I gave you, and you should have all

2    received a copy of the jury instructions, but first we have some

3    formal proceedings to take care of in front of you.

4        So I'm going to turn to Mr. Harris.  If I can have you all

5    mute again.

6        Mr. Harris, does the defense have any further witnesses?

7             MR. HARRIS:  No, Your Honor.  The defense rests.

8             THE COURT:  Mr. Wampold, the defense rests.  Is there

9    any rebuttal?

10            MR. WAMPOLD:  There is no rebuttal, Your Honor.

11            THE COURT:  Okay.

12       Ladies and gentlemen, I'm going to ask for your kind

13   attention as I read to you the court's final instructions.  You

14   can follow along with me, because they're going to be up on the

15   screen, and it's entirely up to you as to how you learn best.

16   If you learn by listening, it's fine for you to just listen.  If

17   you learn by reading along, then please follow along with me.

18       These are the court's instructions to the jury.

19                          COURT'S INSTRUCTIONS

20            THE COURT:  Members of the jury, now that you've heard

21   all the evidence, it is my duty to instruct you on the law that

22   applies to this case.  It is this final set of instructions that

23   controls your consideration.  It is your duty to weigh and to

24   evaluate all the evidence received in the case, and in that

25   process, to decide the facts.  It is also your duty to apply the

1    law, as I give it to you, to the facts as you find them.

2    Whether you agree with the law or not, you must decide the case

3    solely on the evidence and the law and must not be influenced by

4    any personal likes or dislikes, opinions, prejudices, or

5    sympathy.  You'll recall that you took an oath promising to do

6    so at the beginning of the case.

7         You must follow all of these instructions and not single

8    out some and ignore others.  They are all important.  You must

9    not make any assumptions based upon any changes from the

10   preliminary set of instructions.  It is the final set that you

11   are governed by.  Please do not read into these instructions, or

12   anything I may have said or done, any suggestion as to what

13   verdict you should return.  That is a matter entirely up to you.

14        Number 2:  To help you follow the evidence, I will give you

15   a brief summary of the positions of the parties.  This is a

16   civil case brought against defendant Integon General Insurance

17   Company.  The plaintiff is Daniel Hopkins.  On April 23rd, 2016,

18   plaintiff Daniel Hopkins and his wife Irene were stopped behind

19   a pedestrian crosswalk on Northwest 85th Street in Seattle,

20   Washington, when they were hit from behind by another driver.

21        The driver who caused the crash was underinsured at the

22   time of the collision.  Plaintiff Hopkins is an insured under

23   the underinsured motorist UIM policy with the defendant Integon

24   Insurance Corporation.

25        Because the driver who caused the crash was underinsured,

1  plaintiff Hopkins has a claim for the insurance benefits against

2  defendant Integon, his insurer for this claim.

3       Plaintiff Hopkins makes the following five claims against

4  the defendant, Integon:  One, for insurance benefits; two, for

5  violation of the Consumer Protection Act; three, for violation

6  of the Insurance Fair Conduct Act; four, for violation of the

7  insurance duty of good faith; and five, for negligently handling

8  Mr. Hopkins' UIM claim.

9       Plaintiff Daniel Hopkins claims that as a result of

10  defendant Integon General Insurance Corporation's conduct, he

11  suffered damages.  You'll be asked to determine the value of

12  each of these claims.

13       Defendant Integon General Insurance Corporation disputes

14  the amounts of benefits requested, and denies each and every one

15  of plaintiff Hopkins' claim.

16       Instruction 3:  During deliberations, you will have to make

17  your decision based on what you recall of the evidence.  You

18  will not have a transcript of the trial.  I urge you to pay

19  close attention to the testimony as it is given.  If at any time

20  you cannot hear or see the testimony, evidence, questions, or

21  arguments, let me know so that I can correct the problem.

22       Number 4:  Those exhibits received in evidence that are

23  capable of being displayed electronically by using the Box

24  platform will be provided to you in that form, and you'll be

25  able to view them in the jury room.  The court technician will

1   show you how to use the Box platform and how to locate and view

2   exhibits on your device.  If you have any questions about how to

3   operate the Box platform, you may send a note through the chat

4   function of ZoomGov to the courtroom deputy.  Do not refer to or

5   discuss any exhibit you were attempting to view.

6        If a technical problem or question requires hands-on

7   maintenance or instruction, the court technician may enter the

8   jury room, with the courtroom deputy present for the sole

9   purpose of assuring that the only matter that is discussed is a

10  technical problem.  When a court technician or any non-juror is

11  in the jury room, the jury shall not deliberate.  No juror may

12  say anything to the court technician or any non-juror, other

13  than to describe the technical problem or seek information about

14  the operation of the equipment.  Do not discuss any exhibit or

15  any aspect of the case.

16       The sole purpose of providing the Box platform in the jury

17  room is to enable jurors to view the exhibits received in

18  evidence in this case.  You may not use the platform or your

19  devices for any other purpose; for example, any website,

20  database, directory, dictionary, or game.

21       If you discover that the computer provides or allows access

22  to such materials, you must inform the court immediately, and

23  refrain from viewing such materials.  Do not remove the computer

24  or any electronic data from the jury room, and do not copy any

25  such data.

1    Number 5:  You had permission to take notes to help you

2    remember the evidence.  If you took notes, please keep them to

3    yourself until you and your fellow jurors go to the jury room to

4    decide the case.  When you leave, you should destroy your notes.

5    Whether or not you took notes, you should rely on your own

6    memory of the evidence.  Notes are only to assist your memory.

7    You should not be overly influenced by your notes or those of

8    your fellow jurors.

9    Number 6:  There are rules of evidence that control what

10   can be received into evidence.  During the trial, when a lawyer

11   asked a question or offered an exhibit into evidence, and a

12   lawyer on the other side thought it was not permitted by the

13   rules of evidence, that lawyer was allowed to object.  If I

14   overruled the objection, the question could have properly been

15   answered and the exhibit received.  If I sustained the

16   objection, the question could not have been properly answered,

17   and the exhibit was not received.

18   Whenever I sustained an objection to a question, you must

19   ignore that question and must not guess what the answer might

20   have been or consider any answer that was given.

21   During the trial, I may have ordered that evidence be

22   stricken from the record, and that you disregard or ignore the

23   evidence.  When you are deciding the case, you must not consider

24   the evidence that I told you to disregard.

25   Number 7:  The evidence you are to consider in deciding

1  what the facts are consists of, one, the sworn testimony of any

2  witness; two, the exhibits which are received into evidence;

3  three, any facts to which the lawyers have agreed; and four, any

4  facts that I instructed you to accept as proved.

5       You may also hear testimony in the form of depositions.

6  This testimony is also evidence from which you are to decide the

7  facts.  You should draw no inferences from whether these

8  individuals were or were not physically present in the court

9  themselves.

10      Number 8:  In reaching your verdict, you may consider only

11  the testimony and exhibits received into evidence.  Certain

12  things are not evidence, and you may not consider them in

13  deciding what the facts are.  I'll list them for you.

14      One, arguments and statements by lawyers are not evidence.

15  The lawyers are not witnesses.  What they say in their opening

16  statements, closing arguments, and at other times is intended to

17  help you interpret the evidence, but it is not evidence.  If the

18  facts as you remember them differ from the way the lawyers have

19  stated them, your memory of them controls.

20      Two, questions and objections by lawyers are not evidence.

21  Attorneys have a duty to their clients to object when they

22  believe a question is improper under the rules of evidence.  You

23  should not be influenced by the objection or by the court's

24  ruling on it.

25      Three, testimony that has been excluded or stricken or that

1   you have been instructed to disregard is not evidence and must

2   not be considered.

3        Four, anything you may have seen or heard when the court

4   was not in session is not evidence.  You are to decide the case

5   solely on the evidence received at the trial.  In addition, some

6   evidence is received only for a limited purpose.  When I

7   instructed you to consider certain evidence only for a limited

8   purpose, you must do so, and you may not consider that evidence

9   for any other purpose.

10       Instruction No. 9:  Evidence may be direct or

11  circumstantial.  Direct evidence is direct proof of a fact, such

12  as testimony by a witness about what that witness personally saw

13  or heard or did.

14       Circumstantial evidence is proof of one or more facts from

15  which you can find another fact.  You should consider both kinds

16  of evidence.

17       The law makes no distinction between the weight to be given

18  to either direct or circumstantial evidence.  It is for you to

19  decide how much weight to give to any evidence.

20       Number 10:  In deciding the facts of this case, you may

21  have to decide which testimony to believe, and which testimony

22  not to believe.  You may believe everything a witness says, or

23  part of it, or none of it.

24       In considering the testimony of any witness, you may take

25  into account, one, the opportunity and ability for the witness

1    to see and know and hear the things testified to; two, the

2    witness's memory; three, the witness's manner while testifying;

3    four, the witness's interest in the outcome of the case, if any;

4    five, the witness's bias or prejudice, if any; six, whether

5    other evidence contradicted the witness's testimony; seven, the

6    reasonableness of the witness's testimony in light of all the

7    evidence; and eight, any other factors that bear on

8    believability.

9        Sometimes a witness may say something that is not

10   consistent with something else he or she said.  Sometimes

11   different witnesses will give different versions of what

12   happened.  People often forget things or make mistakes in what

13   they remember.  Also, two people may see the same event but

14   remember it differently.  You may consider these differences,

15   but do not decide the testimony is untrue just because it

16   differs from other testimony.

17       However, if you decide that a witness has deliberately

18   testified untruthfully about something important, you may choose

19   not to believe anything that witness said; on the other hand, if

20   you think the witness testified untruthfully about some things

21   but told the truth about others, you may accept the part you

22   think is true, and ignore the rest.

23       The weight of the evidence as to a fact does not

24   necessarily depend on the number of witnesses who testify.  What

25   is important is how believable the witnesses were and how much

1    weight you think their testimony deserves.

2        Eleven, you've heard testimony from experts who testified

3    to opinions and the reasons for their opinions.  This opinion

4    testimony was allowed because of the education or experience of

5    the witness.  Such opinion testimony should be judged like any

6    other testimony.  You may accept it or reject it, and give it as

7    much weight as you think it deserves, considering the witness's

8    education, experience, their reasons given for the opinion, and

9    all the other evidence in the case.

10       Instruction 12:  All parties are equal before the law, and

11   a corporation is entitled to the same fair and conscientious

12   consideration by you as any party.

13       Number 13:  Defendant Integon General Insurance Corporation

14   is a corporation.  A corporation can act only through its

15   officers and employees.  Any act or omission of an officer or

16   employee is the act or omission of the corporation.  A

17   corporation is charged with the knowledge of its officers,

18   agents, and employees.

19       Instruction No. 14:  In this case, the plaintiff was

20   required to prove each of the claims by a preponderance of the

21   evidence.  When a party has the burden of proof on any claim by

22   a preponderance of the evidence, it means that you must be

23   persuaded by the evidence that the claim is more probably true

24   than not true.  You should base your decision on all the

25   evidence, regardless of which party presented it.

1      Instruction 15:  The term "proximate cause" means a cause

2   which in a direct sequence produces the injury complained of and

3   without which such injury would not have happened.  There may be

4   more than one proximate cause of an injury.

5      Instruction 16:  An underinsured motorist UIM policy

6   provides coverage to its insured for injuries or damages caused

7   by an at-fault, underinsured motorist.  The purpose of UIM

8   insurance is to allow an injured party to recover those damages

9   that the injured party would have received had the at-fault

10  party been insured with liability limits as broad as the injured

11  party's own UIM insurance limits.

12     Instruction 17:  Benefits claim.  The Integon General

13  Insurance Corporation policy provides UIM coverage for any

14  injury and damages which was proximately caused by the April

15  23rd, 2016, collision.  The plaintiff has the burden of proving

16  what injuries and damages to the plaintiff were proximately

17  caused by this and what amount the plaintiff should be

18  recovered.

19     Number 18:  Consumer Protection Act claim.  Plaintiff

20  Hopkins claims that defendant Integon General Insurance

21  Corporation violated the Washington Consumer Protection Act.  To

22  prove this claim, plaintiff Hopkins has the burden of proving

23  each of the following propositions:

24     One, that defendant Integon General Insurance Corporation

25  engaged in an unfair or deceptive act or practice; two, that the

1   act or practice occurred in the conduct with defendant Integon

2   General Insurance Corporation's trade or commerce; three, that

3   the act or practice affects the public interest; four, that

4   plaintiff Hopkins was injured in either his business or his

5   property; and five, that defendant Integon General Insurance

6   Corporation's act or practice was a proximate cause of plaintiff

7   Hopkins' injury.

8        If you find from your consideration of all the evidence

9   that each of these propositions has been proved, your verdict

10  should be for plaintiff Hopkins on this claim.  On the other

11  hand, if any of these propositions has not been proved, your

12  verdict should be for defendant Integon General Insurance

13  Company on this claim.

14       Instruction 19:  A violation, if any, of one or more of the

15  following statutory or regulatory requirements is a failure to

16  provide benefits, an unfair or deceptive act or practice under

17  the rules of insurance under the Consumer Protection Act and a

18  breach of the duty of good faith;

19       One, failing to acknowledge and act reasonably promptly

20  upon communications with respect to claims arising under

21  insurance policies; two, failing to adopt and implement

22  reasonable standards for the prompt investigation of claims

23  arising under an insurance policy; three, refusing to pay claims

24  without conducting a reasonable investigation; four, not

25  attempting in good faith to effect prompt, fair, and equitable

1  settlement of claims in which liability has become reasonably

2  clear; five, failing to promptly provide a reasonable

3  explanation of the basis in the insurance policy in relation to

4  the facts or applicable law for denial of a claim; six,

5  compelling an insured to initiate or submit to litigation,

6  arbitration, or appraisal to recover amounts due under an

7  insurance policy by offering substantially less than the amounts

8  ultimately recovered in such actions or proceedings.

9       Number 20:  A single violation of a statute or regulation

10  related to the business of insurance is an unfair or deceptive

11  act or practice.  A violation of these statutes and

12  administrative rules also affects the public interest.

13  Statutory and administrative rules that govern insurance

14  companies are set forth in jury instructions above.

15       If you find that a violation of a statute or regulation

16  relating to the business of insurance has occurred, then you

17  must find that the first three elements of Consumer Protection

18  Act violation have been proved.

19       Number 21:  An insured has suffered a, quote, injury, under

20  the Consumer Protection Act if their property or business has

21  been injured to any degree.

22       The injury element is met if the insured's property,

23  interest, or money is diminished because of the unlawful

24  conduct, even if the expenses caused by the statutory regulatory

25  violation is minimal.

1        Under the Consumer Protection Act, plaintiff has the burden

2   of proving that he has been injured, but no monetary amount need

3   be proved, and the proof of any injury is sufficient, even if

4   expenses or losses caused by the violation are minimal.

5   Injuries to business or property include financial costs or

6   loss.

7        Number 22:  Insurance Fair Conduct Act claim.  Plaintiff

8   Hopkins claims that defendant Integon General Insurance

9   Corporation has violated the Washington Insurance Fair Conduct

10  Act.  To prove this claim, the plaintiff has the burden of

11  proving each of the following propositions:

12       One, that defendant Integon General Insurance Corporation

13  unreasonably denied payment of benefits; two, that plaintiff

14  Hopkins was damaged; three, that defendant Integon General

15  Insurance Corporation's act or practice was a proximate cause of

16  damage.

17       If you find from your consideration of all the evidence

18  that each of those propositions has been proved, your verdict

19  should be for the plaintiff Hopkins on this claim.  On the other

20  hand, if any of these propositions has not been proved, your

21  verdict should be for defendant Integon General Insurance

22  Corporation on this claim.

23       Number 23:  Failure to act in good faith claim.  An insurer

24  has a duty to act in good faith.  This duty requires an insurer

25  to deal fairly with its insured.  The insurer must give equal

1 consideration to its insured's interest and its own interests,

2 and must not engage in any action that demonstrates a greater

3 concern for its own financial interest than its insured's

4 financial risk.  An insurer who does not deal fairly with its

5 insured or who does not give equal consideration to its

6 insured's interests fails to act in good faith.

7         In proving that an insurer failed to act in good faith, an

8 insured must prove that the insurer conduct was unreasonable,

9 frivolous, or unfounded.  The insured is not required to prove

10 the insurer acted dishonestly or that the insurer intended to

11 act in bad faith.

12        Instruction No. 24:  The duty of good faith requires an

13 insurer to conduct a reasonable investigation before refusing to

14 pay a claim submitted by its insured.  An insurer must also have

15 a reasonable justification before refusing to pay a claim.  An

16 insurer who refuses to pay a claim without conducting a

17 reasonable investigation or without having a reasonable

18 justification fails to act in good faith.

19        Number 25:  The reasonableness of the defendant's claim

20 handling must be measured as of the time that the conduct

21 occurred, and based on the facts known to it at the time.

22        Number 26:  The negligence claim.  The plaintiff has the

23 burden of proving each of the following propositions on the

24 claim of negligence:

25        First, that Integon General Insurance Corporation acted or

1    failed to act in one of the ways claimed by the plaintiff, and

2    that in so acting or failing to act, Integon General Insurance

3    Corporation was negligent; second, that the plaintiff was

4    harmed; third, that the negligence of Integon General Insurance

5    Corporation was a proximate cause of damage to the plaintiff.

6        If you find from your consideration of all the evidence

7    that each of these propositions has been proved, your verdict

8    should be for the plaintiff on this claim.  On the other hand,

9    if any of these propositions has not been proved, your verdict

10   should be for Integon General Insurance Corporation on this

11   claim.

12       Instruction 27:  Negligence is the failure to exercise

13   ordinary care.  It is the doing of some act that a reasonably

14   careful person would not do under the same or similar

15   circumstances, or the failure to do some act that a reasonably

16   careful person would have done under the same or similar

17   circumstances.

18       Ordinary care means the care that a reasonably careful

19   person would exercise under the same or similar circumstances.

20       Instruction No. 28:  An insurance regulation provides that

21   the following is applicable to all insurers:

22       One, every insurer shall complete investigation of a claim

23   within 30 days after the notification of the claim, unless such

24   investigation cannot reasonably be completed within such time;

25       Two, if the insurer needs more time to determine whether a

1  claim should be accepted or denied, it shall so notify the

2  claimant within 15 days, giving the reasons more time is needed.

3  If the investigation remains incomplete, the insurer shall,

4  within 45 days from the date of the initial notification, and no

5  later than every 30 days thereafter, send to such claimant a

6  letter setting forth the reasons that additional time is need

7  for investigation.

8      Three, for all other pertinent communications from a

9  claimant reasonably suggesting that a response is expected, an

10  appropriate reply must be provided within 10 working days for

11  individual insurance policies, or 15 working days with respect

12  to communications arising under group insurance contracts.

13      Four, the insurer's claims files are subject to examination

14  by the commissioner or by a duly appointed designee.  The files

15  must contain all notes and work papers pertaining to the claim

16  in enough detail that pertinent events and dates of the events

17  can be reconstructed.

18      Number 29:  The violation, if any, of a statute or

19  administrative rule is not necessarily negligence, but it may be

20  considered by you as evidence in determining negligence.

21  Statutory and administrative rules that govern insurance

22  companies are set forth in Instruction No. 19 and 28 above.

23      Instruction No. 30:  Damages, benefits claim.  It is your

24  duty to determine the value of plaintiff Hopkins' claim for

25  insurance benefits, which is the amount of money that will

1   reasonably and fairly compensate plaintiff Hopkins for such

2   damages as you find were proximately caused by the negligence of

3   the at-fault driver in the April 23rd, 2016, collision.

4        In determining the value of that claim, you shall not

5   consider the limits of plaintiff Hopkins' UIM policy.  You

6   should consider the following past economic damage elements:

7        The reasonable value of necessary medical care, treatment,

8   and services received at the present time.  Plaintiff Hopkins

9   and defendant Integon General Insurance Company agreed that this

10  amount totals $10,931.

11       In addition, you should consider the following noneconomic

12  damage elements:  The nature and extent of the injuries; the

13  disability, disfigurement, and loss of enjoyment of life --

14  excuse me.  I think we have someone's mike -- could that

15  individual please mute?

16       Let me back up.

17       In addition, you should consider the following noneconomic

18  damage elements:  The nature and extent of the injuries; the

19  disability, disfigurement, and loss of enjoyment of life

20  experienced and, with reasonable probability, to be experienced

21  in the future; the pain and suffering, both mental and physical,

22  and inconvenience experienced and, with reasonable probability,

23  to be experienced in the future.

24       Plaintiff has been paid $10,000 in personal injury

25  protection and $25,000 from Progressive Insurance Company for

1   Ms. Montes causing the collision.  You are not to consider the

2   fact that plaintiff Hopkins has already received these payments

3   in calculating your damages.

4        The question of who pays or whom reimburses whom will be

5   decided by the court in another proceeding after you return your

6   verdict.

7        It is the duty of the court to instruct you as to the

8   measure of damages.  That is the amount of money that will

9   reasonably and fairly compensate plaintiff Hopkins on plaintiff

10  Hopkins' claim that Integon General Insurance Corporation

11  violated the Consumer Protection Act, the Insurance Fair Conduct

12  Act, failed to act in good faith, and for negligence, and by

13  instructing you as to the measure of damages of those claims,

14  the court does not mean to suggest for which party your verdict

15  should be rendered as to those claims.

16       Consumer Protection Act:  If you find for plaintiff Hopkins

17  on his claim that defendant Integon General Insurance

18  Corporation violated the Washington Consumer Protection Act,

19  then the damages that you may award for this claim are limited

20  to plaintiff Hopkins' unreimbursed medical expenses and the

21  expert witness fee that plaintiff Hopkins paid for this case.

22  Plaintiff Hopkins' unreimbursed medical expenses totaled $935

23  and the expert witness fees he paid totaled $16,000.

24       Insurance Fair Conduct Act:  If you find for plaintiff

25  Hopkins on this claim that defendant Integon General Insurance

1  Corporation violated the Washington Insurance Fair Conduct Act,

2  then you should consider the following damages:

3       Any emotional distress that plaintiff Hopkins suffered as a

4  proximate result of the defendant Integon General Insurance

5  Corporation's violation of the Insurance Fair Conduct Act; loss

6  or diminished assets or property.

7       Failure to act in good faith, if you find for plaintiff

8  Hopkins on his claim that defendant Integon General Insurance

9  Company failed to act in good faith, then you should consider

10  the following elements of damage:

11       Any emotional distress that Plaintiff Hopkins suffered as a

12  proximate result of defendant Integon General Insurance

13  Company's failure to act in good faith; loss or diminished

14  assets or property.

15       Negligence:  If you find for plaintiff Hopkins on his claim

16  that defendant Integon General Insurance Company was negligent,

17  then you should consider the following elements of damages:

18       Any emotional distress that plaintiff Hopkins suffered as a

19  proximate result of Integon General Insurance Corporation's

20  negligence; loss or diminished assets or property.

21       The burden of proving damages rests upon plaintiff Hopkins,

22  and it is for you to determine, based upon evidence, whether any

23  particular element has been proved by a preponderance of

24  evidence.

25       Your award must be based on evidence, and not upon

1    speculation, guess, or conjecture.

2        The law has not furnished us with any fixed standards by

3    which to measure noneconomic damages.  With respect to these

4    matters, you must be governed by your own judgment, by the

5    evidence in the case, and by these instructions.

6        When determining the damages for each or any individual

7    claim that has been proven by plaintiff Hopkins, you should

8    determine what damages were proven, by a preponderance of the

9    evidence, for that individual claim, regardless of any amount

10   determined or awarded for any other claim.  In other words, you

11   should determine the amount of damage for any individual claim

12   as if it were the only claim that was asserted or proven.

13       If you determine that more than one claim has been proven

14   and award damages for more than one claim, then the total award

15   is reflected, and the verdict form should not duplicate the

16   damages.  In other words, if you conclude that plaintiff Hopkins

17   suffered the same economic or noneconomic damages as a result of

18   more than one of the causes of action that was proven, then the

19   total award should only reflect those damages one time.  Thus,

20   the total award recorded in the verdict form should reflect

21   total damages suffered by plaintiff Hopkins, not a duplicate of

22   the same damages.

23       Instruction 31:  An insured has a duty of good faith to the

24   insurer.  Plaintiff Hopkins complied with his duty.

25       Instruction No. 32:  If your verdict is for the plaintiff,

1   and if you find that, one, before this occurrence, the plaintiff

2   had a condition that was not causing pain or disability, and,

3   two, the condition made the plaintiff more susceptible to injury

4   than a person in normal health, then you should consider all of

5   the injuries and damages that were proximately caused by the

6   occurrence, even though those injuries due to the pre-existing

7   condition may have been greater than those that would have been

8   incurred under the same circumstances by a person without that

9   condition.

10       No. 33:  A verdict form has been prepared for you to fill

11  out electronically.  After you have reached unanimous agreement

12  on a verdict, your presiding juror will fill in the form that

13  has been given to you, sign and date it, and advise the

14  courtroom deputy that you are ready to return to the courtroom.

15       Instruction No. 34:  I'll now say a few words about your

16  conduct as jurors.

17       First, keep an open mind, and do not decide what the

18  verdict should be until you and your fellow jurors have

19  completed your deliberations.

20       Second, because you must decide this case based only on the

21  evidence received in the case and on my instructions as to the

22  law that applies, you must not be exposed to any other

23  information about the case or to the issues it involves during

24  the course of your jury duty.  Thus, until the end of the case

25  or unless I tell you otherwise, do not communicate with anyone

1   in any way, and do not let anyone else communicate with you in

2   any way about the merits of the case or anything to do with it.

3   This includes discussing the case in person, in writing, by

4   phone or electronic means, via email, text messaging, or any

5   Internet chat room, blog, website, or other feature.

6        This applies to communicating with your fellow jurors until

7   I give you the case for deliberation and applies to

8   communicating with everyone else, including your family members,

9   your employer, and the people involved in the trial.  Although

10  you may notify your family and your employer that you've been

11  seated as a juror in the case, but if you are asked, in any way,

12  about your jury service or anything about this case, you must

13  respond that you've been ordered not to discuss the matter and

14  to report the contact to the court.

15       Because you've received all the evidence and legal

16  instruction you properly may consider to return a verdict, do

17  not read, watch, or listen to any news or media accounts or

18  commentary about the case or anything to do with it.

19       Do not do any research, such as consulting dictionaries,

20  searching the Internet, or using other reference materials, and

21  do not make any investigation or in any other way try to learn

22  about the case on your own.

23       The law requires these restrictions to ensure that the

24  parties have a fair trial based upon the same evidence that each

25  party has had an opportunity to address.

1      A juror who violates these restrictions jeopardizes the

2   fairness of these proceedings, and a mistrial could result that

3   would require the entire trial process to start over.  If any

4   juror is exposed to any outside information, please notify the

5   court immediately.

6      Instruction No. 35:  Before you begin your deliberations,

7   elect one member of the jury as your presiding juror.  The

8   presiding juror will preside over the deliberations and serve as

9   the spokesperson for the jury in court.

10      You should diligently strive to reach agreement with all of

11   the other jurors, if you can do so.  Your verdict must be

12   unanimous.  Each of you must decide the case for yourself, but

13   you should do so only after you've considered all the evidence,

14   discussed it fully with the other jurors, and listened to their

15   views.  It's important that you attempt to reach a unanimous

16   verdict, but, of course, only if each of you can do so after

17   having made your own conscientious decision.

18      Do not be unwilling to change your opinion if the

19   discussion persuades you that you should, but do not come to a

20   decision simply because other jurors think it is right, or

21   change an honest belief about the weight and effect of the

22   evidence simply to reach a verdict.

23      Ladies and gentlemen, that concludes the reading of the

24   court's instructions.  You should have also received a verdict

25   form.  As I indicated to you previously, a verdict form will go

1  with you to the jury room, and it will be able to be filled out

2  by the jury foreperson.

3      I ask now that you give your kind attention to Mr. Wampold.

4  He has the privilege of giving the closing arguments for

5  Mr. Hopkins.

6      Mr. Wampold?

7          MR. WAMPOLD:  Thank you, Your Honor.

8      Good morning, members of the jury.  Again, it may be useful

9  to put this in speaker mode, and then move the screen around,

10  because I'm going to have the screen on the entire time, so do

11  whatever you wish, but that may be useful.

12      And with your permission, Judge Pechman, I'll begin?

13          THE COURT:  Yes, please do so.

14                   PLAINTIFF'S CLOSING ARGUMENT

15          MR. WAMPOLD:  May it please the court, counsel,

16  members of the jury.

17      You're here to decide -- for two reasons, really -- to

18  decide the proper value of Mr. Hopkins' damages caused by the

19  April 23rd, 2016, collision, and to enforce the insurance laws

20  that are designed to ensure that insurance companies treat their

21  policyholders fairly, and that they do not act against the law

22  and the public interest.

23      Now, I want to begin by talk about your role as a jury.

24      During this trial, you've seen that we've given Judge

25  Pechman a lot of respect, and that respect is deserved.  But one

1    of the things that's been lost that we would have had if we'd

2    been in court -- and this is, from my understanding, only the

3    second time in the history of the United States that we've had a

4    Zoom trial, and we're all learning.  But one of the things

5    that's been lost is, had we all been in person, every time you

6    came into the courtroom, we would stand for you, and every time

7    you left the courtroom, we would stand for you.  And that honor

8    has been lost, but it's too bad, because we do -- you are very

9    important to this process, and the reason that we stand when

10   we're in person is because, in reality, you are the most

11   important people in this courtroom, and that's because of your

12   role in this case.

13        Our role is to advocate for Mr. Hopkins.  Defense counsel,

14   Mr. Harris and Ms. Lee, their role is to advocate for the

15   insurance company.  Judge Pechman's role is to decide what

16   evidence comes before you and to tell you what the law is.  But

17   you have the most important role.  You will be the ones that

18   will decide what justice is in this case.  And this case is

19   important, and your decision will be on record for everyone to

20   see.  Jury trials are public, and verdicts stand on record in

21   the courthouse for the world to see your work.

22        Now, Judge Pechman said this yesterday, and it's true.  Our

23   legal system in our country is a beacon of justice around the

24   country (sic).  Our system gives great power to the people, to

25   citizens.

1     The way our system works is that the legislature writes the

2   laws, but juries like you enforce them.  And unlike the

3   legislative branch, no one can influence you.  They can't offer

4   you money or a job when they're done.  They can't pay you.  It's

5   just citizens coming together from a cross section of our

6   community to decide cases in an unbiased way, and this is an

7   integral part of our democracy.

8     Now, this is an insurance case.  You all know that.  You've

9   heard that word "insurance" more times than you probably want to

10   in the last week or so.  But insurance cases are important, and

11   the reason insurance is important is because insurance is meant

12   to protect people when they need it most.  We all hope to never

13   need insurance, but we pay premiums every month so that we have

14   that protection when tragedy strikes.  It is the umbrella meant

15   to protect us on a rainy day, and we pay good money, every

16   month, for the promise of that protection.

17     But as you heard in this trial, insurance is a strange

18   product.  Every month you make a payment.  Think about the other

19   products you pay for every month.  Electricity, cable, garbage,

20   water.  In exchange for all of those payments, you get something

21   tangible.  With insurance, you don't get anything tangible; no

22   electricity, no cable, no garbage.  What you get is a promise.

23   That's all you get, a promise, a promise that an insurance

24   company will pay you when you need it.

25     But how does one make insurance companies live up to that

1   promise?  Obviously, the better business model for the insurance

2   company is just to accept your premium every month, and then

3   when it's time to fulfill the promise, say, "No, thank you."

4   What is it that stops insurance companies from saying, "Yes,

5   your injuries are quite significant, but we do not want to cover

6   it because it's not in our financial interest.  We'd rather keep

7   your premiums and the money we owe you.  We make more money that

8   way."  What happens if they do that?

9         Well, if the insurance company does that, it's too late to

10   switch insurance companies.  Once the tragedy strikes and you

11   need the coverage, it's too late to switch horses.  So what can

12   be done to stop insurance companies, like Integon, from breaking

13   their promise?  What is stopping Integon from acting in its own

14   financial interest?  What is it that forces insurance companies

15   to act reasonably and fairly?  The answer is you; you, the jury.

16         We know that insurance companies are financially

17   incentivized to stiff people, like Integon has tried to do to

18   Mr. Hopkins in this case.  That is why we have laws meant to

19   stop this behavior.

20         But even though these laws are on the books, insurance

21   companies still have the arrogance to act like they're above the

22   law; disagreeing with doctors without any foundation; doing no

23   investigation; concluding early on, "Yeah, if you want the

24   limits, you'll have to sue us."  That is what you do when you're

25   so big and important that you believe you can ignore the law.

 1   You are above the law.  And that is why juries like you are so

 2   important.

 3        Integon probably assumed at some point that Mr. Hopkins

 4   would just give up.  That's why they offered so little, $17,000

 5   and then $40,000.  They figured at some point Mr. Hopkins would

 6   cave and take the little amount they offered, even though it

 7   wasn't fair.  But guess what?  Here we are.  Here we are, in the

 8   middle of a pandemic, and we've made it all through a trial.

 9   Thanks to Judge Pechman and the courts, the justice system is

10   open for business.  And you, now, can stop -- you are the only

11   ones that can stop Integon from this bully behavior of refusing

12   to do what the law and the policy require them to do.

13        Now, when you go back to the jury room, when we're all done

14   with closing arguments here, you're going to have two jobs.

15   One, you're going to have decide what your answers are to each

16   of the questions that Judge Pechman has asked you in the verdict

17   form.

18        Your Honor, do the jurors have the verdict form?

19             THE COURT:  Yes, they do, Mr. Wampold.

20             MR. WAMPOLD:  Okay.  Thank you.

21             THE CLERK:  Your Honor, I need to email that out to

22   them.

23             THE COURT:  Oh.  It's coming.

24             MR. WAMPOLD:  Well, I'll give you a little preview of

25   it, and because this is what you're really going to do.  Judge

1  Pechman, in the verdict form, has asked you questions, and,

2  one, you're going to have to decide what the answers are to each

3  of the questions Judge Pechman has asked.  And then you're going

4  to have to explain to your fellow jurors why you've answered

5  those questions the way you have, and I plan to use my time this

6  morning to help you answer those questions.

7      The first question is for you to value Mr. Hopkins' claim.

8      Now, importantly, if you look at Instruction No. 30 -- we

9  just read it -- Judge Pechman tells you to not consider the

10  $250,000 limit or the money that Mr. Hopkins has already

11  received, the $25,000 from Ms. Montes and the $10,000 for

12  medical bills.

13      What Judge Pechman has explained is the question of who

14  pays or who reimburses who will be decided by Judge Pechman in

15  another proceeding.  So as Judge Pechman has said several times,

16  you have to trust her.  You have to follow her instructions and

17  trust that she knows what she's doing.  So what you-all are

18  going to do is the exercise that Integon never performed but

19  that Mr. Hopkins had paid them to do, which is to evaluate,

20  overall, what his claim was worth.  That is what you're going to

21  do.

22      Now, the first item in Instruction No. 30 is the economic

23  damages that the parties agree are $10,931.  That amount should

24  be included in this figure.  But also included on this line

25  should be the noneconomic damages.  And this is where it gets

1    more interesting, because, as Judge Pechman instructed you,

2    there is no fixed formula for how you come up with this amount.

3    You-all will have to work together as a community to decide what

4    is justice, based on the evidence.

5         But Judge Pechman, in her wisdom, doesn't leave you at sea

6    without a compass.  She gives you some guidance on how to arrive

7    at the right number.

8         For starters, we need to look at what the measuring stick

9    is for proving damages.  This is from Jury Instruction No. 30,

10   and it says, "The burden of proving damages rests upon the

11   plaintiff.  It is for you to determine, based upon the evidence,

12   whether any particular element has been proved by a

13   preponderance of the evidence."

14        Now, this is very important.  This is not a criminal trial.

15   In a criminal trial, where someone could go to jail, the burden

16   is beyond a reasonable doubt.  So if we have scales, it's beyond

17   a reasonable doubt.  It's a very, very high burden.  And that

18   burden can be frustrating for jurors who are bound by this

19   standard of measuring justice.

20        In a criminal setting, when the burden is very high, almost

21   black-and-white certainty, it can be frustrating for jurors who

22   say, "You know, I think this person did X, Y, or Z, but I just

23   can't say beyond a reasonable doubt," and so the doubt allows an

24   out.  A defense can hire an expert, muddy the waters, throw up

25   different things to see what sticks, and jurors feel frustrated

1      that the doubt creates an out.

2           In a civil trial, it's a different standard, and let me

3      read this to you.  This is Instruction No. 14.

4           "In this case, the plaintiff is required to prove each of

5      his claims by a preponderance of the evidence.  When a party has

6      the burden of proof on any claim by a preponderance of the

7      evidence, it means you must be persuaded by the evidence that

8      the claim is more probably true than not true."

9           So beyond a reasonable doubt is like this, and more

10     probably true than not true is like this, 51 percent.

11          And this, in a civil trial, where no one is going to jail,

12     the jury is allowed to apply this much more manageable standard.

13     Preponderance is an approach in which jurors get to weigh

14     conflicting evidence and decide which is probably true and not

15     true.

16          Casting doubt does not create an out in civil cases.

17     Reason and common sense carry the day, rather than how much

18     confusion and doubt the other side can stir up.

19          So when you're calculating damages in the back, there may

20     be someone that says, "You know, I'm just not sure, I have

21     doubts," remind them of the law.  The law is preponderance.  You

22     can have doubts.  You can have reasonable doubts.  It's just

23     what is more reasonably true than not true.

24          So let's look at the other guidance that Judge Pechman

25     provides you to value Mr. Hopkins' claim.

1       In Instruction 30, she said, "It is your duty to determine

2   the value of plaintiff Hopkins' claim for insurance benefits,

3   which is the amount of money that will reasonably and fairly

4   compensate plaintiff Hopkins for such damages."

5       And I want to talk about a couple of words here.

6   Reasonable, and that means in accordance within reason or sound

7   thinking, within the bounds of common sense.  And I'm going to

8   give you reasons for each element of damages that I'm going to

9   ask for.

10      Fair, you all know what fair means:  Impartial, in

11  accordance with the evidence, law, rules, logic, unbiased,

12  unprejudiced.  Put aside your preconceived notions.  That's

13  fair.

14      Now, compensate.  This is an interesting word.  It's,

15  actually, an old English world that means balance the scales.

16  You've all seen the scales of justice, you've seen that, and

17  that is what compensate refers to.  And the reason is is that

18  when there's been an injury like this, and somebody's life has

19  been forever altered, the scales of justice are out of

20  alignment, and so it's your job, as the jury, to compensate.

21      What does that mean?  Well, it's an old British term -- an

22  Old English term that means you put weight on this end of the

23  scales to bring them back into alignment.  And you, basically,

24  have to decide how much money -- because that's all we can do.

25  We don't have an eye for an eye anymore.  The way we deal with

1   this is money.  You have to decide how much money to put on the

2   scales of justice.

3        Now, to do that, you have to compensate Mr. Hopkins for the

4   life that was taken from him, and the concept is pretty

5   straightforward.  You need to decide what is fair trade value to

6   put on the scales of justice to make up for the harm that

7   Mr. Hopkins has experienced and what he will experience for the

8   rest of his life.

9        A good example of how this works is if you had a horrible

10  car accident, and one of the cars was completely destroyed, and

11  when this happens, juries have to determine what's the fair

12  trade value of that car before the collision, and appraisers

13  would say the car was worth this, and you would ask to write

14  that down.  That is what you're doing here.  You're coming up

15  with a fair trade value of the life that was taken from

16  Mr. Hopkins.

17       So let me talk about that life a little bit.

18       You heard that Mr. Hopkins was someone who worked hard his

19  whole life.  He came out to Seattle in the '80s.  He started a

20  business.  He ran that business for decades.  He raised a

21  family.  You heard Sarah Hopkins talk about what a great dad

22  Daniel Hopkins was, how he wrestled with his daughters, he was

23  silly.  He was always there.

24       Then, in 2011, he had a tragedy strike.  He had to retire.

25  He had to change his whole life.

1      But through hard work, Dan Hopkins came back.  This is not

2  somebody who just sits around and feels sorry for himself.  This

3  is somebody who works hard, he has his whole life, and that's

4  what he did in 2011.  He worked hard, he tried his best to get

5  back.

6      And, finally, after several years, he really was able to

7  get back most of his life, and you know that.  He was able to

8  really be in a position where he could enjoy his golden years.

9  He could enjoy sailing.  He could enjoy helping out other boats

10  on the dock.  He could enjoy his children and his grandchild,

11  and, hopefully, other grandchildren.

12      Now, those golden years were, unfortunately, tarnished by

13  this injury, and now he has to significantly curtail the life

14  that he had to deal with the injuries that he is suffering from.

15      So you, basically, are the appraisers of what Dan Hopkins

16  lost.

17      Now, you may be thinking to yourself, How can we come up

18  with a value of Dan Hopkins enjoying his golden years?  Each

19  person is unique and priceless, and their golden years are

20  unique.

21      Well, the answer to that is, there's lots of priceless and

22  unique things in our society, and many of those things we

23  provide a lot of value to, we give them great value.  So if

24  someone in the jury room says, How can you put a value on the

25  harm here?  Remind them of all the priceless and unique things

1    that we put value on.  It just means that it's worth a lot.

2        So there are appraisers for high-end homes and paintings,

3    and now there is an appraiser for what Dan Hopkins had taken

4    from him:  You.  You will be the conscience of this community,

5    and you will decide what justice is in this case.

6        You probably noticed that there were lots of experts in

7    this case.  There were experts on neurology and insurance and

8    physical therapy, but none on the value of what was taken from

9    Mr. Hopkins.  And the reason is is that you are the community's

10   experts on that value, and you all have life experience that you

11   need to decide what the fair trade value is for what was taken

12   from Mr. Hopkins.

13       Now, one question that may come up for you-all is how do we

14   factor in the fact that Mr. Hopkins was vulnerable to this

15   injury because of the 2011 traumatic brain injury?  Well, Judge

16   Pechman provided you with the law on that as well.

17       This is Instruction 32.  This is a very important

18   instruction.  And what this says is that, basically, it doesn't

19   matter that Mr. Hopkins had this traumatic brain injury in 2011

20   and that he had recovered so well but that he was susceptible to

21   an injury more than a normal person.

22       What Judge Pechman says is you should consider all the

23   injuries and damages that were caused by the occurrence, even

24   though those injuries, due to the pre-existing condition, may

25   have been greater than those that would have been incurred under

 1    the same circumstances by a person without that condition.

 2         So what this -- if somebody back in the jury room, says,

 3    "Hey, it's not Integon's fault that Mr. Hopkins had a previous

 4    TBI," remind them of Instruction No. 32.  It doesn't matter.

 5    Integon is responsible for all of the damages that he

 6    experienced.

 7         Now, you know that Mr. Hopkins, in 2011, before his crash,

 8    was doing great.  He was working.  He was still living a very,

 9    very good life.  And then he got knocked down by that crash, and

10    that was a significant crash.  And when he got knocked down, he

11    had to stop working.  He was in a lot of pain.  He had a lot of

12    physical disabilities.

13         But then he worked very hard, and he got nearly back to

14    where he was, and you see that in the medical records.  And now,

15    because of the 2016 crash, he's knocked way back down to where

16    he was back in 2011.  And, unfortunately, because this is

17    permanent, he hasn't made it all the way back.  He's not back to

18    the baseline of where he was in 2015.  And, unfortunately, no

19    one is more upset about this than Dan Hopkins.  He can't get all

20    the way back.  He never will.

21         So what is the fair trade value of that loss?  That is the

22    question.  And what I would submit is that he should be

23    compensated for the constant, daily, swaying sensation he has to

24    endure.  He should be compensated for the way he has to change

25    his life, the way he thinks about his life, strategizes, how he

1   has to plan differently, avoid areas, think about his

2   activities, slow down his activities, not do things.  He has to

3   be compensated for the way he has to go through life that's

4   completely different than before this collision.

5       Now, this is a Sisson painting, and many of you are

6   probability wondering why I have a Sisson painting up there now.

7   And the reason is is because the fair trade value of this Sisson

8   painting is about $250 million.  That was how much the seller

9   valued this painting.  Why?  Because it's unique.

10      You also probably have heard that Russell Wilson, the

11  Seahawk quarterback, got $205 million for four years.  Why?

12  Because he's unique.

13      So if someone destroyed this painting, negligently, would

14  there be any doubt that they would be on the hook for the fair

15  trade value of the $250 million?  If someone hurt Russell Wilson

16  so that he couldn't fulfill his contract, is there any doubt

17  that they would have to pay hundreds of millions of dollars?

18      This is no difference.  Mr. Hopkins is unique, he's got a

19  unique life, and the question for you is, what is the fair trade

20  value of what was taken from Mr. Hopkins?

21      Now, I don't want to make you nervous.  We're not asking

22  for hundreds of millions of dollars in this case, or anywhere

23  close to that, but I just do it to make a point.  The reason

24  that things like paintings and sports people get the big money

25  they do is because of the uniqueness, and Mr. Hopkins -- you

1    know -- is a unique man who has a unique loss.

2         Now, Judge Pechman also gives you the standards to consider

3    when coming up with what the amount should be, and you-all have

4    seen this during the course of the trial, and she tells you that

5    when evaluating noneconomic damages, these are the factors you

6    are to consider.

7         And based on these factors, it's my job to suggest a number

8    for you, and I will, I will suggest that number for you.  But I

9    want to make this clear:  Ultimately, you-all are the conscience

10   of the community, and it's you who will decide this; not me, not

11   Mr. Harris, not Judge Pechman.  This will be you.  And so it's

12   my job to make suggestions; it's your job to decide what the

13   proper amount to put on the scales of justice is.  So if you

14   think what I'm about to propose is too little, you should give

15   more, and put more on the scales of justice.  If you think what

16   I've suggested is too much, then you should give less.  This is

17   completely up to you.

18        Now, Mr. Strzelec explained that this is what Integon

19   should have done and never did.  So what you're going to do is

20   to do what Integon -- what Mr. Hopkins paid for them to do,

21   which was to evaluate what his claim is worth.  You're going to

22   do what Integon never did.  Under these different damages, what

23   is this claim worth?

24        And if you break it out, there's a lot of different aspects

25   of this claim.  There's the nature and extent of the injuries;

1    loss of enjoyment of life, past and future; disability, past and

2    future; disfigurement, past and future; pain and suffering, past

3    and future; and inconvenience, past and future.

4         Each of these elements is different and distinct and has to

5    be considered separately, and these are all factors that Judge

6    Pechman has instructed you to take into account when arriving at

7    the fair trade value for what Mr. Hopkins' damages are from the

8    collision, from the collision to today, and from today through

9    the rest of his life.  Judge Pechman tells you to consider all

10   of these factors, and I'm going to go over them in some detail.

11        Your Honor, we've been going for about a half an hour.

12   Should I have the jurors stand up and take a stretch?

13             THE COURT:  Yes.  Ladies and gentlemen, let's stand up

14   and stretch so we can give our full attention back.

15             (Off the record 10:06 to 10:07)

16             THE COURT:  Mr. Wampold, you may continue.

17             MR. WAMPOLD:  Thank you, Your Honor.

18        So there is really three distinct areas of time that I

19   think you have to consider when compensating Mr. Hopkins.  One

20   is, from the accident through when Dr. Taylor finally said, Yep,

21   you're definitely not going to improve.  She thought he wasn't

22   going to improve at the beginning, you heard her say that, and

23   then, ultimately, she concluded, Yep, you're not going to

24   improve at all.

25        So from that date -- from the accident through that date,

1    from the date -- that date through trial, and from trial through

2    the remaining 14 years of his life's expectancy.  That's

3    Mr. Hopkins' life expectancy.  He's 72 now, so it's about 86

4    that is his life expectancy.

5         So his damages really vary depending on that time frame,

6    and you know that.  You know that how he experienced these

7    events was different at the beginning than it is today and will

8    be into the future.

9         But we have to really remember that how he didn't

10   experience these events in a lump.  It's not like he experienced

11   the first year all at once.  He experienced it hour by hour, day

12   by day.  And that's really how you have to analyze it is, what

13   is a reasonable daily rate through, for example, the first time

14   period?  You know at the beginning it wasn't just the vertigo

15   that he has now.  He had many other symptoms, and his life was

16   really hard.

17        So the question is, at the beginning of this injury, when

18   he had -- couldn't listen to music, he'd get headaches all the

19   time, he had cognition problems, what is a daily rate?  And I,

20   actually, think that Integon was fair in how they determined a

21   daily rate during the initial time period, when he was

22   experiencing the vertigo and the return of his brain-injury

23   symptoms.  How did they value that initial time period?

24        Well, you heard Ms. Gordon, actually, talk about this on

25   the stand, and she said, "I will increase offer to $40,000,

1   based on Kutsy's report that three months of treatment for

2   cervical strain and vestibular therapy were likely needed from

3   this accident."

4         So what she's really saying is that they're going to just

5   consider that he was only hurt for three months, 90 days, and

6   after 90 days, he got all better.

7         And she explained that $40,000 wasn't her evaluation,

8   because she knew that he had already received some funds, so

9   she, really, explained that her valuation was, Well, we're

10  offering $40,000, he got $10,000, and he also got $25,000, so

11  we, really, are valuing his claim for those 90 days at $75,000.

12        And if you break that into a daily rate, it equals about

13  $833 a day, which is about right for that time period.  If you

14  go back and look at his medical records, that was a really tough

15  period of time.  And it breaks down to waking hours.  If you

16  look at 16 hours a day, it comes to about $50 an hour, and I

17  would venture to say that if you put a want ad out and ask

18  somebody to experience all the headaches, all the cognition

19  problems, all the problems he had during that time period, you'd

20  have a very hard time getting somebody to endure all that for

21  $50 are a day.  So it seems reasonable.

22        So if you apply that through that beginning period, from

23  the accident through when he reaches maximum medical

24  improvement, this is what the analysis looks like.  I,

25  basically, took $800 a day and broke it down by these different

1   categories that Judge Pechman has given you.

2       You know the nature and extent of his injuries, and you

3   know they're profound.  The headaches, the balance issue, and

4   the resumption of his TBI, and it affected every aspect of his

5   life.  And then so if you apply $300 a day for that element, you

6   get $261,300.

7       Then you have the loss of enjoyment of life.  This is

8   really, really significant, because you heard that Mr. Hopkins

9   had really made it back to enjoying the life he wanted to.  He

10  was volunteering around the dock, taking multi-month sailing

11  trips to the far reaches of Canada, and he lost a lot of joy of

12  life during this period.  I would say give him $100 a day for

13  this loss, which is $87,100.

14      Disability, being disabled.  You heard how frustrating that

15  is for Mr. Hopkins to not be able to do the things he was able

16  to do before; get upside down in people's boats, being able to

17  walk up and down a dock without a cane.  For this, I would

18  recommend you give $100 a day, and that's $87,100.

19      Disfigurement.  So disfigurement applies to any alteration

20  in a person's appearance or presentation, and you know from the

21  testimony Hopkins has disfigurement.  He doesn't appear to

22  people the way he did before.  He's more tentative, he's more

23  cautious, he has trouble -- he walks with a cane, he walks

24  differently.  You know that during this period he appeared very

25  different, and you heard Mr. Moore talk about that, how

1    different he appeared.  For that, I would recommend $50 a day,

2    $43,550.

3          Suffering.  Now, pain and suffering are different, and

4    we're going to get to pain, but this is just suffering.  We all

5    know they're different.  You experience the pain, but then you

6    suffer.  You suffer because the pain won't go away.  If you have

7    a headache, and you can take Advil and you know it's going to go

8    away and you're not going to get it back forever, or maybe

9    months, you don't have that much suffering.  But when you

10   continue day after day after day to have pain, you suffer.  You

11   have depression, you think about what's lost, how your life has

12   changed, and for that, we would recommend $100 a day.

13         Then there's the pain.  And the problem with pain -- and

14   you know he had a lot of pain during that time period, it's

15   throughout his record -- the problem with pain is, we all know

16   it gets your attention to the exclusion of everything else.  It

17   commands your attention, it demands your effort, it takes over

18   your life, it zaps your strength, it wears you out.  It takes

19   you away from the people you love because it makes you

20   unavailable, it makes you irritable, angry, unable, depressed,

21   bitter, tired.  You're no fun to be around when you're in pain,

22   and, for that, we think you should include $100 a day.

23         Inconvenience.  You know that there was a lot of

24   inconvenience here.  Mr. Hopkins had to go to 59 medical

25   appointments during this time period, and he had to spend a lot

1  of time doing his own physical therapy and taking care of

2  himself, not overdoing it.  That is inconvenient, and for that

3  we think you should give $50 a day.

4      The total comes out to $800 a day, which, I think, if you

5  see how this is broken down, that seems reasonable.  So for that

6  initial time period, we would recommend that you include

7  $696,800 in your verdict.

8      Now, after that, you heard that Mr. Hopkins did improve.

9  He improved substantially.  He was doing much better.  But he

10 still -- you know -- is not back to where he was, and he still

11 has to completely change his life.  If he doesn't completely

12 change his life, he gets these horrible headaches.

13     And so we came up with an amount for that time period.

14 From September 12, 2018, through trial, through yesterday, we

15 came up with an amount of $200 a day, which comes out, for

16 waking hours, to about $12 an hour, which seems, sort of, the

17 minimum that you should compensate Mr. Hopkins for an injury

18 like this, and that works out to $152,400.

19     Now, for the rest of his life, Mr. Hopkins is expected to

20 be on this planet for another 14 years, and that works out to

21 5,110 days.  And applying that same math, it comes out to a

22 $1,000,022.

23     So this is what we're recommending that you include for

24 general damages.  And what I would say to you-all is, if you

25 don't agree with the numbers, that's fine, apply different

1   numbers.  But I think the methodology should be like this,

2   because this is how he experienced these injuries.  He

3   experienced it minute by minute, day by day, hour by hour.  So

4   whatever analysis you do to come up with how much these

5   different elements are worth in general damages, it should be

6   some method like this.  But we would recommend that you use this

7   $1,871,200.  And if you add that to the medical bills, it comes

8   up to $1,882,131.  And if you think it should be higher, make it

9   higher; if you think it should be lower, make it lower.  This is

10  up to you.

11       Now, I can anticipate what Mr. Harris is going to say,

12  because he said it in opening.  What he said was, "Hey, this

13  case isn't possibly worth seven figures because there wasn't a

14  lot of visible property damage."

15       And if you remember, he didn't even show you, till very

16  late in the trial and didn't show you in opening statement, that

17  there actually is visible property damage.  There may not have

18  been a lot to Mr. Hopkins' car, but to Ms. Montes' car, there

19  was enough force to bend the metal on the license plate, and

20  there was enough force to bend the hood.

21       And notice they didn't even provide these photos to

22  Dr. Kutsy.  So they had Dr. Kutsy say the forces weren't that

23  great, but they don't even provide the photos that show it was

24  great enough to bend metal.

25       Also, we all know, it's common sense, that you don't have

1    to have a lot of property damage for people to be seriously

2    hurt, and, besides, common sense, you heard the medical

3    testimony of Dr. Taylor and Dr. Eaton explain that; that people

4    often are really hurt, even when there isn't a lot of property

5    damage.

6        Why is that?  Why are people sometimes really hurt when

7    there isn't a lot of property damage?  Well, the reason is is

8    it's not the metal bending that hurts us, right?  If you're in a

9    horrible collision and your car collapses on you, you get hurt.

10   But what happens in a collision like this is, it's not the

11   property damage.  It's the sudden acceleration and deceleration

12   of your head and neck.

13       So you heard Mr. Hopkins say his neck and head suddenly

14   went forward and then banged against the headrest, that is what

15   causes the injury.  And we all know this makes common sense that

16   you can be hurt this way.

17       Did you ever notice that little kids constantly play a game

18   where they surprise each other?  They jump up behind each other

19   and hit each other in the back and laugh, and everybody thinks

20   it's funny?  But adults, we don't do that to each other.  And

21   why don't we do that to each other?  The reason is is we know

22   that if you suddenly hit somebody from behind and make their

23   head snap forward and backwards, you can really cause harm,

24   regardless of whether there's property damage.

25       So an example would be, I run -- I'm a runner, and I run

 1    about eight miles an hour.  If I put Mr. Hopkins -- and I would

 2    never do this to him -- but if I put him in the courtroom, in a

 3    chair, and I ran up to him and he's not paying attention, he's

 4    looking other places, and I ran up and I ran as fast as I could

 5    and I hit that chair, is there any doubt, with his prior injury,

 6    that his head would snap and go backwards and forwards, and he

 7    could be very badly hurt?  Would it be fair if I did that --

 8    which I never would do to Mr. Hopkins, I would never do that --

 9    but would it be fair, if I did that, to say, Well, there's no

10    damage to the chair?  Of course not.  The answer is of course

11    not.

12         The problem here is the snapping of the head and neck, and

13    it has nothing to do with the amount of visible property damage.

14         The argument that Mr. Hopkins couldn't have been badly hurt

15    here doesn't make any sense, also, because you all know that he

16    was vulnerable to an injury, so it didn't take a lot of force.

17    But we also know there wasn't just enough force to bend that

18    license plate or bend Ms. Montes' hood.  There was also not --

19    enough force to hurt someone who wasn't vulnerable in the

20    collision, Mrs. Hopkins.

21         Mrs. Hopkins was badly hurt in the collision, and she had

22    nerve damage, and it took her a year to get better.  It

23    shouldn't be surprising that there was enough force to badly

24    hurt Mr. Hopkins, who was vulnerable, when Mrs. Hopkins took a

25    year to improve.

1        So the final thing that the defense does, in trying to

2   argue that this isn't a large case, is they bring you Dr. Kutsy.

3   And his testimony, I have to say, was not totally clear to me,

4   but this is what I gleaned, and we'll see if it matches what you

5   gleaned.

6        He concedes that Mr. Hopkins was hurt.  He just thinks that

7   he should have, you know, miraculously woken up on January 1st,

8   2018.  And you're going to have to decide who to believe;

9   Dr. Kutsy, on the one hand, that Mr. Hopkins should have woken

10  up on January 1st, 2018, and been all better; or Dr. Taylor,

11  Dr. Eaton, the Hopkins, the medical records that all show that

12  that's not what happened; that he was injured, and that his

13  injuries haven't gone away.

14       So how do you evaluate Dr. Kutsy's opinions?  Well, again,

15  Judge Pechman, in her wisdom, gives you some guidance.

16       This is Instruction No. 10, and Judge Pechman tells you,

17  "In deciding the facts of this case, you may have to decide

18  which testimony to believe and which testimony not to believe.

19  You may believe everything a witness says, or none of it.  In

20  considering the testimony, you may take into account," and then

21  she gives you a bunch of factors, and I want to talk about a

22  couple of these factors.

23       The first factor is the opportunity and ability of the

24  witness to see or hear or know the things testified to.

25       So you heard that Dr. Kutsy has never even met Mr. Hopkins,

 1   let alone examined him.  So you have Dr. Eaton and Dr. Taylor,

 2   who, between the two of them, had dozens and dozens of visits

 3   with Mr. Hopkins.  And do you remember Dr. Eaton's testimony?

 4   It probably seems like a long time ago, but if you remember

 5   Dr. Eaton's testimony, what she said was, "The day I know my

 6   patient the best is the day I discharge them, because every time

 7   you meet with them, you learn."

 8        And you don't just have Dr. Eaton and Dr. Taylor.  You also

 9   have Dr. Weakland, and you have the physical therapy notes from

10   all those other physical therapists.  They knew Mr. Hopkins

11   well.  They worked with him day in and day out.  They did all

12   kinds of objective tests.  And if you look at the -- if you have

13   any doubt about this, look at the physical therapy notes, the

14   dozens and dozens of notes.  They're doing all kinds of tests.

15   And you heard Dr. Eaton say, "The tests always correlated with

16   what he was telling us, we never doubted him, we found him to be

17   honest and truthful."  That is the greater weight of the

18   testimony you apply; number one, the opportunity and ability to

19   see or hear the things they testified to.  The fact that these

20   people all had close, intimate contact with Mr. Hopkins, and

21   Dr. Kutsy didn't, should be important.

22        Now, another factor here is No. 4, the witness's interest

23   in the outcome of the case, if any.

24        Dr. Kutsy makes over $600,000 testifying on behalf of

25   insurance companies.  Now, compare that to Dr. Taylor or

1   Ms. Eaton.  They have nothing to gain by this.  Whether you

2   agree with them or don't agree with them, they're just going to

3   go about seeing their patients.

4         Now, meanwhile, Dr. Kutsy has a big interest in how this

5   case comes out.  If you believe him, they will hire him again,

6   and that is an interest in the outcome of this case.  And this

7   isn't theoretical.  You saw the example in the record, where

8   Cliff Wilson, that defense attorney that they originally hired,

9   he said, "Well, there was a case where we hired Ms. Reif, and

10  the case didn't turn out very well, so I'm not sure if we should

11  use her."  So Dr. Kutsy has $600,000 worth of reasons for how he

12  wants the outcome of this case.

13        Number 5 is bias, what bias or prejudice did they show?

14  Well, you know the bias of Dr. Kutsy.  On the other hand, you've

15  got Dr. Taylor, Ms. Eaton, these other witnesses, there's no

16  bias.  They're just in here telling what happened with their

17  patient.

18        But Dr. Kutsy, on the other hand, he regularly works for

19  insurance companies.  And you heard him.  He gets hired.  He

20  makes $600,000 a year working for insurance companies, and a

21  high percentage of the time -- he told you this yesterday, he

22  was reluctant to tell you -- but he told you, yesterday, a high

23  percent of the time when he gets hired, he disagrees with the

24  diagnosis of the treating doctors, the doctors who actually are

25  going to help the patient.

1        Dr. Kutsy has one job, and that is to keep his job.  As

2   long as he keeps saying that everybody is better in three

3   months, that the treating doctors are wrong, that the injury was

4   minimal, that the person didn't suffer a concussion, despite

5   what the providers say, as long as he keeps saying that, there

6   will never be a shortage of insurance companies that are willing

7   to hire him, and he will keep on earning $600,000 just to parrot

8   the same opinion in every case.

9        You also saw the bias in the real time, live on the Zoom

10  trial.  Remember he tried to tell you, at the beginning of his

11  testimony with Mr. Harris, he said, "Well, one of the reasons

12  that we know Mr. Hopkins didn't have a concussion is because no

13  one diagnosed him within 48 hours."  And on direct, Mr. Harris

14  had him talk about Dr. Taylor, six weeks later, diagnosing

15  concussion.  But what he didn't mention, even though he knew

16  about it, was that Dr. Weakland, in fact, had diagnosed a

17  concussion, and had done it within 48 hours.

18       So when presented with that by my colleague, Mr. Gahan,

19  what did he say?  He said, "Well, the record isn't that clear.

20  It's not that clear if Dr. Weakland meant a concussion because

21  of the collision in 2016, or if she was just referencing a

22  historical concussion."

23       But that is not what the record shows.  You all have seen

24  this.  This is in Exhibit 7-2, and it could not be more clear.

25  "AP," you know what that means.  "Assessment plan."  The

1   assessment was, "concussion injury of brain, personal history of

2   traumatic brain injury."  Dr. Weakland put both.  The diagnosis

3   here was concussion, and this was within 48 hours, and you saw

4   Dr. Kutsy try to ignore that, and then try to muddy the waters.

5        Also, remember, on redirect, Mr. Harris had him say that it

6   showed he was walking within normal limits and that he had no

7   balance issues on that visit with Dr. Weakland.  He, sort of,

8   implied in his testimony that, "Well, that must have come up

9   later," but that's not what this record shows.  If you look at

10  Exhibit 7-1, it says, "Balance not tested, as patient off

11  balance with standing and with eyes closed, holds on to wall."

12  Dr. Kutsy had these records, but he showed his bias in real

13  time.

14       Finally, the reasonableness of the witness's testimony in

15  light of all the evidence.  So you have to decide the

16  reasonableness.  That means use your common sense.  Does it make

17  sense that, after all he went through, he woke up on January

18  1st, 2018, and was cured?  It makes no sense.

19       Does it also make any sense, other things he said, like,

20  "We know he's not hurt because there was a gap in treatment"?

21  So that's what he said.  If you look back at your notes, he

22  said, well, because he didn't go to the doctor on Sunday, when

23  the doctor's office was closed, that means he's not injured.

24       Or the fact that there's times when the PT said, "Yeah, go

25  ahead and go on vacation.  Do your physical therapy at home."

1   We all know that you can have gaps in treatment.  That doesn't

2   mean you aren't hurt.  It just means there's a period of time

3   when you're not going to the doctor.  If what Dr. Kutsy was

4   saying was true, that every time there's a gap in treatment,

5   that means people aren't really injured, that means that

6   everyone out there who suffered a personal injury and wasn't

7   able to go to the doctor during COVID times, that they're going

8   to be able to say, in a courtroom, Well, they must not have been

9   hurt because there's this gap in treatment for months, where

10  they didn't get to see the doctor.

11      It doesn't make any sense, and Judge Pechman tells you that

12  you're allowed to look at the reasonableness of the witness's

13  testimony in light of all the other evidence.

14      Now I want to turn to the other claims in the case.

15      Your Honor, it's 10:30.  Do you want me to keep going here?

16          THE COURT:  I think what I'd like to do is have us

17  take our 15-minute break.  I need to rest the court reporter,

18  and we've now been at it for an hour and a half here.

19      So ladies and gentlemen, please take your 15-minute break.

20  You can be excused to the jury room, and we'll be back with you

21  at 10:45.

22              THE FOLLOWING PROCEEDINGS WERE HELD
                 OUTSIDE THE PRESENCE OF THE JURY:
23

24          THE CLERK:  Your Honor, they are all in the jury room.

25          THE COURT:  Okay.  Mr. Wampold, can you tell me about

1    how much more you have here?

2         MR. WAMPOLD:  I've got about 25 minutes left, Your

3    Honor.

4         THE COURT:  All right.

5    Then, Mr. Harris, we'll start with you -- Mr. Cogswell,

6    would you talk with the jurors, before you bring them back in,

7    to see if their lunch is delayed, whether that causes any

8    difficulty for them.

9         THE CLERK:  Yes, Your Honor.

10         THE COURT:  I'm just trying to figure out what the

11    options are, whether we should break again or push on through.

12    Mr. Wampold, have you timed your rebuttal?

13         MR. WAMPOLD:  We'll be about 30 minutes, Your Honor.

14         THE COURT:  Okay.  Let's take our break, please.

15              (Court in recess 10:32 a.m. to 10:44 a.m.)

16         THE COURT:  All right.  Let's bring the jury back in,

17    please.

18         THE CLERK:  They are on their way.

19         THE COURT:  Do we have everyone?

20         THE CLERK:  I think we are waiting for one more to

21    connect.

22         THE CLERK:  Everybody is here, Your Honor.

23              THE FOLLOWING PROCEEDINGS WERE HELD
              IN THE PRESENCE OF THE JURY:

24

25         THE COURT:  Mr. Wampold, you may continue.

1              MR. WAMPOLD:  Thank you, Your Honor.

2         So now I want to turn to the other claims in the case, and

3    these claims all have to do with how Integon handled

4    Mr. Hopkins' insurance claim.

5         And the first thing that probably crosses your mind, as you

6    listened to all of the instructions, is that all of these claims

7    have different names, and there's a lot of them.  But it's all

8    based on similar conduct.  And why is that?  Why does the law

9    prohibit similar conduct in so many different ways?  Why does

10   the law provide policyholders with so many different claims when

11   they're mistreated by insurance companies?  And the answers are

12   actually in the instructions themselves.

13        You have Instruction No. 19.  This is not Instruction No.

14   19, but you've got Instruction No. 19, which lists the laws that

15   insurance companies must adhere to if they choose to do business

16   here in Washington.

17        And you see some very unique language for the business of

18   insurance, and this says, "A single violation of a statute or

19   regulation relating to the business of insurance is an unfair or

20   deceptive act or practice.  A violation of these statutes and

21   administrative rules also affects the public interest."

22        And what does that tell us?  What it tells us is that the

23   reason there are so many regulations and laws for policyholders

24   is because this doesn't just affect the policyholders -- it

25   doesn't just affect Daniel Hopkins -- it affects the public

1    interest.

2         What the instructions are getting at is that this affects

3    the public as a whole.  And so when an insurance company takes

4    advantage of its policyholders, it affects all of us.  The

5    public relies on insurance for protection when tragedy strikes,

6    and because of that, we need insurance companies to keep their

7    promise; not use their vastly unequal bargaining power to bully

8    policyholders, or evaluate claims in a way that protects their

9    interests, not policyholders.

10        And just like violation of these laws affect the public

11   interests are the enforcement of the laws.  And when they are

12   held accountable here, like in a case like this, the verdict

13   resounds everywhere, and that is what public interest means, and

14   that is why the law provides so many different remedies, to make

15   sure that insurance companies behave properly, because when they

16   don't, it affects the public interest.

17        And it may seem daunting.  With all of these claims, you

18   may have gotten anxious as you listened to the instructions, but

19   I think I can simplify them for you.

20        And, basically, what these instructions explain is that

21   when insurance companies violate the statutes and the

22   regulations and the behavior that Judge Pechman has instructed

23   you, that you should find in Mr. Hopkins' favor on those claims,

24   and I'll explain that, but that's the basic concept.

25        So with that in mind, let's turn to our first claim that

 1   deals with Integon's conduct, and that's the violation of the

 2   Consumer Protection Act, and this is Instruction No. 18 on the

 3   CPA.  And again there's that phrase, "the act or practice

 4   affects the public interest."  In that same vein, one of the

 5   unique aspects of this instruction is that you are the enforcers

 6   here of a Consumer Protection Act violation.  Sometimes that's

 7   the Attorney General's Office that enforces violations of the

 8   CPA, but, in this setting, these types of violations, it's you.

 9   And it makes sense to have members of the community be the ones

10   to enforce these Consumer Protection Act violations.

11        So Instruction No. 19 explains that, "A violation, if any,

12   of one or more of the following statutory or regulatory

13   requirements is a failure to provide benefits:  An unfair or

14   deceptive act or practice in the business of insurance under the

15   Consumer Protection Act."

16        So, basically, when you violate these rules, then you are

17   violating the Consumer Protection Act.  That's what this says,

18   and this is consistent.

19        When Mr. Strzelec testified, he explained that these were

20   standards in the industry for how insurance companies are

21   supposed to behave.  But now you know, from reading your

22   instructions, that these are all based on laws.

23        I went ahead and wrote in the numbers of each law that

24   backs up these rules.

25        So they aren't just industry standards, they're also law.

1    And, basically, what this says is, "A violation, if any, of

2    one or more of the statutory or regulatory requirements is a

3    violation of the Consumer Protection Act."

4    So what this sentence means is, we don't have to prove all

5    of the violations that Mr. Strzelec went over.  We just have to

6    prove any of them.  If you find that they violated any of these

7    rules, then you find that Integon violated the Consumer

8    Protection Act.

9    So when you're going through these different rules, if

10   somebody back in the jury room says, Well, I'm not sure they

11   committed this one, I agree they committed that one, you remind

12   them that all they have to do for violation of the Consumer

13   Protection Act is find that any of the rules has been violated.

14   Now, the same is true for the Insurance Fair Conduct Act,

15   the next claim on your verdict form.

16   A violation of the Insurance Fair Conduct Act is

17   established if we prove that Integon unreasonably denied

18   benefits.  That's number one there.

19   Now, we know, in this case, that Integon denied the

20   benefits.  You heard he was in a 2016 accident.  Everyone agrees

21   he was not fairly compensated, and they have not provided him

22   any benefits.  So the question is whether the denial was

23   unreasonable.  That's, really, the question for you.

24   And in Washington, reasonableness is defined by enacting

25   these rules that we've discussed this whole trial.  So if you

 1    find that they've violated those rules, that is an unreasonable

 2    denial of benefits.

 3         The next claim is a breach of the duty of good faith, and

 4    what this says here, in Instruction No. 23, is, the insurer must

 5    give equal consideration to its insureds' interests and its own

 6    interests, and an insurer who does not deal fairly with its

 7    insureds or who does not give equal consideration to its

 8    insureds' interests fails to act in good faith.

 9         And, finally -- and you'll see, too, that, for good faith,

10    it explains that "a violation of any of the statutes or

11    regulations is a violation of good faith."  And it makes sense

12    because, again, the concept is to protect the public because of

13    the unequal bargaining power of the insurance company.

14         Finally, if you turn to negligence, this is Instruction

15    No. 29, and it says, "The violation, if any, of a statute or

16    administrative rule is not necessarily negligence, but may be

17    considered by you as evidence in determining negligence."

18         Again, what this is saying is that if you find that they've

19    violated these rules and statutes and regulations, then that is

20    evidence of what a reasonable insurance company would do.  So a

21    violation of any of those rules should be considered as

22    negligence.

23         So, basically, it's very simple at the end of the day,

24    which is, if you find that the insurance company violated these

25    rules, you should find for us on all four of these claims.

1          And I believe we've proved that to you by a preponderance

2   of the evidence.  We provided you the testimony of

3   Mr. Strzelec -- and I know he was on the stand for a long time,

4   and I promise I won't repeat everything he said -- but basically

5   what he explained was how this claim, following the law, should

6   have been handled, which is, as soon as they understood that

7   there was this claim, they should have been in a position to

8   evaluate it.  And he says at the beginning of the claim, they

9   were going down the right track.

10         This is Christina May from February 6th of 2018, and she

11  says, "If the injury complaint is substantiated, it's very

12  possible this case could potentially be worth the policy limits,

13  depending on the severity of the balance and vertigo issues."

14         So basically what Mr. Strzelec is saying is, yeah, she

15  recognized that if there's proof that the gravitational vertigo

16  he's got was caused by the accident, was permanent, and was

17  seriously affecting his life, they need to pay limits.

18         Then they give it to a different adjuster, and that

19  adjuster also writes down -- she has a conversation with

20  Ms. Rosato, and she understands that Dr. Taylor is saying this

21  is permanent, it is not going to improve.  And basically they

22  have a conversation, and Ms. Rosato says, "Yeah, I'll outline in

23  the letter what Dr. Taylor had to say, and I'll give you all of

24  the backup, all of the substantiation," and Ms. Rosato did that.

25  And you'll have this exhibit, 2-22.  But Ms. Rosato really walks

1   through all of his injuries and all the objective testing

2   they've done to show the injuries and all the treatment, and

3   says, "In light of the time that has passed since the collision,

4   and the fact that Dan underwent regular physical therapy

5   treatments for a year and a half but is still experiencing

6   gravitational vertigo, Dr. Taylor says that Dan's vertigo will

7   not improve any further," and demands limits.

8        Mr. Strzelec explained, at this point, that a reasonable

9   insurance company has an obligation to look at that and say,

10  Okay, what evidence do we have before us?  We've got the

11  evidence of what Dr. Taylor says in her records, we've got the

12  evidence of what is reported, what their opinion is.  You've got

13  all of the evidence, all of the physical therapy notes.  So if

14  we take that injury, and we treat them with equal consideration,

15  and go through all of these damages and really analyze, you

16  know, what would a jury do with this, what you would realize,

17  from the analysis that we did this morning, is that this claim

18  is worth way more than the $250,000, and what they should have

19  done was paid limits.

20       And this is a record you may not have seen yet.  This is

21  Exhibit 2-26.  But, basically, this is an email from Mary Gordon

22  to her boss, and the truth is, on April 17th of 2018, she had a

23  pretty good understanding of what Dan -- Mr. Hopkins had

24  experienced.  She understood that he had a mild concussion, that

25  afterwards had post-concussive syndrome, he had an inner ear

1   disturbance resulting in gravitational vertigo, he had

2   headaches, he had cervical strain.  She really understood, at

3   this point, what his injuries were.  So if we look at the rules

4   here, if you give equal consideration, number one; if you

5   reasonably evaluate, number two; if you -- what you need to do

6   is do No. 4, which is makes a prompt, fair, and reasonable

7   offer, which would have been to pay the limits.

8        But we know that's not what she did.  Instead, what she did

9   was, she did what's not allowed, and she just speculated,

10  speculated that it wasn't permanent, with no medical evidence;

11  assumed that, actually, this wasn't affecting his life, even

12  though it was, and did a low-ball offer.

13       Now, she claims that she did all of that, even though she's

14  not a doctor and she didn't consult a doctor and she didn't

15  consult a nurse -- she said she did that because she thought,

16  based on this one record, that there was some evidence that he

17  had had these vertigo issues before the collision, that he was

18  experiencing the same problems he is now before the collision.

19       And then we asked her, on the stand, "Well, what about this

20  record?"  I mean, this is pretty important to that analysis,

21  like, if you're going to conclude that he was experiencing this

22  before, what about the fact that there is this exhibit, 34-2,

23  that says that, you know, he had a full checkup in December of

24  2015, and it showed he had no fatigue or weakness, no vision or

25  hearing problems, no problem with headaches, that his mood had

 1   been good, sleeping well, no irritability, no dizziness.  What

 2   about that record?

 3        Now, very important -- this is, obviously, a very important

 4   record, and what Ms. Gordon said on the stand -- and you heard

 5   her -- she said, "I didn't have that."

 6        So here's a fact, right?  She either had it or didn't, and

 7   we can prove she had.  We know she had it because she sent it to

 8   Kutsy.  It was part of the demand package, and then she sent it

 9   to Kutsy.  Why would she get on the stand and say that?  Why

10   would she get on the stand and take the risk and say, "I didn't

11   have that"?  The reason is because she knows it's devastating to

12   what they ended up doing.

13        For them to speculate that he was having these problems

14   before, when they had clear proof that, in December of 2015, he

15   had a full physical evaluation and was not having these

16   problems.  She knows that that is absolutely devastating, and

17   makes her refusal to give the money clear, which is exactly what

18   she was doing, which was, We just don't want to give the money.

19   Yeah, you deserve it, yeah, you had this new injury, yeah, it's

20   really affecting your life, but we don't want to give you the

21   money.

22        So now, at that point, there's, obviously, a standoff,

23   because Ms. Rosato is making clear he's not going to accept

24   less.  He deserves the limits.  He's not going to take your

25   $17,000.

1       So what does Ms. Gordon do at that point?  Does she just

2  call around to say, Hey, who is a reputable neurologist who can

3  answer this discrete question for me?  Who is a really good

4  neurologist in town?  Maybe call some friends in Seattle, "Who

5  do you know who is a good neurologist?"  No, she calls a defense

6  attorney, the defense attorney who represents Integon Insurance

7  Company, and asks him for a referral, and, basically, she says,

8  "Yeah, we want a records review," and he says, quite

9  intelligently, quote -- the last two sentences -- "He has never

10  been able to get someone to provide an opinion based on a record

11  review.  Records won't show them what they need in order to

12  provide an opinion."

13       And that makes sense.  You heard Dr. Taylor explain how

14  important it was for her to (sound interruption) --

15       Does everybody hear that noise?  Okay.

16       Your Honor, is there somebody that can mute?

17       Okay.  Great.

18       You heard Dr. Taylor explain that it was very important for

19  her to come up with her diagnosis to actually do a physical exam

20  on Mr. Hopkins and to really understand his history so it makes

21  sense.

22       So then Ms. Gordon says, "Asked if there will be a downside

23  to doing the in-person exam," and then she says, "It will likely

24  go into arbitration or litigation.  Not really, other than if we

25  do an IME, we have to share it with him.  If we do a records

 1    review, we can just hide it."

 2         That is not showing equal consideration for Mr. Hopkins.

 3    That is assuming this is going to go to trial.  And it explains

 4    what Ms. Gordon is up to here.  She is not trying to get to the

 5    truth.  She doesn't really have an honest question about his

 6    situation.  She actually just wants to set Integon up in the

 7    best possible situation to go to trial.  And you heard

 8    Mr. Strzelec say that's not fair, that's not reasonable, that's

 9    not acting in good faith.

10         And now what happens is -- and one of you asked a great

11    question about the time frame, and you've got Instruction No. 28

12    that explains the time frames, and they've now violated all the

13    time frames.

14         So that happens in May.  They don't even hire Dr. Kutsy,

15    for the first time, until August, and they don't even report

16    back to Ms. Rosato until October.  They violate all these

17    regulations about time.  And you have these here.  Here's

18    Ms. Rosato June 22nd, over a month later, "What's the status?"

19    July 27th, a month has gone by, "What's the status?"  August

20    now --

21         So this note -- again, I don't know that we showed it to

22    you, and if we did, we haven't focused on it enough, but I think

23    it's really important.  This is Exhibit 1-16.  "Received email

24    from insured's attorney, Ann Rosato.  She said it's been over

25    three months since we told her we were going to a records

1    review, and the delay is unacceptable.  She will wait two more

2    weeks, and then proceed with legal proceedings.  Never received

3    fax from Rockwell.  Will move forward with Dr. Kutsy if defense

4    counsel is okay with this doctor."

5         So she wants to make sure not, Hey, is Dr. Kutsy a

6    reasonable person who is objective?  She wants to know, "Is he

7    acceptable to the defense attorney, the lawyer that's going to

8    defend us?  Is this somebody we can rely on in a trial," just

9    like this.  That's what she's asking, and that's not fair,

10   that's not reasonable, and that's not acting with equal

11   consideration of Mr. Hopkins' interests.

12        And she, basically, then just throws up her hands.  "It's

13   unlikely we'll get a response in the next two weeks, so I want

14   to make sure he is okay with this doctor before we send out the

15   file material."

16        So what she's saying here -- again, I think this is a very

17   important exhibit.  She's, basically, saying, Yeah, you know, we

18   offered $17,000.  It's probably not reasonable.  We also know

19   we've blown all the deadlines.  We're going to get sued, so

20   let's just make sure Dr. Kutsy is someone we can rely on at

21   trial, because we're going to end up right where we are.

22        That is exactly what the insurance company did, and that is

23   not fair and that is not reasonable, and that violates,

24   basically, all of these rules, and they did violate all of these

25   rules during this time frame.

1      They didn't give equal consideration to the insured's

2  interest; they didn't reasonably evaluate; they denied and

3  reduced benefits without a reasonable justification; they didn't

4  make a prompt, fair, and reasonable offer; they didn't

5  reasonably investigate; they didn't update the insured about the

6  claim every 30 days and respond to timely communications within

7  10 days.  Instead, what they did was they forced us to all be

8  here, and that, also, is a violation of the insurance rules and

9  regulations.

10      So now, when you're asked, do you find that Integon

11  violated the Consumer Protection Act?  We think the answer

12  should be, "yes," because we've proven all of these.  We only

13  need to prove one, but we've proven all of these.

14      The Insurance Fair Conduct Act; same thing, the answer

15  should be "yes."

16      Did they fail to act in good faith?  Yes.

17      Do you find they acted negligently?  Yes.

18      Now, I'm going to spend the last bit of my time talking

19  about the damages that were caused by Integon's treatment of

20  Mr. Hopkins, because that's what answer you have to put in for

21  each one of these.  What do you find the amount of damages?

22      For the Consumer Protection Act, that is the loss or

23  diminished assets or property.

24      So, here, the diminished assets or property is, he had to

25  pay $931 that he didn't have -- right? -- because they paid

1    $10,000 in medical bills, but he had to pay $931 of his own, and

2    he had to pay -- you heard -- $16,000 just to get to this trial.

3    So that is the amount we think you should put in this column.

4    We think the number should be $16,931.

5         Insurance Fair Conduct Act, what are the total amount of

6    damages for that?  Well, he gets the same damages, the loss or

7    diminished assets or property, but he also gets emotional

8    distress damages.  So you have to ask yourself, what's the fair

9    trade value for making up for that harm?

10        Again, there's been an injustice.  You know that.  There's

11   been an injustice, and the scales of justice are out of

12   alignment.  How much money do you have to put back for what they

13   put him through?  The insult; treating him like an adversary

14   when they're supposed to treat him like a customer.  What is the

15   value to a citizen when a corporation abuses its power?  What is

16   the value of having to sit through this trial, have your doctors

17   hauled in, in a public courtroom, imply that you're a liar?

18        You heard from Kevin Moore, Sarah Hopkins, Irene Hopkins,

19   how horrible this has been for him to have his insurance company

20   treat him like the enemy.  You saw on the stand how horrible it

21   was to get cross-examined by Mr. Harris, to have his doctors

22   questioned, to have his own veracity questioned.  This is his

23   own insurance company.  All of is that is compensable.  And,

24   again, you will decide how much to put on the scales of justice

25   for that harm, but we believe that that harm should be a million

1  dollars, and we would ask that, for the Insurance Fair Conduct

2  Act, you put $1,116,931 on that line.

3         Failure to act in good faith.  Again, the damages are

4  really the same.  The emotional distress and the lost/diminished

5  assets, we believe that number should be $1,116,931.

6         The negligence claim, what are the damages for that?

7  Again, the same damages, and again, we think you ought to put

8  that same amount down, $1,116,931.

9         So then it asks you to total the damages, and the reason

10 this is really important is, no one, including us, wants Integon

11 to have to pay for more than you've awarded.  So to be clear,

12 what we're asking for this part of claim, how they handled the

13 insurance claim, to put in a total of $1,016,931.  Basically,

14 the other damages are duplicative, so the total here should just

15 be $1,016,931.

16        I'm just about done, but I want to say, at the end, thank

17 you, all, for your service.  You know this case is important for

18 Mr. Hopkins, it's important for the public interest, and you are

19 acting to protect that public interest.  You are here to set

20 standards, to enforce the laws, and to hold insurance companies

21 accountable.

22        What you do in deliberations will be on record in this

23 courthouse forever, and we would ask that you deliver justice

24 for Mr. Hopkins and set things right, please.

25        Thank you.

 1          THE COURT:  All right, ladies and gentlemen.  How

 2   about let's stand up, take a little stretch, shake it out so we

 3   can turn our kind attention to Mr. Harris in a moment.

 4              (Off the record 11:12 to 11:30 a.m.)

 5          THE COURT:  All right, ladies and gentlemen.  Please

 6   give your kind attention to Mr. Harris.  He has the privilege of

 7   giving the closing argument on behalf of Integon.

 8       Mr. Harris?

 9          MR. HARRIS:  Thank you, Your Honor.  Can I share my

10   screen?

11          THE COURT:  Certainly.

12              DEFENDANT'S CLOSING ARGUMENT

13          MR. HARRIS:  Can everybody see that?

14       May it please the court, counsel, ladies and gentlemen of

15   the jury.

16       I want to start, similar to where Mr. Wampold started, by

17   thanking you for your time, your dedication, and your attention

18   during this trial.

19       You heard from Judge Pechman -- I think it was on Friday --

20   that this trial made her more nervous than any other trial she

21   had during her long career.  I'll be honest.  I felt the same

22   way.

23       When we found out a little over a month ago that we'd be

24   doing this trial by Zoom, I didn't know what to expect, but I

25   knew that the only way this would work is if everybody bought

1   in.  If everybody was committed to this, they showed up, they

2   paid attention, and did their role.  And I have to say, I've

3   been pleasantly surprised by the way this has gone, and your

4   attention to the details and your participation in this case, I

5   just want to start by saying thank you for your time and

6   dedication here.

7        At the beginning of this trial, I told you this case is

8   about striving to do our best, and that Integon strived to do

9   its best in its evaluation and handling of Mr. Hopkins' UIM

10  claim.

11       Now, in this case, plaintiff's counsel and their witnesses

12  have asked you to hold Integon to the wrong standard.  They've

13  asked you to check every box, dot every i and cross every t.

14       While it has a corporate name, Integon is run by people.

15  It is people that operate the company, people that investigate

16  and administer claims, people whose sole job it is to come up

17  with an evaluation and settlement of the appropriate claim at

18  the appropriate value.  Like all of us, they're not always

19  perfect.  It's for that reason that the law doesn't require them

20  to be perfect.  It only requires them to be reasonable and to

21  not place their interests over those of their customers.

22       Now, despite the efforts to tap into your prejudice and

23  sympathy for Mr. Hopkins in this case, you swore an oath, at the

24  beginning of this case, that you would decide it based on the

25  facts and the evidence, not the arguments of David and Goliath,

1   as Mr. Wampold alluded to during his summation, and by not

2   appealing to your passions, as plaintiffs have tried to do

3   repeatedly throughout this trial, but based on the facts and the

4   evidence that you heard during the course of this trial.

5        One of the jury instructions that Judge Pechman provided to

6   you in this case talks about prejudice, and it says that all

7   parties are equal before the law.  And while you may feel some

8   compassion for Mr. Hopkins and his family, you must decide this

9   case based on the same consideration for my client that you show

10  for him.  Our system of justice depends on it, regardless of who

11  the parties are, that they are being treated fairly and equally

12  in the eyes of the law.

13       And Mr. Wampold also mentioned this jury instruction during

14  his summation, and I want to bring it up again to talk about it

15  from our perspective.  Because it says the plaintiff has the

16  burden of proving their case by a preponderance of the evidence.

17  That means you must believe that all of the elements, for each

18  of their claims, have been proven on a more-probable-than-not

19  basis.  And if you find that some of those elements have not

20  been proven, for some of those claims, you must return a verdict

21  in favor of my client.

22       Now, remember the issues that you're being asked to decide.

23  I showed this to you earlier on, and this, really, relates to

24  some of the extra-contractual claims.  I'll talk about the UM

25  benefits and the UIM claim later on.

1          The first question, really, asks you, but did Integon fail

2     to use reasonable care?  Did my client act in a manner that was

3     unreasonable, frivolous, or unfounded?  Did my client

4     unreasonably deny the payment of benefits?

5          These all really come down to the same question.  Was

6     Integon reasonable in its decision to not agree to pay the

7     $250,000 demand in addition to the $10,000 in PIP, the $25,000

8     from Progressive, and the $1,064 in repair costs to Mr. Hopkins'

9     car.

10         You've seen no evidence in this case that plaintiff ever

11    offered to settle for below $250,000.  So that was, really, the

12    question that was being asked:  Were they willing to pay that

13    amount, or were they going to try to evaluate it and then settle

14    it for a reasonable sum?

15         Now, you heard from both of the experts in this case,

16    Mr. Strzelec and Mr. Hight.  My client was not required to be

17    perfect.  It was not required to do everything possible.  It was

18    only required to act reasonably.

19         And my client had a basis to investigate whether

20    plaintiff's injuries were related to the 2011 accident or the

21    2016 minor, low-speed car accident that we're here for today.

22         Now I want to highlight this jury instruction for you.  It

23    talks about the reasonableness of the claim handling, and it

24    tells you that when looking at my client's actions in this case,

25    you must judge them not necessarily from what you heard during

1   this trial or what occurred with regard to the claim after the

2   lawsuit was filed, but you have to look at it based on the

3   information that was available at that time and based on what

4   occurred at that time.

5        So if a report or a document was not provided to my client

6   at the time they made their decision, and was never considered

7   by them during their pre-suit investigation and evaluation of

8   the claim, you may not consider it for the purposes of judging

9   the reasonableness of my client's actions.

10       For example, this is a report from Dr. Taylor.  You've seen

11  it.  It's dated September 11th, 2018, which is right before this

12  lawsuit was filed.

13       During the course of this trial, you've heard no evidence

14  that Integon ever received a copy of this document prior to the

15  filing of this lawsuit.  There's no record of it in the claim

16  file, there's no mention of it by Dr. Kutsy, there's no record

17  or email or a letter by anybody, including plaintiff's counsel,

18  indicating that this document was provided to my client during

19  the course of their investigation.

20       For them to suggest, during the course of this trial, that

21  Integon's decision regarding the UIM claim and the value of it

22  was wrong based on this record, is just false.  It defies logic,

23  common sense, and defies the law, as you saw in the jury

24  instruction I just showed you.

25       What the evidence does show is that this was the last

1    record, that was provided to my client during its evaluation,

2    from Dr. Taylor.  This is the April 20th, 2017, report.

3         Ms. Gordon specifically noted this record in her

4    evaluation, and Dr. Kutsy evaluated and discussed, in his

5    report, that this was the last update from the neurologist

6    regarding the plaintiff's condition.

7         It indicates that the plaintiff was still making progress

8    with his vertigo.  It reports that all of his symptoms had

9    resolved, including his headaches, his fatigue, his cognitive

10   issues.  All had either resolved or gotten all the way back to

11   baseline.

12        Again, this is one year after the accident and right after

13   Mr. Hopkins took his four-month trip to Panama.

14        This is another important instruction that I want you to

15   look at, and it talks about the negligence standard, and it has

16   a similar concept as what we just got done looking at in terms

17   of reasonableness.  It says, "Negligence is some act that a

18   reasonably careful person would not do under the same or similar

19   circumstances, or the failure to do some act that a reasonably

20   careful person would not have done under the same or similar

21   circumstances."

22        Again, we have to put ourselves in the position of the

23   person in the same or similar circumstances.  What did they

24   know, when did they know it, and what did they do about it?

25        With regard to the IFCA claim, it has a similar concept as

1  the negligence claim, because it talks about this unreasonable

2  denial of benefits.

3       Again, we look at the jury instruction regarding

4  reasonableness, and we have to decide what did they know, when

5  did they know it and what did they do in terms of their decision

6  to offer benefits in this case.  That's how it relates to the

7  IFCA claim.

8       It's a similar standard.  You can't

9  Monday-morning-quarterback this.  You can't go back and say

10  hindsight is 2020.  You have to look to see what did they know,

11  and what did they do about it.

12       With regard to the CPA standards, I showed you this slide

13  in opening, and we've talked about this extensively during the

14  course of this trial, but it's worth noting again that all of

15  these standards have this concept -- almost all these

16  standards have this concept of reasonableness.

17       I'm going break these down for you.

18       The communication with the plaintiff, which is almost

19  exclusively done through plaintiff's counsel, was done in a

20  reasonable and prompt manner, but I'll explain that a little

21  more later on.

22       The investigation performed by Integon in this case was

23  reasonable, both in terms of the scope and timeliness of it.

24       Integon's efforts to settle this claim were prompt, fair,

25  and equitable at all times.  And as you've seen how plaintiff,

 1  through his attorneys, were well aware of the UIM coverage that

 2  was available under the policy.

 3         And, lastly, I'm going to show you how Integon did not

 4  force plaintiff to file this lawsuit by offering substantially

 5  less than the amounts ultimately recovered; not just did they

 6  offer lower than what was ultimately -- than what you decide was

 7  his damages from the accident, but did they offer substantially

 8  less than what was recovered?  But, again, looking at this in

 9  terms of what did they know and when did they know it.

10         Based on the information that they had at this time, and

11  based on the insistent and never-wavering demands by the

12  plaintiff's counsel that Integon pay the $250,000 policy limits,

13  and nothing else, the answer to these questions is going to be

14  yes, that they did act reasonably, and, no, they did not violate

15  the CPA.

16         So let's go through the history of the claim, because

17  Mr. Wampold went through, and he gave you, kind of, a cursory

18  review of the timeline, but he left out some really important

19  parts, so I want to go through and really do a detailed analysis

20  of how this claim was handled.

21         So let's start with November 20th, 2017.  By all accounts,

22  this was the first time that the claim was submitted to Integon

23  in terms of a request for UIM benefits.

24         A couple of days before this, plaintiff's counsel had

25  resolved the claim with Progressive for the $25,000 policy

 1    limits, and only then were plaintiff's counsel in a position to

 2    then open up a UIM claim with Integon.

 3         Up to this point, all of plaintiff's medical bills had been

 4    paid for by Integon under the PIP coverage.

 5         So from November 20th, in terms of timeliness, we see the

 6    UIM claim opened the next day, and we see, the next day, calling

 7    the insured's attorney, trying to get ahold of them, trying to

 8    get more information.

 9         Also that same day, calling them back, having a

10    conversation, trying to get information, and trying to find out

11    what was going on with this claim.  This is prompt investigation

12    to try to get to a position where this claim could be settled.

13         It was reported here -- this is when Integon learned that

14    the plaintiff had settled the claim with Progressive for

15    $25,000, and Ms. Rosato indicated that she would be submitting a

16    UIM demand in the next couple of months.  There was a discussion

17    about this, and Integon indicated that it would respond to the

18    UIM demand once they had received it.  Ms. Rosato understood.

19         This was a first, in a series of agreements, that showed

20    the cooperation and coordination between plaintiff's counsel and

21    Integon with regard to how the claim was going to be

22    investigated, evaluated, and handled.

23         Following this telephone call, Integon sent a letter the

24    same day, November 21st, the day after the UIM claim had been

25    submitted, saying, "Thank you for your letter.  We look forward

1  to working with you to evaluate your claim.  Can you please send

2  us your demand, along with a complete copy of the medical

3  records you would like us to consider?"  Again, showing this

4  collaboration, agreement, the parties are on the same page in

5  terms of how this claim is going to proceed forward.

6       And at this point in time, they're on the same page in

7  terms of plaintiff would submit his UIM demand a few months

8  later.

9       So this is a timeline.  We're going to add to this as we go

10 through, but we see, in 2017, November of 2017, a letter,

11 response, phone call, letter in response to that letter.

12 Timely, prompt investigation and communication.

13      Mr. Strzelec's testimony that Integon just sat back and

14 waited and didn't do anything ignores the clear evidence in this

15 case.  As Mr. Wampold mentioned to you, that's something you can

16 look at in terms of the credibility of witnesses.  Did they

17 provide accurate statements at all during the course of this

18 case?  I'll submit to you, and you've seen during the course of

19 this trial, that Mr. Strzelec's testimony, in regards to Integon

20 just sitting back and waiting, isn't true.  That's not what

21 happened, and we'll go through and we'll see why that's not

22 true.

23      You also heard from Mr. Hight, who said this is common

24 practice in the industry for the plaintiff's counsel to prepare

25 a UIM demand to initiate these types of negotiations.  And

 1  there's no standard that requires an insurance company to go out

 2  and conduct its own investigation, to pull together the records

 3  in order to begin their process of evaluating the claim.  They

 4  can wait for the UIM demand.

 5       And in this case, specifically, not only was that a common

 6  standard of practice, but it was agreed upon.  The parties

 7  agreed this is how it was going to proceed.

 8       Mr. Strzelec's opinion that Integon acted unreasonably by

 9  reaching this agreement with the plaintiff's counsel and waiting

10  for the UIM demand completely defies logic and is not supported

11  by any of the facts in this case.

12       So the next time we see activity in this case is on

13  February 6th, 2018, and it's about two and a half months later.

14  By this point, we hadn't received the UIM demand yet, and

15  Ms. Rosato called Integon and spoke with Ms. May, who had been

16  assigned the claim.

17       And during this conversation, Ms. Rosato provided an update

18  on Mr. Hopkins' condition; said, "He went through two rounds of

19  cognitive testing and has deficits in executive functioning and

20  doing complex tasks."  Now, she's talking about the 2011

21  accident here, and this is Ms. Rosato communicating to Integon

22  that Mr. Hopkins has deficits in cognitive functioning and doing

23  complex tasks from the 2011 injury.

24       "Due to the brain injury, he had to stop working as a

25  marine mechanic and was not able to return.  Continued to have

1   cognitive issues."

2        These are statements by the plaintiff's counsel to Integon,

3   acknowledging that, from the 2011 accident, there were still

4   deficits and cognitive issues that the plaintiff was suffering

5   from.

6        She also indicates that Mr. Hopkins is set to see his

7   doctor to determine if there's anything else that can be done

8   with regard to his condition.  But, again, no report from

9   Dr. Taylor.  The only report they had at this time was the April

10  20th report from 2017.  We'll see what happens a little bit

11  later.

12       So the same day, Ms. May prepares the PEV analysis.  We've

13  heard about the PEV analysis during the course of this trial.

14  You heard from Ms. Gordon that this analysis is intended to not

15  give equal consideration but every consideration for the

16  policyholder's version of the claim.  Essentially, it assumes

17  everything that is being said by the policyholder to Integon is

18  accurate.  They take everything at face value, and accept it as

19  being true.

20       So it's a straight calculation of what amount, in total,

21  would plaintiff likely be able to recover from Ms. Montes from

22  the accident.

23       There are three notable aspects about the PEV analysis.

24  The first and most notably is it has potential medical specials,

25  and you'll see it's $32,500 to $50,500, which, as we know and as

1   we heard from Mr. Wampold, the actual medical costs are $10,900

2   and change.  So this is three to five times over what the actual

3   medical costs turned out to be.

4       Second, the PEV analysis doesn't include any offsets.  It

5   doesn't include a consideration of the $10,000 in PIP or the

6   $25,000 from Progressive.  It is a straight calculation saying

7   what is the total value of this claim.

8       Third, it does not account for any of plaintiff's medical

9   records, repair estimate, photos of the accident scene, or

10  photos of the damage to the car.  At this point, Ms. May had

11  none of that information because she had not received the UIM

12  demand or the medical records from the plaintiff's counsel.

13      And based on that, and as you heard Mr. Strzelec say, this

14  was a good analysis, "Ms. May did a good job," those were his

15  words, her range is $111,000 to $135,500.

16      So she also prepared what's called a case-reserve analysis,

17  and you've heard about this.  It has a separate purpose for what

18  she's doing.

19      You heard Ms. Gordon testify that this is really looking at

20  in terms of -- of an overall value of the case.  So it factors

21  in some of these offsets.  So Ms. May still has the medical

22  specials at three to five times what they actually are.  She

23  still doesn't have any medical bills, same day as her PEV

24  analysis, but she factors in the offsets, and so she comes up

25  with a settlement range for the UIM claim of $79,203, and she

1   specifically notes, "I don't have any medical records at this

2   time."

3        So based on Ms. May's analysis -- we heard Ms. Gordon

4   testify -- the claim got moved over to the large-loss unit, got

5   moved over to a unit of more experienced adjusters, people who

6   were more equipped to handle this, and it was assigned to

7   Ms. Gordon.

8        The very first thing that Ms. Gordon does is she calls

9   plaintiff's counsel to get an update on treatment and status of

10  the demand, which we saw before, Ms. Rosato had agreed to

11  provide to Integon.  During this call, Ms. Gordon specifically

12  asked for prior medical records and a report from the

13  neurologist regarding his current condition.

14       Once again, we see an agreement by plaintiff's counsel and

15  Integon as to how the claim would be investigated and the

16  settlement discussions initiated, as she said -- "she,"

17  referring to Ms. Rosato -- "will put together all the

18  information and send the demand."

19       We heard from Mr. Hight about this collaboration,

20  cooperation between Integon and the plaintiff's counsel in this

21  case, and how they worked together and kept each other informed

22  of what was going on, to try to work together to settle this

23  claim.

24       After she had this conversation with Ms. Rosato, Ms. Gordon

25  sends an email confirming, "I am the adjuster.  I'm looking

1   forward to working with you to resolve this claim."  Again,

2   being timely, being responsive, keeping the plaintiff's counsel

3   informed of what was going on and how the claim was going to be

4   progressing.

5         So here we've got the responsive letters in November of

6   2017, and then we've got these series of letters in February of

7   2018, phone calls, emails, letters, keeping each other informed

8   of what's going on, and trying to coordinate getting the

9   information that each side needs in order to evaluate the claim,

10  and try to work together to effectuate a settlement.

11        Now, Ms. Gordon didn't just sit back and say, "Okay, well,

12  I can wait for the UIM demand to come in.  I don't have to do

13  anything else" -- again, as Mr. Strzelec says, sitting back and

14  waiting -- that's not what she did.  She prepared an estimate,

15  and she prepared her own evaluation with fresh eyes from

16  Ms. May's evaluation.

17        By this point, Ms. Gordon was able to find more accurate

18  estimates for the medical specials, so she knew that the

19  medicals were closer to $9,000 than to $50,000, and she prepares

20  an estimate based on that, as well as the generals, as well as

21  the information she received from Ms. Rosato.  But her general

22  damages were fairly consistent with Ms. May -- which we'll see

23  in a minute when I show you a comparison, side by side -- and

24  her total range -- which both insurance experts agreed -- from

25  Ms. May was a reasonable range, and she had a total of zero to

1    $84,000, and she set the midpoint at $42,000, and that was for

2    the reserve.  Again, her estimate of what it would probably take

3    to resolve this case, because she acknowledged that this case

4    could be up to $84,000.

5        So, here, we look at the side-by-side estimates.  We have

6    Ms. May's on the left; we have Ms. Gordon's on the right.  And

7    this is the estimate -- again, you heard from Mr. Strzelec --

8    was a good plan, was a good job by Ms. May.  And what we see

9    here is a striking similarity between a lot of these numbers.

10       You see that the good plan by Ms. May is not so different

11   from Ms. Gordon's estimate in terms of the high-side value of

12   the claim.  You'll notice Ms. Gordon actually has a higher

13   estimate for general damages.  Ms. May is still using the

14   $32,000 to $50,000 range.  Really what we see is a wider range

15   of the damages for the vertigo; acknowledgement by Ms. Gordon

16   that she knew and that she was told by Ms. Rosato that

17   Mr. Hopkins had these deficits and had some cognitive issues,

18   and so she knew there was probably going to be a causation issue

19   here, and she'd also heard that it may be permanent, but she

20   didn't know, and she didn't have a report from a doctor saying

21   that it was permanent at the time.

22       So she's giving a wide range.  She's acknowledging that

23   there's a lot of unknowns at this point.  And, again, she

24   doesn't have any of the medical records at this point in time,

25   when she's doing this estimate.  But it's a reflection -- there

1    is a number of factors -- and a high degree of difficulty for

2    Ms. Gordon, using her professional judgment and discretion, when

3    estimating a claim such as this one.

4        The reasonableness of Ms. Gordon's initial estimate is

5    confirmed by this note, by Mr. Chodacki, which is her manager at

6    the time.  Again, not sitting back and waiting for a demand;

7    preparing an evaluation that's then reviewed and approved by her

8    supervisor.  They were preparing the estimate based on the

9    information they had at that time, to proactively evaluate the

10   claim so that when the UIM demand came in, they would be

11   prepared to respond in a prompt and timely manner.

12       You'll also remember Ms. Gordon's testimony about

13   Mr. Chodacki.  He was a regional manager on the West Coast for

14   Farmers Insurance before he came to Integon, and he had a lot of

15   experience with claims in Washington.  He was very familiar with

16   the laws of Washington, and Ms. Gordon relied on him and his

17   knowledge and experience in handling claims in Washington.

18       You also heard Ms. Gordon specifically talk about how she

19   and Mr. Chodacki regularly conferred about their claims and that

20   they specifically talked about this claim on multiple occasions.

21       So that brings us to the UIM demand, March 26th, 2018.  As

22   we saw and as we heard during the course of this trial, it was

23   not received until April 3rd, 2018, and plaintiff's counsel

24   asked for the entire policy limit, $250,000, which was two to

25   two and a half times the estimate prepared by Ms. May and by

1    Ms. Gordon up until this point in time.

2        It was not until then that plaintiff's counsel had

3    submitted the medical records as well, so now Ms. Gordon had the

4    opportunity to review the medical records and prepare her

5    evaluation based on those.

6        So, again, looking back at our timeline, we've got this

7    initial communication in November, where there is an agreement

8    that they're going to provide a UIM demand; there is subsequent

9    conversations in early February, and going into later February,

10   where, again, they're reconfirming their agreement and their

11   plan -- their joint plan -- to investigate the claim by getting

12   a demand, getting the medical records, and then working through

13   the evaluation of it.  And then that brings us to the demand,

14   which was dated on the 26th of March but not received until the

15   third of April.

16       So what we see after we get the demand is, Ms. Gordon gets

17   to work.  She reviews and summarizes the demand letter in her

18   notes.  She specifically notes a number of medical records that

19   jump out to her, that you're going to recognize because you've

20   seen these repeatedly throughout the course of this trial.

21       She specifically notes Dr. Taylor's first record of seeing

22   Mr. Hopkins, where she diagnosed him with gravitational vertigo.

23   She also noted Dr. Taylor's third visit, the last visit before

24   this and the only record -- the last record from Dr. Taylor that

25   was provided to Integon, which is the 4/20/17 record, where it's

1   noted that all of his symptoms had resolved, except for some of

2   his vertigo.  The vertigo had improved, and, hopefully, would

3   couldn't to improve.  She specifically noted the issue of

4   permanency of the injury and the ambiguity in these records.

5   She also accounted for the fact that plaintiff claimed that he

6   would never return to his pre-collision status.

7        So she didn't discount these assertions, as Mr. Strzelec

8   noted.  She specifically included it in her evaluation as yet

9   one of the factors she was looking at in preparing her

10  evaluation.

11       And she also noted the record you've heard about a lot

12  during the course of this trial, the September 1st, 2017, record

13  from Cascade.  You've heard excuses, you've heard explanations,

14  you've heard allegations about whether this record is accurate

15  or not, but you also heard from Dr. Eaton, and Ms. Emami is a

16  well-respected certified physical therapist.  Plaintiff offered

17  you no evidence to undermine her credibility or the accuracy of

18  her record, other than pure speculation and conjecture.  We did

19  not hear from Ms. Emami during the course of this trial.

20       So getting back to the jury instructions that I mentioned

21  at the beginning, plaintiff had the burden of proof.  They have

22  not met their burden of proof to show that this record was

23  wrong, was inaccurate, and they certainly haven't met their

24  burden of proof to show that Ms. Gordon's reliance on this

25  record was unreasonable.

1        The record and its meaning could not be more clear, which

2   is why plaintiffs have gone to great lengths to discount it, but

3   they've offered nothing, in terms of evidence, to disprove it.

4        So based on this record and the significant prior TBI from

5   2011, Ms. Gordon realized that she's got two issues:  Permanency

6   and causation.  And she further documents these issues in her

7   evaluation on April 17th, 2018.  She specifically notes that,

8   "While plaintiff's counsel claims the vertigo is permanent, the

9   last record from Dr. Taylor is inconclusive."  Again, not taking

10  someone's word for it, not speculating, but giving equal

11  consideration to the evidence, to the medical records that are

12  not entirely consistent with what she's hearing from plaintiff's

13  counsel, and not entirely consistent with each other.

14       So make no mistake.  Her evaluation was not just based on

15  this record, though, it was based on this note that we talked

16  about a little while ago, where she talked to Ms. Rosato, and

17  Ms. Rosato specifically told her about deficits in executive

18  functioning and doing complex tasks, and how he continued to

19  have cognitive issues.

20       So though his vertigo, as claimed by the plaintiff, was

21  permanent after the 2016 accident, she also has this admission,

22  from the plaintiff's counsel, that he was having these issues

23  before the accident.  Again, inconsistencies that warranted

24  further investigation.

25       We also heard about Dr. Weakland's record, and Mr. Wampold

1   showed this to you during his summation.  This is the

2   December 1st, 2015, record.  They didn't note to you that

3   Dr. Weakland even noted out that he was having residual

4   processes a bit slower.  Again, a recognition by Dr. Weakland

5   that there were issues that Mr. Hopkins was still experiencing

6   prior to the 2016 accident.

7          While it appears that he made a significant recovery from

8   the 2011 accident, he was not back to normal.  He had residual

9   problems, as noted by Dr. Weakland, and as we saw, during the

10  course of this trial, noted by Dr. Stobbe, who noted that his

11  balance issues had plateaued and would impact him for the rest

12  of his life.

13         We've heard about that objectively from the plaintiff

14  himself that he was not able to return to work at any point in

15  time following the 2011 accident.  If he was back to normal, if

16  he had no residual issues, why does it show up in the medical

17  records?  Why didn't he go back to work?  Why was it that he

18  continued to go on sailing trips, or boating trips, as he

19  describes it.  It just doesn't add up.

20         More importantly, as it relates to this case, it raises

21  issues about whether and how serious Mr. Hopkins' vertigo was,

22  as well as what role his lifestyle choices were playing and

23  contributing towards it.

24         So that brings us to Ms. Gordon's April 17th, 2018,

25  evaluation.  And you saw this slide in my opening, and you saw

1   it during the course of this trial as well.  The jury

2   instructions, as I mentioned, tell you that you have to judge

3   Ms. Gordon's evaluation based on what she knew at this time.

4        She was trying to give equal consideration to both sides,

5   to come up with a reasonable, fair estimate based on these

6   conflicting reports from both plaintiff's counsel and from the

7   medical records.

8        And here is her evaluation.  She came up with a total

9   evaluation.  She came up with a total evaluation of $39- to

10   $106,000 for generals, and $81- to $93,040.  So for an overall

11   case value of $47- to $115-.  That does not include the offsets.

12   That's a pure-value estimate.

13        This was not a low-ball estimate.  This was based on the

14   evidence.  It was based on the facts.  It was based on the

15   information that had been provided to her by the plaintiff's

16   counsel.  This was her best effort to estimate the value of the

17   claim at this time, based on the information that she had.

18        So when you account for the offsets, which no one has

19   really disputed in this case, you get the settlement range that

20   Ms. Gordon made in this case, $16,000 to $84,000, and her

21   initial offer was $17,340, so, actually, a little bit more than

22   the low end of her range.

23        But she was not willing to pay $250,000.  Her goal was to

24   start a negotiation that would result in a settlement that was

25   within this range.  And you heard Mr. Strzelec and Mr. Hight

1    both talk about how calculating these damages, in terms of

2    range, is a common practice.  This is meeting the standards of

3    custom and industry for these types of claims.  She was trying

4    to negotiate.  She was trying to get the claims settled at a

5    reasonable price.

6          So now let's look at the three estimates side by side.

7    We've got Ms. May's February 6th, 2018, estimate, the very good

8    plan, according to Mr. Strzelec.  We've got the March 2nd

9    estimate by Ms. Gordon, which is her reevaluation after she's

10   assigned the claim.  And then we've got the April 17th, 2018,

11   estimate, so her last estimate after she gets the medical

12   records.

13         And what we can see is a consistency in terms of the

14   numbers, in terms of the ranges, and in terms of evaluations.

15         We know the first two estimates didn't have the medical

16   records, but it had some information, and it had information

17   specifically from the plaintiff's counsel, and that same

18   information was available on April 17th, 2018, when Ms. Gordon

19   prepared her estimate for this case.

20         Mr. Wampold told you during his summation that Ms. Gordon

21   never did this, that she never prepared these kind of estimates.

22   That's just not true.  The evidence shows that she did.  She

23   calculated specials, she calculated generals.  We heard from

24   Mr. Hight, this was common practice in the industry for her not

25   to break it out by these individual numbers, as Mr. Wampold did

1    during his summation.  This is how they do it in the industry.

2         So in terms of timeliness, going back to our timeline,

3    we're at April of -- April 20th, 2018, and we see that Integon

4    received the UIM demand on April 3rd.  And so they've responded

5    now, by April 20th, a call to Ms. Rosato saying, "Hey, let's

6    talk about this claim," but she wasn't in, so she left a message

7    for her.

8         And then we see on the 24th of April 2018 that she got a

9    voicemail, from Ms. Rosato, to talk more about the evaluation of

10   the claim, and this is where she makes the settlement offer of

11   the $17,340.  And she provided a basis for this offer, the

12   September 21st, 2017, record from Cascade.  And she indicates

13   that because of it, they weren't considering these injuries to

14   be permanent.

15        And Ms. Rosato indicated, "Well, this seems at odds with

16   what Mr. Hopkins has been telling me, but I'll take it do him

17   and I'll discuss it with him, and I'll get back to you about

18   it."

19        And Ms. Gordon followed it up with an email, where she

20   specifically noted, "Hey, thanks for our conversation.  Here's

21   my offer of $17,300, and here's the basis for it."  She was

22   showing her cards.  She was laying it out there and explaining

23   why she came up with the evaluation that she did.  She wasn't

24   trying to hide anything from the plaintiff in this case.

25        So then Ms. Rosato goes and talks to Mr. Hopkins and

1    provides this response with regard to the September 1st, 2017,

2    record.

3         "They got it wrong.  They must have confused the timing;

4    must have been a mistake in my medical records."  Again, the

5    theme that we heard, throughout the course of this trial, is

6    that they think this record is wrong, but yet they've produced

7    nothing -- no witness, no evidence -- to show that Ms. Emami's

8    recollection of the events on that day was incorrect.

9         It also applies to medical records, not just this

10   September 1st, 2017, record, but also Dr. Taylor's April 20th,

11   2017, record, where all of Mr. Hopkins' symptoms had resolved,

12   except for some of the vertigo, and Ms. Grove's and Dr. Eaton's

13   record from around the same time, June of 2017, where they both

14   reported that his headaches were gone.  We heard the same

15   themes:  These must be mistakes, they didn't ask the right

16   questions.  This is further evidence of the uncertainty

17   regarding the permanency and causation of Mr. Hopkins' symptoms.

18        So we go to May, early May 2018.  You can see from this

19   note that Integon's plan, despite these inconsistencies in the

20   medical record, was to continue negotiating the settlement of

21   the UIM within the authority provided.

22        You heard Ms. Gordon testify that she had the authority of

23   up to $75,000, and this was in addition to the $10,000 PIP and

24   the $25,000 from Progressive.  So she sends an email to her

25   supervisor, Mr. Chodacki, saying, "I got this response from the

1   plaintiff's counsel.  They think this September 1st record is in

2   error.  I suggest we continue to negotiate within this amount."

3       So Mr. Chodacki responds, and he enters a note saying,

4   "Yeah, I'm in agreement with you.  I think that you should

5   continue to investigate and continue to negotiate, but I also

6   think you should do a records review to address the causation

7   and the apportionment issues."  And as we saw throughout this

8   course of this trial, that's exactly what happened.

9       So right after this exchange with Mr. Chodacki, Ms. Gordon

10  calls Ms. Rosato and says, "Hey, we're still analyzing causation

11  and wanting to have the records reviewed.  We can make another

12  offer, if you want to continuing negotiating with us," at that

13  time, and Ms. Rosato responds, "Why don't you just wait until

14  after you've had this records review done before we continue to

15  negotiate?"

16      What's notable is, there is no evidence and there's no

17  notation in these notes that there was any complaints, any

18  objections, no letters from Ms. Rosato or anyone else on behalf

19  of the plaintiff in the following weeks saying, "Hey, you're

20  taking this investigation in the wrong direction.  We don't

21  think this records review is a good idea."  Nothing.  At no

22  point, during this period of time, did we hear from the

23  plaintiff's counsel that they thought this was a bad idea.

24          THE COURT:  Mr. Harris, we need to find a place to let

25  the jurors stand up and take a stretch.

1    MR. HARRIS:  I think we can do that now.

2    THE COURT:  Thank you.  Ladies and gentlemen, let's

3  stand up and take a stretch, please.

4    (Off the record 11:54 to 11:55 a.m.)

5    THE COURT:  All right.  Mr. Harris, you may continue.

6    MR. HARRIS:  Thank you, Your Honor.

7    So what we see at this point in time -- and Mr. Wampold

8  mentioned this to you during his summation -- we see Ms. Gordon

9  reaching out to Mr. Wilson, a local attorney, to get

10  recommendations for a doctor to do a records review.  We've seen

11  extensive efforts, multiple emails, phone calls with Mr. Wilson,

12  to find a qualified doctor with the appropriate qualifications

13  and certifications -- a neurologist, in this case -- to complete

14  the records review.

15    So we see the amount of activity that's going on during

16  this period of time from when we get the demand letter, which

17  was dated in late March but not received until early April.  We

18  had this series of phone calls, emails, going back and forth,

19  trying to coordinate this records review so that everybody is on

20  the same page in terms of they know what's going to happen.

21  Ms. Rosato knows, Ms. Gordon knows, Mr. Wilson knows.  They're

22  all trying to work together to try to get the investigation to

23  move forward so they can resolve the UIM claim.

24    And this shows the plan, the investigation that was

25  performed, in terms of first reviewing the material that was

1    provided, preparing the initial evaluation regarding the claim

2    value, communicating with the plaintiff about the claim value

3    and explaining the basis for that evaluation, collaborating with

4    the plaintiff to get a plan in place for how they were going to

5    break through this logjam -- because one side was at one number,

6    the other side was at a different number -- and they had issues

7    about causation, how were they going to break through to try to

8    come to a common ground to settle this claim, and then, fifth,

9    executing this plan by having Mr. Wilson provide recommendations

10   for neurologists that are local that can perform this work and,

11   if needed, perform an IME down the road or do other

12   investigation if it's warranted in the future.

13        Again, Ms. Gordon is not sitting by idly, as Mr. Strzelec

14   testified.  She was working the case.  She was trying to get it

15   to a position where it could be settled.

16        By mid June, Ms. Gordon was having some difficulties

17   finding the appropriate expert, and she continued to follow up

18   with Mr. Wilson.  There are other notations in the claim file --

19   that you can review during your deliberations -- showing the

20   multiple and regular efforts by Ms. Gordon to get Mr. Wilson --

21   to work together with him to find an expert to do the records

22   review.

23        So this is a notation that Mr. Wampold didn't show you

24   during his opening.  He showed you one that comes a lot later.

25   But in terms of emails going back and forth and this phone call

1    that occurs on June 28th, 2018.

2         And we talked about this with Mr. Hight.  We ended up

3    talking about this at the very end of the day -- I don't

4    remember -- the very end of the day on Friday last week.  This

5    notation indicates there was a phone call on this date, on June

6    28th, where Ms. Gordon talks to Ms. Rosato, provides the status

7    to Ms. Rosato, and they have a conversation about a neurologist

8    or a neuropsychologist.  And it's Ms. Rosato who says, "Well, I

9    think you want a neurologist, since it is a vestibular issue

10   versus a TBI."  And so Ms. Rosato not only agrees with the

11   course of the investigation, but she's, actually, participating

12   in the investigation.  She's helping direct the investigation in

13   terms of who is the appropriate doctor to have a records review

14   done to further the investigation.

15        So based on this, Ms. Gordon calls Mr. Wilson right after

16   this and says, "Hey, let's look at neurologists instead of

17   neuropsychs.  Let's change what we're looking for in terms of a

18   records review.  I want to have the right expert with the right

19   credentials in place to do this records review."

20        So we're at a few weeks later, and we're still waiting on

21   neurologists recommendations, and they're still trying to find

22   out who is the right expert, who is available, who has the time

23   to do this.  And so she receives a long list of names:

24   Dr. Reif, Dr. Rockwell, Dr. Braun, and Dr. Kutsy.  And she

25   starts calling around.  She calls Dr. Reif, and Dr. Reif says,

1   "Well, we're not booking for another four months right now, in

2   terms of this, so it's going to be a little while."  And

3   Ms. Gordon knows it's kind of been a little while and she needs

4   to get this going, she needs to move this forward, and so she

5   reaches out to Dr. Kutsy and says, "Hey, are you available?  Can

6   you help me out with this claim?"

7       The same day she gets an email from Ms. Rosato -- and

8   Mr. Wampold told you this during his summation -- asking for a

9   status and saying, "Hey, have you selected a neuro, and what's

10  going on?"

11      And so Ms. Gordon said, "I advised Ms. Rosato I hope to

12  select a neuro and send out file materials by the end of this

13  week."  And we know this because we had this email to Ms. Rosato

14  from Ms. Gordon in late July 2018, saying, "Good afternoon, Ann.

15  I've been in contact with some neurologists.  I'm hopeful to

16  make the decision soon.  I appreciate your patience,"

17  acknowledging this is taking some time, but they want to go in

18  the right direction.  They want to get the proper doctor to do

19  the records review.  They don't want to rush it.  They want it

20  done right.

21      Again, no objection to this records review by Ms. Rosato at

22  this time; no indication that an IME should be performed; no

23  request by Ms. Rosato to interview Mr. Hopkins or any of his

24  doctors or his family; an acknowledgment, an agreement, that

25  this is the plan going forward and that, Once this is done,

1   we're going to continue negotiating settlement after it's all

2   done.

3        So we see this pattern, these multiple communications

4   during this period of time, keeping Ms. Rosato informed of

5   what's going on, keeping them updated with regard to the status

6   of the investigation.

7        And then going back to August 1st, Ms. Gordon finally gets

8   ahold of Dr. Kutsy, the next day.  Based on the response of his,

9   it looks like Dr. Kutsy has time and is available to do this.

10  He has the qualifications.  He's board certified in the

11  appropriate specialty, neurology, so she decides to hire him,

12  and one week later, Ms. Gordon sends the materials to Dr. Kutsy.

13       As you heard during trial, Ms. Gordon didn't just send the

14  medical records that she received from the plaintiff's counsel.

15  She provided the demand letter as well so that Dr. Kutsy could

16  see these are the allegations that the plaintiff is making, here

17  is what they're seeking in this case.

18       She also provided photos of the accident and the repair

19  estimate so that Dr. Kutsy could understand the forces that were

20  involved in the accident.  As you heard Dr. Kutsy talk about,

21  that was an important part of his evaluation regarding the

22  medical -- based on the medical literature for recurrent

23  concussions in low-force car accidents or low-force head blows

24  following a prior concussion.

25       And Ms. Gordon didn't just stop there.  She also

 1   provided -- and I think this is very significant -- a copy of

 2   the email that she got from Ms. Rosato that indicated that

 3   September 1st, 2017, record was in error.  She wasn't trying to

 4   skew Dr. Kutsy's opinions by withholding this record from him.

 5   She wanted a real second opinion based on the same information

 6   that she had, that she was looking at, with regard to the value

 7   of the plaintiff's UIM claim.

 8       This is the very definition of good faith and equal

 9   consideration for the insured's interests.

10       It shows that she was trying to get to a fair and unbiased

11   opinion from Dr. Kutsy, given the discrepancy in the medical

12   records and the further discrepancies based on the statements

13   that were given to her by plaintiff's counsel with regard to the

14   September 1st, 2017, record being erroneous.

15       So a few days later, Ms. Gordon received confirmation that

16   Dr. Kutsy had received the documents, and she sent a reminder, a

17   diary, to follow up with Dr. Kutsy's office about the report.

18       And then a few weeks later, she gets the report.  She takes

19   a look at it, she reviews it, and then she summarizes it in her

20   notes, and she noted Dr. Kutsy's opinions:  One, Mr. Hopkins did

21   not sustain a concussion as a result of the 2016 accident.

22       And you heard Dr. Kutsy explain that yesterday during his

23   testimony.  He testified that he disagreed with any diagnosis of

24   a concussion, including Dr. Weakland's diagnosis, given a lack

25   of objective findings, objective evidence to support a finding

1  of a concussion.  No loss of consciousness, no amnesia, no

2  alteration of speech or behavior.

3       Dr. Weakland's record -- and you can see this during your

4  deliberations -- of April 25th, 2016, also notes that

5  Mr. Hopkins exhibited no signs of certain clear symptoms that

6  are diagnostic for a concussion.  No confusion in terms of

7  knowing the date, the place, or the President.  He knew the

8  doctor's name, he had no alteration of recall abilities, and had

9  no reports of any sleeping problems.

10      Dr. Kutsy, like all the other medical records provided,

11  reviewed it, considered it -- it's in his report that it was a

12  record that was provided that he reviewed and analyzed in

13  forming his opinions.

14      We also heard from Ms. Montes.  Ms. Montes was at the

15  accident scene, right after it happened, and she testified that

16  the plaintiff exhibited no signs of being dazed and confused,

17  that he did not have any nausea or any vomiting that she

18  witnessed at the time.

19      And she also testified about the forces that were involved

20  in the accident.  She testified about how she was stopped, and

21  then she went forward and then impacted Mr. Hopkins' vehicle.

22  And as the photo that you saw, from Mr. Wampold during his

23  opening, shows her hood was bent up a little bit, and that's

24  because it got caught underneath the spare-tire cover of the

25  back of Mr. Hopkins' vehicle.  But what you don't see on

1    Mr. Hopkins' vehicle is any markings, really on the bumper.

2    Ms. Montes' car never actually got to the bumper.  At least you

3    can't visibly see anything, which indicates the only part that

4    they impacted was the hood hitting the back of the tire cover.

5    That is low impact, low forces, and that was part of the basis

6    for Dr. Kutsy's opinions that this kind of accident, based on

7    the forces, could not have caused a concussion.

8         We also have Mr. Hopkins' own police report that was filed,

9    not just the day after but two weeks later, where he indicates

10   that his injuries from the car accident were minor.

11        Dr. Kutsy's second opinion had to do with vertigo, and he

12   explained how plaintiff may have suffered some BPPV, benign

13   paroxysmal positional vertigo, gravitational vertigo, but it

14   should have resolved within three months, which is the common

15   standard for the resolution of this type of vertigo.

16        He also discussed how the medical reports indicate some

17   reports of vertigo in 2016, and occasionally in 2017, but the

18   reports changed, and they, really, start talking more about

19   dizziness, disequilibrium, and balance issues.  Given the low

20   impact of this car accident, along with natural aging, Dr. Kutsy

21   could not attribute these balance issues or the disequilibrium

22   to the 2016 car accident.

23        He noted there was no clinical evidence of a concussion or

24   any objective testing, including the battery of tests that were

25   available to diagnose a problem with the inner ear that were

1    performed.  So given that, there was nothing objective in terms

2    in terms of diagnosing the cause of this disequilibrium.

3         You heard from Dr. Kutsy that that lack of objective

4    testing was an important factor, an important consideration

5    based on the medical and scientific standpoint that there was

6    insufficient evidence to attribute these symptoms to the 2016

7    accident.

8         He also noted the gaps in treatment, boating trips, the

9    trip to Panama, which all suggested, in conjunction with the

10   medical records, that his symptoms were resolving, and that,

11   except for this vertigo and some of this dizziness he was

12   experiencing, he was improving and getting better.

13        So based on Dr. Kutsy's report, Ms. Gordon made the

14   determination to increase to the offer to $40,000, and for

15   Mr. Wampold to say, "Well, this was based on a number of days

16   and this is how she was calculating it," well, that's not

17   exactly how it works.

18        What she was doing is she was saying, "Okay, we had this

19   issue of the vertigo, and we had this range of potential

20   damages, if there is a vertigo that exists."  And so she said,

21   "Okay, given the fact that we've got some vertigo here, how am I

22   going to the calculate this?  How am I going to come up with

23   more money for Mr. Hopkins to try to settle this case, to try to

24   move the negotiations further," as she indicated before she

25   wanted to do.

1    You from heard her -- we talked about it earlier in terms

2    of her claim notes -- that the basis for her increasing her

3    offer was Dr. Kutsy's report that at least some of the vertigo

4    was attributable to the accident, but there were questions about

5    causation and about permanency with regard to the vertigo,

6    overall, after that period of time.

7        You also heard Ms. Gordon testify that at no point prior to

8    this lawsuit was she provided with a copy of this report.  I

9    mentioned this to you earlier.  This could have been another

10   piece of evidence that she could have considered and Dr. Kutsy

11   could have considered with regard to permanency.  But without

12   this report, there was nothing.  There were no declarations, no

13   statements, no evidence whatsoever from Dr. Taylor that she

14   considered these injuries to be permanent.

15       I mentioned to you earlier, you have to judge Ms. Gordon

16   and her actions based on what she had and when she had it, not

17   on what subsequently occurred, what was prepared later, and what

18   was provided later.

19       When combined with Dr. Kutsy's report and his opinions,

20   Ms. Gordon had nothing more than plaintiff's counsel's

21   unsubstantiated assertion that the vertigo was permanent.  He

22   had no medical record establishing that fact.

23       You heard from Mr. Strzelec that she's not permitted to

24   speculate or guess or take blind assertions as being true.  She

25   has to investigate the facts and the documents to see where that

1   investigation leads and what it shows.

2        Based on what she had at that time, she was reasonable to

3   believe that the plaintiff did not have a permanent injury as a

4   result of the 2016 car accident.

5        So given that, we have to look at the reasonableness of the

6   settlement offer.  When you consider the offsets for the PIP and

7   the $25,000 from Progressive, her offer, the increase to

8   $40,000, constituted a $75,000 assessment of the overall value

9   of Mr. Hopkins' claim.

10       You also heard Ms. Gordon testify that she was willing to

11  offer more money to resolve the UIM claim.  You saw this from

12  the claim notes and the approval from her manager, Mr. Chodacki,

13  that she could settle this claim within her authority.  And had

14  she gone up to the top end of her range, at $84,000, she would

15  have paid a total of $119,000 to settle this UIM claim.

16       But plaintiff was unwilling to negotiate.  Ms. Gordon was

17  willing to negotiate.  She tried.  She made two different offers

18  to try to get this claim resolved at a reasonable value.  You

19  heard from both Mr. Hight and Mr. Strzelec.  This process of

20  negotiation is common and standard in the handling of UIM

21  claims.

22       But let's talk about the specifics and the claims that

23  you're going to be asked to decide as you begin your

24  deliberations in the jury room, or the Zoom jury room as we're

25  going to refer to it, and though it relates to the

1   extra-contractual claim, the other claims, I want to start by

2   talking about a couple of things regarding coverage.

3        The first one is that Integon, at no point in time, ever

4   denied coverage.  It always admitted that it owed UIM coverage

5   to Mr. Hopkins.  They never disputed it.

6        They made two offers to settle the UIM claim and it paid

7   all the medical bills, and all the damage to Mr. Hopkins' car

8   was paid for my Progressive.

9        Question 1 of the verdict form you're going to get asks you

10  to enter an amount for the damages that were sustained as a

11  result of the 2016 car accident.  We ask that you award the

12  $10,000 in PIP, the $25,000 from Progressive, the $1,069 for the

13  car, along with the $84,000 that was offered within the range

14  that was established by Ms. Gordon, for a total of $120,069.

15       As to the other claims, the first one, negligence, we

16  talked about this a little bit at the beginning, but it asks you

17  whether Integon breached a duty of care.  As I mentioned before,

18  this is based on a standard of reasonableness.  Would a

19  reasonably prudent person act in the same manner, under the same

20  circumstances, based on the same information as Ms. Gordon and

21  others at Integon had at that time?

22       After consideration of the evidence and the testimony in

23  this case, my client asks that you come back and return a

24  verdict and answer this question no, that Integon was not

25  negligent in this case.

1          The next claim is bad faith, and it has a very similar

2   standard.  Did they act unreasonably, frivolous, or unfounded?

3   I explained these concepts to you a little bit during my

4   opening, and we heard from Mr. Strzelec and Mr. Hight about the

5   reasonableness of my client's conduct in this case, how it's

6   common in the industry to negotiate and to handle claims, and to

7   work cooperatively with the other side.  The question you're

8   going to be asked is whether that was unreasonable, frivolous,

9   or unfounded.

10         And I showed this to you in opening, but here's my take on

11  the definitions of these terms:  Unreasonable, meaning without

12  reason; frivolous, meaning baseless; unfounded, meaning

13  unsubstantiated.

14         Again, perfection is not required.  No one is perfect.

15  That's why pencils have erasers.

16         These are people.  These are people handling claims.  These

17  are people trying to do the best they can to evaluate this claim

18  with imperfect information, and not all the information at

19  times.

20         You can't take Ms. Gordon and Integon, put them under a

21  microscope, and say they could have done this and they could

22  have done that.  That's not the standard.  They're not required

23  to be perfect.  They had a reason and a basis for doing what

24  they did, and they were trying their best to resolve this claim.

25         The court has provided you this instruction with regard to

1  the duty of good faith.  It instructs you that what they had to

2  do is deal fairly with Mr. Hopkins.  They had to give him equal

3  consideration.

4       You heard from Mr. Strzelec that equal consideration meant

5  51 percent to 49 percent.  They didn't have to give him every

6  benefit of the doubt.  All things being equal, they had to go

7  with the policyholder, but they could also consider their own

8  interests.  It's a very narrow balance in terms of the interests

9  in this case.

10      Did they take Mr. Hopkins' interests into consideration?

11 We can see from the claim files, the information that Ms. Gordon

12 evaluated, reviewed, provided to Dr. Kutsy, they did.  They gave

13 equal consideration to his interests, and they were trying to

14 reach a reasonable and appropriate settlement value in this

15 case.

16      Based on the evidence and the documents and the witnesses

17 you've heard in this case, we ask that you return a verdict of

18 no, and find that Integon did not act in bad faith in this case.

19      As to IFCA, it's another question on the verdict form

20 you're going to be asked to answer, and it asks you, "Did

21 Integon unreasonably deny payment of benefits?"  A little more

22 specific, but really it's kind of the same question that we

23 talked about with regard to bad faith, with regard to

24 negligence.

25      Based on the testimony and for the same reasons I've

1    mentioned to you before, my client asks that you return a

2    verdict of no on this claim as well and find they did not

3    violate IFCA by not unreasonably denying payment of benefits to

4    Mr. Hopkins.

5         And then, lastly, to the CPA.  This one asks a series of

6    questions, and Mr. Wampold went through those, but, first, one

7    question you're going to be asked is to look at the

8    communication with Ms. Rosato in this case.  And I previously

9    went through the communication already.  I showed you how

10   Integon responded to various communications, sometimes that same

11   day, but, typically, within a couple of days after they received

12   it, and once the UIM demand came in, how Integon reviewed it.

13   They submitted a timely and appropriate response, and at no

14   point was plaintiff's counsel unaware that Integon intended to

15   complete a records review and provide a settlement offer.  There

16   is now evidence in this trial that's been presented to the

17   contrary.

18        My client asks that you find in its favor as to this part

19   of the CPA claim.

20        Second, you're going to be ask to decide if Integon

21   promptly provided a reasonable explanation of the policy.

22        There is no evidence that the plaintiff's counsel in this

23   case did not know that UIM coverage existed or what benefits

24   were available, and the only issue is the explanation of the

25   settlement offer.

1    You saw from the email I provided to you that Ms. Gordon

2  not only provided the amount of the settlement offer, but she

3  provided the basis.  She explained what she was doing; that she

4  was relying on this record from September 1st, 2017, that was

5  inconsistent with other information she had received.  But she

6  was told and provided an explanation for the coverage that was

7  being provided under the policy.

8    Based on that, my client asks that you find in its favor

9  and answer this question "no" as well.

10    The next two questions as to the CPA asks whether Integon

11  failed to adopt or implement reasonable standards for prompt

12  investigation, and whether they performed and conducted a

13  reasonable investigation, really focusing on the investigation

14  that was performed.

15    As to the first question, there is no evidence that's been

16  presented regarding the standards that Integon had for a prompt

17  investigation; thus, there's nothing really for you to decide on

18  whether those standards are reasonable or not.

19    As to the investigation, as I've mentioned to you and we've

20  talked about during the course of this trial, the investigation

21  was reasonably prompt and plaintiff's counsel was kept informed

22  the whole time.

23    The concept of the records review versus the IME was

24  discussed at length during the course of this trial.  Mr. Hight

25  testified that the decision to do a records review instead of an

1    IME was reasonable.

2        Integon's decision to do this did not foreclose the

3    possibility that it could conduct an IME at a future date or

4    take other steps to further its investigation had this lawsuit

5    not been filed when it was.

6        The idea of interviewing plaintiff and his medical

7    providers, as Mr. Hight testified, is not a common practice in

8    the insurance industry.  That's not part of a reasonable

9    investigation.  Could it have been done?  Yes, but it's not a

10   matter of minimum claim-handling standards and practices.  It's

11   not done in every case.  In fact, Mr. Hight said it's rarely

12   done in these types of cases.

13       It was not unreasonable to do it at the outset of this

14   investigation, and it was certainly not unreasonable to not do

15   so until after the records review was completed, given the

16   agreement and the collaboration with plaintiff's counsel that

17   this was the appropriate first step for the investigation.

18       Lastly, you heard from Mr. Strzelec, who said he had no

19   problem with the investigation in terms of the decision to have

20   a record review done.  And they all agreed that a neurologist

21   was the appropriate doctor to conduct the records review.

22       Lastly, as I mentioned, there is no indication, no evidence

23   whatsoever of any objection, any letters, or emails saying,

24   "Maybe you should be doing this, maybe you should be doing an

25   IME, maybe you should be calling plaintiff's doctors."  None of

1    that exists in this case.

2         At no point was it even suggested to Integon that they

3    should be doing anything else other than what they were doing.

4         Therefore, as to these two questions regarding the

5    investigation, my client asks you to find in its favor and

6    answer "no" to both of these questions.

7         The last two questions regarding the CPA asks about the

8    settlement efforts and whether plaintiff was offered

9    substantially less than the value of their claim.

10        As I mentioned before, Integon, on two separate occasions,

11   tried to settle this claim.  Even after the initial offer was

12   rejected, Integon asked plaintiff's counsel, "Hey, do you want

13   us to make another offer?"  They said, "No, let's do the records

14   review first, and then we'll talk more in the future."  That was

15   the plan that was agreed upon.  Based on the information that

16   was provided, what Integon knew at the time, their efforts to

17   try to settle the claim were equitable and fair at that time.

18        Therefore, based on these questions, my client asks that

19   you answer "no" as well, that Integon did not violate the

20   Consumer Protection Act in this manner.

21        So in conclusion, my client does not dispute, nor have they

22   ever disputed, that plaintiff is entitled to UIM benefits.  I've

23   suggested a number you should award for those benefits, but that

24   really is up to you to make that determination as to what amount

25   of damages Mr. Hopkins suffered as a result of the 2016

1 | accident.

2 |     Integon's conduct, however, was reasonable at all times.

3 | It didn't breach any duties to the plaintiff, it didn't act in

4 | bad faith, it didn't violate any of the statutes at issue.  At

5 | all times, Integon, and its people, were striving to do their

6 | best to accurately and appropriately evaluate this claim.

7 |     You should find for my client on all the other claims at

8 | issue in this case.

9 |     I want to thank you for your attention, your dedication,

10 | and your time.  You are what makes our system of justice work,

11 | and I appreciate your contribution towards it in this case.

12 |     THE COURT:  Thank you, Mr. Harris.

13 |     Ladies and gentlemen, I'd like to talk with you as the jury

14 | for a second.  Would you please unmute yourselves?

15 |     It's now 12:23, and we ran into our lunch hour, and I want

16 | to make sure that you can concentrate on what is yet to come,

17 | which is about another 30 minutes of a rebuttal.

18 |     If I cut your luncheon a bit short, to 1:10, does that

19 | still give you enough time to eat and come back to us?

20 |     JUROR:  Yes.

21 |     THE COURT:  Yes?  No?

22 |     JUROR:  Yes.

23 |     THE COURT:  All right.  Then that's what I'm going to

24 | ask that you do.  I don't expect you to gulp down your lunch,

25 | but if you would eat quickly, get a little stretching in, and

 1   come back, and we will finish up, and begin at 1:10.  You may be

 2   excused.

 3                  THE FOLLOWING PROCEEDINGS WERE HELD
                   OUTSIDE THE PRESENCE OF THE JURY:

 4

 5                  THE CLERK:  All the jurors are in the jury room.

 6                  THE COURT:  Okay.

 7        I'm sorry, Mr. Wampold, I just can't push them that hard to

 8   pay attention for another 30 minutes.

 9                  MR. WAMPOLD:  I agree with that decision, Your Honor.

10                  THE COURT:  Okay.  Then let's come back at 1:10.

11        Is there anything else we need to take care of before then?

12                  MR. WAMPOLD:  Not from us, Your Honor.

13                  MR. HARRIS:  No, Your Honor.

14                  THE COURT:  Okay.  Have you gone over the exhibits

15   with Mr. Cogswell so you're ready to certify to me that

16   everything that is in the Box should be there, and there isn't

17   anything there that they will have access to that's not supposed

18   to be there?

19                  MR. WAMPOLD:  That's my understanding.  My

20   understanding is that happened late last night and early this

21   morning.

22                  THE COURT:  Okay.  Then we'll see you at 10 minutes

23   after 1:00, please.

24                  MR. WAMPOLD:  Sounds great.  Thank you, Your Honor.

25                  (Court in recess 12:25 p.m. to 1:11 p.m.)

1        THE COURT:  Good afternoon, counsel.  Mr. Gahan, are

2   you doing the mop-up here?

3        MR. GAHAN:  Yes.

4        THE COURT:  All right.  No more than 30 minutes?

5        MR. GAHAN:  Yes.

6        THE COURT:  Do we have our jurors back, Mr. Cogswell?

7        THE CLERK:  Your Honor, this is Lowell.  Grant just

8   sent me a Skype.  He is stuck in the breakout room.

9        THE COURT:  Okay.  Ms. Williams, can you check and see

10  how our jurors doing?

11        THE CLERK:  I will.

12        THE CLERK:  Okay.  I'm back, Your Honor.  Sorry.

13        THE COURT:  Mr. Cogswell, you were imprisoned in a

14  breakout room?

15        THE CLERK:  Yes, and then I couldn't get back on Zoom.

16  Some of the jurors texted me and said they're experiencing the

17  same issues.  Let me check.

18      All right.  Your Honor, all jurors are in the breakout

19  room.

20        THE COURT:  Let's bring them back, please.

21             THE FOLLOWING PROCEEDINGS WERE HELD
               IN THE PRESENCE OF THE JURY:

22

23        THE COURT:  All right, ladies and gentlemen.  Good

24  afternoon.  This is the homestretch.  I'm asking you to give

25  your kind attention to Mr. Gahan.  He has the privilege of

1    giving rebuttal argument on behalf of Mr. Hopkins.

2        Mr. Gahan?

3            MR. GAHAN:  Thank you, Your Honor.

4                  PLAINTIFF'S REBUTTAL ARGUMENT

5            MR. GAHAN:  Throughout this trial, Mr. Harris has used

6    the phrase, "strive to do their best," to excuse or explain what

7    Integon did here.  And there is a sense in which I agree with

8    him.  Integon strove to do their best.  The problem is, they

9    strove to do their best for Integon.

10       I want you to think about every decision tree that Integon

11   has faced in this case, every opportunity since they received

12   that demand letter to make a decision about what they were going

13   to do next, and I want you to ask yourselves whose interest was

14   Integon looking out for, because Integon is not allowed to

15   strive to do their best for Integon.

16       Remember, this is back in March, April, May, June, July,

17   August, September, October 2018.  There's no trial.  They're

18   supposed to be on the same side.

19       Mr. Hopkins went out and bought insurance and was the

20   policyholder for this insurance with the understanding that his

21   premiums were going to go to -- if he was ever injured and a

22   driver that hit him didn't have enough insurance -- that his

23   premiums was going to go to the evaluation of his claim so he

24   could work together with his insurance company to find out what

25   his damages were, and he could get paid.

1    That's what he thought he was paying for, and that's what

2   was supposed to be happening during this window.  It wasn't

3   supposed to be adversarial.  You're not supposed to be saying

4   things in the claim notes that say stuff like, "Things that are

5   good for Mr. Hopkins are weaknesses for us, and things that are

6   bad for Mr. Hopkins are strengths for us."  "There is a downside

7   to getting an in-person medical evaluation because then we'll

8   have to disclose it."  That is not being on the same team.  That

9   is not equal consideration.  That is not working for your

10   customer, Mr. Hopkins.

11        And that's the context that we're in.  Don't let the fact

12   that this trial has an adversarial nature to it, don't let the

13   fact that, at this trial, it's Mr. Hopkins versus Integon make

14   you think that that's how it was supposed to be back in 2018,

15   because it wasn't.

16        And even though Integon's records draw these clear lines in

17   the sand and are thinking about trial when they were supposed to

18   be thinking about how to evaluate the claim, that doesn't mean

19   that they were following Washington State insurance guidelines,

20   and it certainly doesn't mean that they were within Washington

21   law.

22        If Integon strove to help Integon, to the detriment of

23   their policyholder, then they violated the CPA, they violated

24   IFCA, they violated their good-faith obligations, and they

25   committed negligence.

1       But I know that that's not what Integon is really saying,

2   right?  They're not really saying "we strove to do the best for

3   ourselves."  What they're saying is, "Ladies and gentlemen of

4   the jury, Integon tried really hard, and that's good enough."

5       And then when Mr. Harris made that argument -- he made it

6   in opening, and then he came back and he made it in closing, and

7   he paired it up by saying that we're trying to change the

8   standard, that we're trying to hold Integon to this impossible

9   standard of perfection.  And all I could think of is, well, wait

10  a second.  The standard that we talked about was fair and

11  reasonable.  The standard that we talked about was equal

12  consideration.  We certainly talked about those, and that's an

13  important one, right, equal consideration?  Because, if you

14  remember, Mr. Hight didn't believe that equal consideration

15  applied, and when he evaluated this case, didn't apply equal

16  consideration at all, and, in fact, was critical of Mr. Strzelec

17  for saying that equal consideration applied.  And all of you

18  know that that's exactly the standard that applies here.

19      But Integon says that we're using the wrong standard and

20  that the real standard, that they've cut out of whole cloth, is

21  strive to do your best.  Well, what's the problem with that

22  standard?  Well, first of all, it's completely subjective,

23  right?  All you need to win on that standard is have someone

24  say, "Well, maybe I wasn't great, but I tried really hard."  All

25  you need is to get some expert to come in and say, "Yeah, I

1    looked at this, and, yeah, it looked like they tried hard."

2         The imbalance of power here is overwhelming.  Remember

3    that.  This is an insurance company versus an individual, and

4    that's why, as Mr. Wampold argued in his closing, the law has to

5    be so adamant, so clear, and so forceful -- and that's why

6    there's so many avenues towards compensation for Mr. Hopkins.

7    It's because of this acknowledgment that you don't just have to

8    try really hard.  You actually have to follow very specific

9    criteria.  You have 30-day windows, you have 10-day windows, you

10   have a duty of equal consideration.  You can't make an offer

11   that's so low that it forces your policyholder to sue you just

12   to get fairly compensated.  Those aren't vague.  Those aren't

13   some amorphous, in-the-air standards that would allow,

14   basically, anybody to pass them.  Those are real,

15   etched-in-stone laws and rules that insurance companies have to

16   abide by.

17        And one of the reasons those are in place is to

18   specifically prevent insurers from pursuing their own profits

19   and then hiding behind this, "Well, we tried our best," because

20   if that was the standard, every insurance company in the country

21   would try to do their best and maximize their profits to the

22   extreme detriment of their policyholders, and that's exactly

23   what Washington law prevents them from doing.

24        Mr. Harris and Dr. Kutsy emphasized that, what they saw as

25   gaps in treatment -- I think Mr. Harris got up and said a

1    four-month trip to Panama and --

2         Look.  You're going to have Exhibit 17.  Exhibit 17 shows

3    you all the visits that Mr. Hopkins went to.  I urge you to look

4    at that.  Look at all of his treatment, and tell me if there is

5    a four-month gap in treatment.  You know there's no --

6    Mr. Harris knows, I should say, that, in this document, Exhibit

7    17-1, there's a few months here and there where Mr. Hopkins did

8    not go to treatment.

9         And the irony is that, as critical as Dr. Kutsy was about

10   Mr. Hopkins' gaps in treatment and that he used it to, sort of,

11   fuel his opinion, when I asked him questions about the treatment

12   that Mr. Hopkins underwent, do you remember what

13   Dr. Kutsy said?  He said, "Well, after three months, treatment

14   was pointless.  He didn't need to keep going to treatment

15   because it was clear that his vestibular injury had plateaued,

16   he was never going to get any better, and you can't do anything

17   about it, so why go to treatment?"

18        Well, if that's true, Dr. Kutsy, if there is no point to

19   have treatment, then why are you critical if Mr. Hopkins does

20   treatment on his boat with his family or at home for a few

21   months rather than come in to physical therapy?

22        And the reason that they're making that assertion -- and

23   this is something that I think we just have to come out and say,

24   because Mr. Harris has, sort of, soft-peddled this -- it was the

25   undercurrent in Dr. Kutsy's testimony.  It was certainly, sort

1   of, bubbling underneath the surface of Mr. Hight's testimony --

2   is that Mr. Hopkins must just be a liar.

3           I mean, really.  Mr. Hopkins said, "I didn't have this

4   injury before, and now I have it."  Mr. Hopkins went to visit

5   after visit after visit to treat a new injury, when, in 2013,

6   '14 and '15, he hadn't gone to any visits to treat it.

7           So when they say things like, "Well, why didn't he go to

8   the doctor right away," and, you know, don't mention in their

9   opening that it was actually a Sunday, the day after the

10  collision, and that he went immediately the next business day.

11          Or when they say things like -- they make a big deal out of

12  this notion that Mr. Hopkins wasn't entirely consistent in his

13  medical record, right?  Like, he'll go to physical therapy one

14  day and his headaches are doing well, and then he goes another

15  day, and they're not so good.  He goes one day, and he's able to

16  deal with some things a little better than others.

17          What Mr. Harris is trying to sell to you is that, "That

18  tells us he's lying.  We caught him."  Because Dr. Eaton did

19  this test and it didn't show as much injury one day as it did

20  another, so it must be that Mr. Hopkins is making all of this

21  up.

22          There's really no way around that that's their position,

23  because Mr. Hopkins is saying and said under oath and said to

24  all of his doctors and all of his treaters that he had no

25  vertigo before this collision, that it had been completely

1  resolved by 2013.  So their position has to be that he's just

2  not been honest and, in a sense, he's committing insurance

3  fraud.

4       So I'd like to say a few things about that, but first is,

5  let's just believe him for a second, let's say it's true.  If

6  it's true and what Mr. Hopkins is doing is going to these

7  doctors and trying to craft a record so at the end of the day he

8  can get $250,000, and if he's going to them weekly for two

9  years, why wouldn't he say, "I have headaches all the time"?

10 Why wouldn't he say, "I'm doing way worse."  Why wouldn't he

11 say, "Oh, my gosh, I'm way worse than I was back in 2011.  I'm

12 just not doing well."

13      Remember, according to Integon, what he's doing is being

14 dishonest.  Well, wouldn't you try to make the best possible

15 record you could instead of doing what every single one of his

16 treaters said that he was doing, which was working his butt off

17 trying to get better and better and better every time and

18 showing signs of happiness when he got better.  He was relieved,

19 he was pleased, and his family was, too.  When he got to say,

20 "Yeah, my headaches are pretty much resolved because I've been

21 doing all these activities" -- "I've been avoiding activities

22 that might flare it up."  When he did all of that, that was all

23 an indicator that Mr. Hopkins is not only going through serious

24 injuries and going through recovery and working hard, it shows

25 that Mr. Hopkins is honest.

1    Everything that they're trying to do to tell you he's lying

2    by pointing out an inconsistency in the record speaks directly

3    to the veracity of the record.  Because if Mr. Hopkins was

4    trying to trump all this up, the last thing he's going to do is

5    acknowledge how much better he's doing.  The last thing he's

6    going to do is keep working and keep going.  He's going to give

7    up.  He's going to give up right away.

8         But I also want to point out the arrogance of the position

9    itself.  You have Ms. Gordon, who has never met him.  You have

10   Mr. Harris who only met him after the case was filed to drag him

11   into a deposition.  You have Mr. Hight and Dr. Kutsy, who have

12   never met him, and they're making a credibility call on a man

13   they've never met that contradicts not just his family and

14   friends, but treating doctors that have been working with him

15   for years and that work with patients like this, and it's their

16   job to help patients like this.  And because it's a brain

17   injury, so much of their job relies on the narrative and the

18   historical record that the patient delivers.

19        And these doctors all believed him, and they didn't just

20   believe him.  They believed in him, so much so that two years

21   later, having not seen Mr. Hopkins in that whole time, having

22   seen other patients, living out their lives in their clinics,

23   doing what they to do help people, they came to court, and they

24   showed up on Zoom, and they told you everything that Mr. Hopkins

25   did for two years to get better and that they witnessed it and

1   that it was all consistent with everything they did.

2        And now for Mr. Harris to come in in the same context and

3   have the gall to suggest that Mr. Hopkins was anything but

4   honest, well, that's just Integon doing more of the same.

5        And it was their playbook from the beginning.  From the day

6   they got the demand letter, that was a plot to ensure that

7   Mr. Hopkins didn't know what they were truly doing, didn't know

8   that they were trying to purposefully get a record that they

9   could hide if they didn't like, that all of his statements about

10  what he was going through, his medical records, everything else,

11  that all of that wasn't being measured in terms of how can we

12  make sure that he's being fairly compensated.  It was being

13  measured in terms of, "Well, what's a strength for us?  What's a

14  weakness for us?"  That's how Integon was viewing this.

15       Does that sound like equal consideration?  Does that sound

16  like they're really putting their interest on the same level as

17  Mr. Hopkins?  Or does it sound like they're looking out for

18  their own at every step?

19       And, finally, in response to the subtle but, really,

20  indisputable contention that Integon is calling him a liar,

21  please take a look, when you have a chance, at Jury Instruction

22  No. 33.

23       That's the jury instruction that says Mr. Hopkins had a

24  duty of good faith towards Integon.  And Mr. Hopkins complied

25  with that duty.  That means he didn't commit insurance fraud.

1   That means he didn't lie to his insurance company.  That means

2   he didn't try to hold some records back.  And that means -- and

3   it's undisputed.  It's in your jury instructions, and it was

4   agreed to by Integon -- that Mr. Hopkins complied with every

5   obligation he had in this case.  And any suggestion or innuendo

6   otherwise is not part of this case.  It's trying to print out a

7   prejudice that has no place in this courtroom.

8        There was some discussion in closing statement about

9   Dr. Taylor being surprised by the September 2018 report -- I'm

10  sorry -- Mary Gordon being surprised by Dr. Taylor's 2018

11  September report where she said he's reached maximum medical

12  improvement.

13       This is new.  The notion that Mary Gordon didn't know when

14  she was evaluating the claim that Dr. Taylor said that he had

15  reached maximum medical improvement, that's brand new.  Think

16  about it for a second.

17       I asked Mary Gordon on cross-examination, I said, "You

18  didn't think you had to speak with Dr. Taylor because you

19  already knew all of Dr. Taylor's opinions, right?"

20       She said, Yeah."  That's why she didn't reach out to

21  Dr. Taylor.

22       And what did Dr. Kutsy say about Dr. Taylor?  Remember,

23  Mr. Harris made big deal that Dr. Kutsy hadn't yet seen the

24  September of 2018 report.  But Dr. Kutsy said it was obvious,

25  from his review of the records, that Dr. Taylor had said that he

 1  had plateaued, that it was permanent, and it wasn't going to get

 2  any better.

 3      He said he didn't just have to see it from her.  He'd seen

 4  it in all of Mr. Hopkins' records that he had gone in day after

 5  day after day with the same symptoms.  And for Dr. Kutsy, it's,

 6  like, that tells me he's not going to get any better.

 7      It's also true that if you look in the claim notes, you're

 8  going to see a note, in November, from Ms. Gordon, where she

 9  knows that there was this evaluation done in September 2018 and

10  makes no effort to ask for it.  The reason she made no effort to

11  ask for it is because --

12          MR. HARRIS:  Your Honor, this document is not in the

13  record.  This was removed --

14          MR. GAHAN:  I'd ask the jury to refer to the evidence.

15          MR. HARRIS:  This was removed from the evidence at

16  plaintiff's suggestion yesterday, Your Honor.  This document is

17  not in the record.

18          MR. GAHAN:  I'd ask the jury to rely on the evidence,

19  and if that's not in there, we can get it in there because it

20  certainly should be in there.

21      The reality is --

22          THE COURT:  Mr. Gahan, you need to identify for me

23  exactly what exhibit you're referring to.

24          MR. HARRIS:  Page 57, Exhibit 200, Your Honor.  We

25  removed it last night, when we were going over the final

 1   exhibits, at the plaintiff's request.

 2            THE COURT:  All right.  Counsel, we'll sort that out

 3   after we conclude the argument.

 4        Mr. Gahan, go ahead.

 5            MR. GAHAN:  Thank you.

 6        The point is that Ms. Gordon knew that Dr. Taylor was

 7   saying the injury was permanent.  There was no question that she

 8   knew that.

 9        She wasn't contesting that Dr. Taylor said the injury was

10   permanent.  She was contesting whether or not she believed that

11   it was permanent, because, remember, if Mary Gordon had any

12   question about permanency, there was a place to get that answer.

13   If she really had some confusion about what Dr. Taylor was

14   saying, she had, in her ability, the opportunity to ask

15   Dr. Taylor.  She could have done that.

16        And Mr. Harris has said, repeatedly, "Well, you've heard

17   testimony that they don't usually do that."  Well, do you

18   remember when Mr. Hight said that they do do that?  When

19   insurance companies do do that is when there's some confusion,

20   when they need some clarification.

21        So what is it that Ms. Gordon needs right now?  Well, she's

22   saying that she doesn't believe in permanency, even though she

23   knows, and it's in the record, that Dr. Taylor has said that

24   it's permanent.

25        She has options.  She can ask for clarification from

1   Dr. Taylor.  She can seek it out through someone else to do a

2   records review or an in-person meeting.  She can take any of

3   these steps to answer that question.  But don't pretend that she

4   didn't know that Dr. Taylor was saying it was permanent.

5        I also want to speak to this notion that Ms. Rosato and

6   Ms. Gordon had just come up with plan together and that they

7   were working hand in hand all the way up through until the very

8   end, when the lawsuit was filed.  I want to urge you to look at

9   the claim file in this respect.

10       On April 24th, 2018 -- that's Exhibit 200 at 78 -- that's

11  where Mary Gordon made the offer of $17,430 (sic).  And she said

12  she did it because she didn't believe in permanency, she didn't

13  believe the vertigo was new, based on that single record, and

14  because she believed that he was able to do all the activities

15  that he previously enjoyed.

16       Now, on May 1st, 2018, the claim file says that Ann Rosato

17  sent an email from Mr. Hopkins explaining the September record

18  that had Ms. Gordon so concerned.  And you'll see -- and

19  Exhibit 2, page 42, which I'd urge you to look at, you're going

20  to see that Ms. Rosato says, "We renew our demand for limits if

21  you are going to rely on a single record to deny this demand."

22       So this concept that Ms. Rosato is saying, "Yeah, this is

23  great, let's keep going this way, we're hand in hand, we're

24  working together," that's just false.

25       But Ms. Rosato is an attorney.  She knows certain things.

1  She knows that Integon holds all the cards, right?  She knows

2  that Integon has the ability and opportunity to investigate the

3  claim in any way that they want.  And she knows that what

4  Mr. Hopkins deserves in this case are the policy limits that he

5  paid for.  And that's all she can do is provide information and

6  ask for those limits.

7        And if Ms. Gordon tells her, "Well, look, we want to do a

8  records demand to clear this up," Ms. Rosato can't say, "No, you

9  can't do a records demand, a records evaluation, a records

10 review."  Ms. Rosato doesn't have any standing for that.  All

11 she can do is maybe say, "Well, if you're going to do a records

12 review, will you, at least, use the right expert?  Can you not

13 be looking for an ENT doctor?  Can you not be looking for a

14 neuropsychologist?  Can you, at least, find the expert that

15 matches Dr. Taylor's specialty?"

16       And, by the way, the concept that Mary Gordon needed

17 Ann Rosato to tell her that you didn't actually need a

18 neurologist to look at records from a neurologist, why is that?

19 Because Ms. Gordon didn't invest the time and the thoughtfulness

20 that are required to evaluate a claim honestly.  Instead, she

21 punted, she punted to a self-interested defense attorney to find

22 her the right expert.

23       And Mr. Harris kept describing this expert as "very

24 qualified," and she was trying to find someone in that field.

25 Is that what you saw in the records, that she was trying to find

1    someone in that field?  What you see in the records is her

2    trying to find someone that will agree to just do a records

3    review but not actually meet him in person.  That was the

4    qualification, and that's why it took so long, because that's

5    really hard to find, somebody in any of these specialties that's

6    willing to do that, and that's why she couldn't find him.

7          Again to this concept that they were working hand in hand.

8    At one point, he said Ms. Gordon had nothing to hide.  Have any

9    of us been listening to the evidence in this case?  She had

10   nothing to hide?

11         Well, when she was talking to Ann about needing a records

12   review, Mary Gordon never mentioned, "By the way, the reason I

13   want this records review isn't really to clear up the September

14   2017 record that I said I was confused about.  No, what I'm

15   trying to do is get an evaluation by a doctor, handpicked by an

16   insurance defense attorney, in a way that I can hide the results

17   from you if they're not favorable to us."  We know that.  It's

18   in the same record where she actually spoke with Ms. Rosato.

19   Don't tell me she had nothing to hide.  Do you think if

20   Ms. Rosato had known that that was the approach that was being

21   used by Integon, at that point she wouldn't have objected?  But

22   all she hears is, "Look, we have a confusion about a record and

23   we want it cleared up, so we're going to reach out to a doctor

24   and ask him to do a records review to clear up this confusion."

25   Ann says, "Okay, you do what you have to do, but if you're just

1  going to come back and offer me something close to 17 grand,

2  don't even make me an offer until you're done."  That's just

3  looking out for her client.

4      You also heard argument about the September 1st, 2017,

5  record, and Mr. Harris, sort of, drew a line.  Right?  He's

6  saying there's no record that anything was wrong or inaccurate,

7  nothing in terms of evidence to dispute it.  And there's -- the

8  truth is, what we had was the testimony of the physical

9  therapist, at that same clinic, that saw Mr. Hopkins 31 out of

10  33 times.  And she said, "No, no, that record is accurate.  You

11  just have to understand it in its whole context."  That was her

12  testimony.  Don't say there was no testimony about that record

13  and no testimony explaining that record.

14      And read that record again.  It doesn't say, "I had this

15  vertigo all the way up until April 23rd, 2016, and then I just

16  kept having it."  It said that it wasn't unusual for him because

17  he had it before.  And that's uncontested that Mr. Hopkins had

18  vertigo from the 2011 collision.  That's uncontested.  But he

19  got better from it.

20      There's no reason to disregard Dr. Eaton's testimony.  And

21  Dr. Eaton was clear.  If you actually look at his records in

22  their context, all of this makes sense to you.  And she also

23  said, "He's been telling me that same thing the whole time."  He

24  never said this was new, though.  It was new.

25      And think about it logically, right?  You have no records

1   and no treatment for three and a half years, and then you have

2   records and treatment from the day of the collision.  That

3   should tell you something about what he's getting treatment for.

4   It should tell you that he didn't have those same symptoms

5   before, or he would have been going to get treatment for those

6   symptoms before.

7        Mr. Harris also kept saying that we entered evidence or

8   argument that Mr. Hopkins was back to normal after the 2011

9   collision.  That's not true.  We never said he was back to

10  normal.  I wish he was back to normal.

11       Mr. Hopkins took the stand and said, "I got everything back

12  that I could."

13       Dr. Taylor took the stand and said he has a visible hole in

14  his brain where stuff's missing, and you can't get that back.

15       Mr. Hopkins said he can't -- after the 2011 collision, he

16  couldn't drive and have music on at the same time.

17       He, clearly, wasn't back to normal, but he had back

18  everything that he could get back, and that's what makes this

19  injury so devastating is because he got to a point where he

20  could actually hoist the sail again.  He could actually engage

21  in those same activities that gave him joy and defined his life,

22  and those were taken away.  That doesn't mean that when he takes

23  the stand, he's suddenly not going to have a brain injury

24  anymore and he's going to be able to navigate his own records

25  and defend them when a defense attorney is asking him questions.

1    That doesn't mean that he's going to be the same Mr. Hopkins as

2    he was in 2010.  But it does mean that he had something taken

3    away from him, and this trial is about trying to get that back.

4         I want to talk about a few things that happened during this

5    trial that are a little more subtle, a little bit of a

6    suggestiveness or innuendo that was occurring during this trial,

7    because I think it's important to see how far Integon is willing

8    to go.

9         The first is, do you remember when Mr. Harris, in his

10   opening, said that Dr. Taylor uses the word "residual," and when

11   she uses the word "residual," she means that Mr. Hopkins had

12   that back in 20- -- it's an injury that has been sustained since

13   2011.  Do you remember when he said that in opening, which is a

14   promise to you about what the evidence is going to show?

15        And then Dr. Taylor took the stand and said, "I didn't mean

16   'residual' meant it lasted all the way to 2011.  I meant

17   'residual' means he's still suffering post-concussive symptoms

18   from the April 2016 collision."

19        Do you also remember on cross-examination of Dr. Taylor

20   when Mr. Harris said, "And you got these exhibits, Dr. Taylor,

21   and you got them from plaintiff's counsel, and you didn't look

22   at them until plaintiff's counsel gave them to you," and

23   Mr. Wampold had to put the brakes on and say, "Hold on a second.

24   Objection."

25        Those exhibits were mailed to Dr. Taylor at the behest of

1  defense counsel, at the behest of the court because we're on

2  Zoom and we have to send the exhibits.  Why was he trying to

3  make that look untoward or make it look like we're doing

4  something wrong?

5       Do you remember when Mr. Harris pulled out the medical

6  waiver and started reading to it -- reading from it and acting

7  like there was some medical waiver that prevented the insurance

8  company from reaching out to the doctors?

9       Then you had to be instructed by the court that that

10 medical waiver doesn't apply here, it doesn't apply to these

11 facts.

12      Then Mr. Hight had to admit, "Well, yeah, because this is a

13 UIM policy, they certainly had the right to speak to the

14 doctors."  Why is he trying to stir this up and create these

15 insinuations and presumptions that are based on nothing?  It's

16 because he knows the evidence in this case is overwhelming.

17      One more you should look at is the policy, Exhibit 3-3 and

18 3-5.  I want you to see that the standard for the PIP and the

19 standard for the UIM is exactly the same, meaning that they had

20 to find the injuries were reasonable and connected to the

21 collision before they paid, and there's nothing, despite what

22 Mr. Harris said in opening, that changes the standard for PIP to

23 UIM.

24      The only difference for Integon here was that, for the PIP,

25 it was only $10,000 that was on the line.  When it came to the

1    $250,000, suddenly their standard took a sharp turn, and they

2    acted very differently towards exactly the same injuries.

3         And, finally, I want to talk to you about the fact that

4    Integon uses its own adjusters and uses its own experts and uses

5    its own doctors and uses its own lawyers to recommend its own

6    doctors.

7         What have they done here?  They've created a citadel.

8    They've created this self-contained little world where, if

9    you're hurt and you go to your insurance company, they say,

10   "Well, we're going to evaluate the value of your claim, but you

11   know what?  We're not going to look outside of our walls to

12   determine the value.  We're going to use our own experience and

13   the experience of our supervisors, we're not going to look at

14   focus groups, we're not going to look at jury verdicts, we're

15   not going to look at anything else.  We're going to use our own

16   experience, and then if our own experience tells us the value of

17   the claim, we're going to make an offer.  And if we value it at

18   $84,000, we're going to make an offer at $17,000 just to see if

19   you'll bite.  And if you don't, we're going to go to our own

20   defense attorney, and we're going to ask our own defense

21   attorney to recommend somebody who will look at this case in the

22   way that we want them to.  And then if that doesn't work and you

23   still don't bite, then we're going to hire our own expert, who

24   is going to come in and say that all you have to do is try

25   hard."

1          Think about how self-contained that is.  It's a citadel

2    that's impossible to penetrate.  It's a citadel that you can't

3    crash through.  But thank God for you.  Thank God for these jury

4    instructions and these various claims, because they allow you to

5    breach the walls, and they allow you to say, "You know what?

6    You're not allowed to create this self-serving little universe,

7    where you just rely on yourselves to bolster yourselves and

8    create this world that nobody else can get in."

9          You have to apply the standards that are in the law, and

10   when you fail to do that, you're going to be held accountable,

11   and that's exactly what we're asking you to do here.

12         Thank you.

13              THE COURT:  Thank you, counsel.

14         Ladies and gentlemen, the case is now ready to be submitted

15   to you for your deliberations.  So you have your jury

16   instructions.  You have a verdict form that is capable of being

17   filled out electronically.  You'll have access to the exhibits

18   that have been admitted in the case.

19         I'm going to ask that you continue to deliberate until you

20   arrive on a verdict.  If you haven't done so by the end of

21   today, I'll be asking you to come back tomorrow morning at the

22   same time, at nine o'clock, and continue your deliberations.

23         And, remember, it's entirely up to you how long you

24   deliberate.  That is up to each jury in each circumstances.  The

25   court does not tell you how long you should spend on

1    deliberations.  That's your choice.

2        So are there any questions about the instructions I've

3    given you so far about how you're going to conduct yourself for

4    the rest of the day?

5        All right.  Then you may be excused to the jury room.

6                    THE FOLLOWING PROCEEDINGS WERE HELD
                     OUTSIDE THE PRESENCE OF THE JURY:
7

8                    THE COURT:  All right.  All our jurors in are in the

9    jury room?

10                   THE CLERK:  Yes, Your Honor.

11                   THE COURT:  Okay.  Yesterday, as I understand it, in

12   front of the courtroom deputy, you each certified that all of

13   the exhibits that were needed were in the Box.

14       And we had a discussion -- an objection over Exhibit 200, I

15   believe it was page 58; is that correct, Mr. Harris?

16                   MR. HARRIS:  Yes.  So it's Exhibit 200, and it's

17   page 57.

18                   THE COURT:  Page 57.  Okay.

19                   MR. HARRIS:  And it's not in the Box because we took

20   it out yesterday at the insistence of the other side, of

21   plaintiff's counsel, and that is the record that was being

22   referenced in closing.

23                   MR. GAHAN:  That's not correct, Your Honor.  It's

24   Plaintiff's Exhibit 1-11.

25                   THE COURT:  Okay.  Well, that's a big difference.

1  That's about 200 exhibits apart.  Let me take a look at 1-11.

2          MR. HARRIS:  Same page, page 57, they asked us to take

3  out of ours.

4          MR. GAHAN:  Sorry, counsel --

5          THE COURT:  Mr. Gahan, I'm not following your number.

6          MR. GAHAN:  If you look at Exhibit 1, page 11, look at

7  the record from November 2018.

8          THE COURT:  Yes, I'm seeing that, and it is exactly

9  the same as 200.

10          MR. GAHAN:  Okay.

11          THE COURT:  Page 57.

12          MR. GAHAN:  Right.  So this concept that that's --

13  that's a record that I agreed to have withdrawn, obviously was

14  inaccurate.

15      I was relying on my exhibit.  The record's in, and I would

16  ask the court to inform the jury of this exhibit number, because

17  he created this false impression that we were relying on an

18  exhibit that's not in evidence.  It clearly is.

19          MR. HARRIS:  We were asked yesterday, Your Honor, by

20  Mr. Gahan's office to remove this page from the exhibit.  Why

21  would it be removed from one but not the other?  We thought it

22  was not going to be in.  That was our agreement.  That was what

23  we traded emails about last night.  We have the email from 6:43

24  last night from Mr. Gahan's office.

25          THE COURT:  Well, look -- Mr. Cogswell?

1          THE CLERK:  Yes, Your Honor?

2          THE COURT:  Can you take a look at the Box?

3          THE CLERK:  I have it open, Your Honor.

4          THE COURT:  Is Exhibit 1, page 11 in there?

5          THE CLERK:  It is page 57 of 365?

6          THE COURT:  Yes, page 57 of page 365.  It's also

7   Exhibit 1-11.  The problem is we've got three different numbers

8   on these.

9       Is that exhibit in, and was that exhibit certified that it

10  would be there?

11         THE CLERK:  Let me check the email.  Just one moment.

12         MR. HARRIS:  I've got the email from 6:43 last night,

13  and Mr. Cogswell is copied on it.  It indicates that page 57 of

14  Exhibit 200 should be deleted and that these exhibits of what

15  should and should not be admitted -- so that should have been

16  removed from Exhibit 1.

17         MR. COGSWELL:  That is the email I see, Your Honor.

18         MR. GAHAN:  Your Honor, there was no agreement to

19  remove 1-11.  There never was.  It is true that there were some

20  Integon records that were duplicative, there were others that

21  didn't contain the right redactions, and we sent an email -- I

22  guess the paralegal sent an email with the understanding that

23  Mr. Harris and I had received -- had a discussion a while back

24  about making his claim file smaller, but I've always had

25  Exhibit 1-11 in.  It's always been part of Exhibit 1.  We've

1    used Exhibit 1 throughout the trial.  And just because one

2    particular page might be omitted from one exhibit doesn't mean

3    it's automatically removed from all other exhibits.

4        Mr. Harris and I have tried to go through and reduce

5    duplicative exhibits as much as we can.  I don't see why I would

6    have -- there was no understanding that 1-11 was ever going to

7    be removed, and I certified that Exhibit 1 was accurate, and so

8    did Mr. Harris.  The jury now is under the false impression that

9    we were trying to hide something or that we were relying on an

10   exhibit that's not in evidence, and that's just not true.

11       If Mr. Harris wants to put page 57 back in, I have no

12   objection to that.

13            THE COURT:  Mr. Harris, I take it this was taken out

14   at what you believe was Mr. Gahan's request?

15            MR. HARRIS:  At the request of his paralegal, yes,

16   Your Honor.

17            THE COURT:  So it doesn't hurt you if it's in?  It's

18   always been in?

19            MR. HARRIS:  It was in, Your Honor, but we were asked

20   to certify this last night.  Why would we take it out of one

21   version and not the other?  They asked us to take it out of our

22   version, and we did.

23            THE COURT:  Well, look.  It's been in the entire time.

24   I don't know who's certifying, but the lawyers are the ones who

25   are certifying.  The paralegals aren't doing this.

1          But at the time you told Mr. Cogswell that it was all set,

2    it, apparently, was at least in there once.  It's going to stay

3    in there once, and that's all we're going to do about it.

4          MR. HARRIS:  Okay.

5          MR. GAHAN:  Your Honor, would you instruct the jury

6    that Exhibit 1-11 is, indeed, in evidence?

7          THE COURT:  No, because you, basically, made a point

8    that if it's in there, it's in there, and I said I would sort it

9    out.  If they look at either one of those pages, it's there.

10         MR. GAHAN:  All right.  Sounds good.

11         THE COURT:  All right.  So a couple of things.

12    Is Mr. Wampold still with us?

13         MR. WAMPOLD:  I am, Your Honor.

14         THE COURT:  Good.  Mr. Wampold, I didn't think you'd

15    already gone out celebrating.

16         MR. WAMPOLD:  Not yet.

17         THE COURT:  Not yet?  All right.

18    I usually -- as you know, in federal court, we do not allow

19    the lawyers to speak with the jurors afterwards.  And unlike

20    many judges, I do not speak with jurors, except to thank them

21    and receive any comments about the process that they might have,

22    particularly in a case where there still is more work for me to

23    do, and in this case we've got the Consumer Protection Act

24    claim, we've got attorney's fees, so this is not a jury that I

25    would normally go chat it up with, and I don't do that anyway.

1            But because this is a Zoom case, I'm wondering if you would

2    be willing to participate with me in talking with the jurors

3    about the process, the mechanics, how they felt about the

4    techniques, the instructions that they got.  Judge Zilly did

5    that on his case, and I have the transcript of what he did.  It

6    would be my intent to have the reporter there while we did it,

7    and we can go over those kinds of issues, for the sole purpose

8    of making sure that each time we do one of these trials, we can

9    build upon our experience.

10            Is that acceptable to you?

11            MR. WAMPOLD:  Yes, I think that would be great.

12            MR. HARRIS:  Yes, Your Honor.

13            THE COURT:  All right.  Then, first of all, I want to

14    thank you for being game.  I told you at the beginning I hadn't

15    been this nervous about a trial since 32 years ago when I did my

16    first one, but I think we all made it through, and, from my

17    perspective, surprisingly well.

18            I know that we have several lawyers that I admitted and

19    that have been watching, and before we say goodnight to one

20    another, I was wondering if there's anything you would like to

21    say to them about how they might prepare or don't do this -- or

22    whatever you want to say.

23            MR. WAMPOLD:  I guess, from my perspective, you know,

24    I want to thank you guys, the federal court, and you, in

25    particular, Judge Pechman, for making this happen, because I

1    thought it worked remarkably well.

2        I was surprised how similar to an in-person trial it all

3    went, and I don't think it's, actually, very different from a

4    real trial.  So I thought it all went surprisingly well and

5    smoothly.

6        And there were way less technical issues than I expected.

7    We really didn't have that much downtime.  We have more downtime

8    with jurors who are late on a bus than we did with technical

9    issues.

10           THE COURT:  And amazingly, they all showed up on time

11   after lunch and at each break.

12       Mr. Harris, what did you think?

13           MR. HARRIS:  I agree with Mr. Wampold.  I'll be candid

14   with you, Judge.  I had some very serious reservations when you

15   told us in late August.  I got off that call and said, "Oh, boy,

16   this can be kind of messy."

17       I read stories online about other Zoom trials, one in

18   California, in particular, and I was very concerned.  But I have

19   to give credit to both sides and to your staff, because I think

20   we were able to pull it off, with cooperation on everybody's

21   part and a real commitment to making this work.  If we had not

22   bought into this, I don't think we could have pulled this off in

23   this manner.

24           THE COURT:  Well, I think I told you there are some

25   things that are a bit different for me.  One, I'm really sick of

1  looking at myself in the face for seven days in a row.  And I

2  know I could black myself out, but that doesn't help you when

3  you're trying to read me.

4      Did you feel like you were connected with the jurors?

5          MR. WAMPOLD:  I would say not as much as a real trial,

6  but there was some.

7          THE COURT:  Okay.  And did you think that they were

8  forthcoming in their voir dire?

9          MR. HARRIS:  Not as much as normal.

10         MR. WAMPOLD:  I just thought they weren't as talkative

11 as normal.  It was harder to get a conversation going than,

12 probably, in person.

13         THE COURT:  Normally, I have a whole shtick that I do

14 with them with the artwork in the courthouse.  I tried to give

15 them some prompts for them to talk.  We'll find out later if any

16 of that worked, but I might increase that to get them talking a

17 little more along the way.

18     All right.  Counsel, as you heard, they're the ones that

19 are going to decide, sometime between 3:30 and 4:00, whether

20 they're going to stop deliberating, if they haven't reached a

21 verdict.

22     Would you please make sure you stay in place so that

23 Mr. Cogswell can get in touch with you in case we have a

24 question or in case we have a verdict?  And if they don't reach

25 a verdict, then Mr. Cogswell will send you an email saying

1   everybody has gone home and they'll be back tomorrow at nine

2   o'clock to continue.  And we'll go on in that process until we

3   get a result.

4        Thank you so much for your arguments, and, really, thank

5   you so much for being willing to try this out.  There is going

6   to be an article written by the Administrative Office of the

7   Courts about us, and a reporter might give you a call to talk

8   with you.  I told them that I would let them know when we were

9   done.  And so that story is going to run.  I don't know when.

10       And I really -- I really enjoyed your advocacy on all

11  sides.  For a judge to watch good lawyers work is like sitting

12  back and eating bonbons.  So, apparently, I'm food obsessed.

13  Mr. Gahan liked my strawberries in the dark comment, and now I'm

14  on to bonbons.  It was a good experience.

15       I have another Zoom meeting at two o'clock, so I'll say

16  good-bye, and we'll wait on our jurors for the verdict.

17            MR. WAMPOLD:  Thank you, Your Honor.

18            MR. HARRIS:  Thank you, Your Honor.

19            THE COURT:  Thank you.

20                 (Court adjourned at 2:00 p.m.)

21                 (The jury was released at 4:00 p.m.)

22

23

24

25

# C E R T I F I C A T E

I, Nancy L. Bauer, CCR, RPR, Court Reporter for the United States District Court in the Western District of Washington at Seattle, do hereby certify that I was present in court during the foregoing matter and reported said proceedings stenographically.

I further certify that thereafter, I have caused said stenographic notes to be transcribed under my direction and that the foregoing pages are a true and accurate transcription to the best of my ability.

Dated this 11th day of December 2020.

/S/  Nancy L. Bauer

Nancy L. Bauer, CCR, RPR
Official Court Reporter