October 2, 2020          1

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT SEATTLE

———————————————————————————————————————

DANIEL HOPKINS,                          )
                                         ) CASE NO. C18-01723-MJP
                    Plaintiff,           )
                                         ) Seattle, Washington
v.                                       )
                                         ) October 2, 2020
                                         ) 1:30 p.m.
INTEGON GENERAL INSURANCE                )
CORPORATION,                             ) PRETRIAL CONFERENCE
                                         ) via ZOOM
                    Defendant.           )
                                         )
                                         )

———————————————————————————————————————

VERBATIM REPORT OF PROCEEDINGS
BEFORE THE HONORABLE MARSHA J. PECHMAN
UNITED STATES DISTRICT JUDGE

———————————————————————————————————————

APPEARANCES:


  For the Plaintiff:      MICHAEL WAMPOLD
                          TOMAS A. GAHAN
                          Peterson Wampold Rosato Feldman Luna
                          1501 4th Avenue, Suite 2800
                          Seattle, WA 98101


  For the Defendant:      ELIOT M. HARRIS
                          CHRISTINE J. LEE
                          Williams Kastner & Gibbs PLLC
                          601 Union Street Suite 4100
                          Seattle, WA 98101


  Reported by:            NANCY L. BAUER, CCR, RPR
                          Federal Court Reporter
                          700 Stewart Street, Suite 17205
                          Seattle, WA 98101
                          nancy_bauer@wawd.uscourts.gov

```
 1                          PROCEEDINGS

 2       _____

 3            THE CLERK:  United States District Court for the

 4     Western District of Washington is now in session, the Honorable

 5     Marsha J. Pechman presiding.

 6         This is the matter of Hopkins versus Integon General

 7     Insurance Corporation, Cause No. C18-1723, assigned to this

 8     court.

 9            Counsel, please make your appearances for the record.

10            MR. WAMPOLD:  Mike Wampold and Tomas Gahan for the

11     plaintiff.

12            MR. HARRIS:  Eliot Harris and Christine Lee for the

13     defendant.

14            THE COURT:  All right.  I see I have my two courtroom

15     deputies that are going to be with us, and the court reporter,

16     as well as the law clerk, Lia Pernell, who is on this call.  I

17     don't know if there are others that are intending to watch this

18     afternoon.

19            MR. WAMPOLD:  The only other person on there from our

20     office is our paralegal.

21            THE COURT:  Very good.

22         Counsel, we have some things we need to accomplish this

23     afternoon.  First of all, we need to complete and settle our

24     jury instructions.  We need to complete and settle our voir dire

25     questions.  There is a motion for reconsideration that was filed
```

1    by the defense today.  And then there is a motion in limine

2    concerning plaintiff's expert.

3         Mr. Wampold, I can't hear you.

4         MR. WAMPOLD:  I, actually, put it on mute for a second

5    to say something to my colleague, because I realized there was

6    one document I don't have that I need.

7         THE COURT:  Okay.

8         As well as to have us check to make sure everybody is

9    comfortable with what it is we have to do in order to launch.

10   Obviously, the first thing is the judge has to turn on her

11   camera.

12        I did want to tell you that I have reviewed the summons

13   responses that we have, and, interestingly enough, we only had

14   four people out of our requests for summons who said -- one that

15   said, "I don't want to participate in Zoom and I don't want to

16   come to the courthouse, and I don't have any of this equipment,"

17   so I told the jury coordinator that that person would be

18   excused.

19        There was another person who said, "I'm happy to

20   participate, but I can't do it Monday."  I let that person be

21   excused.

22        There was a third person who, basically, was concerned

23   because they are in Island County, and they were worried about

24   their connectivity, and I said, "We'll try you out anyway."  And

25   she was further concerned about if she had to come to the

 1  courthouse, the ferries are not running very reliably, so I
 2  said, "Well, we'll get to that if you happen to be chosen."
 3       And, finally, there was one juror who appeared to answer
 4  inconsistently.  No, she didn't want to participate, but, yes,
 5  she would come to the courthouse.  So I asked the court
 6  administrator to please call her and try and sort out if she
 7  misunderstood the questions, and I haven't gotten a response on
 8  that.
 9       But it certainly looks like we'll have enough jurors for
10  our jury pool.  It also looks like very few people -- I think
11  only one responded that they only had an iPad.  So that
12  surprised me a little bit.  So we may be able to choose our
13  jurors with a single panel.
14       And I just spoke with Judge Zilly a few moments ago.  He
15  was able to get a jury in three hours.  He does it differently
16  than I do.  He individually questions each witness, one at a
17  time.  I don't do that.  So I'm fairly confident that we can get
18  our jury picked in the morning.
19       According to Judge Zilly, we got a normal pool among the
20  people that were responding.  Most of the people here in the
21  Western District have an average of a four-year college degree,
22  and so they seem to be pretty adept at use the equipment.
23       What did seem to be a problem for him was -- not for him
24  but for the jurors is, occasionally, they lost our bandwidth,
25  and that caused some connectivity problems.

1    But other than that, Judge Zilly seemed to think it was,

2  actually, moving faster that what he expected.  He expected an

3  eight-day trial.  He's going to get done in six.  So he didn't

4  report any major problems.

5    For your trial, we've gotten some press around the nation,

6  and *Bloomberg Law* did a piece on this, so we've been contacted

7  by several other jurisdictions, including judges out of Utah and

8  the Northern District of California, who are wanting to watch.

9  So we may have some people watching the proceedings.  Mostly, I

10  think, they're not watching you, they're watching me and

11  watching the court staff, so that shouldn't be a problem.

12    Remember, I told you that if there are people you believe

13  you would bring to watch in the courtroom, Mr. Wampold, perhaps

14  your client's wife, for example, you need to get that name to

15  Mr. Cogswell so that person can have access to be able to watch.

16    So any questions about what I've said so far?

17        MR. WAMPOLD:  Not from plaintiffs, Your Honor.

18        MR. HARRIS:  No, Your Honor.

19        THE COURT:  All right.  So let's get into it.

20    Thank you very much to the defense for putting together a

21  set of voir dire questions.  They all look fine to me.

22    I've added two questions, and I put these questions at the

23  end for a purpose.  I like to get our jurors hooked in to

24  thinking this is going to be interesting before I ask them for

25  any excuses as to why they can't participate.

1    So I've added, "The court is running a timed trial, and the

2    parties and the court are trying to be realistic on how long you

3    will have to be here and serve.  We'll be running court from

4    9:00 to 10:30, with a break; from 10:45 to noon; a luncheon

5    break from 1:00 to 2:30; and then from 2:45 to 3:30; that we'll

6    be asking you to be here from Monday through Friday next week.

7    Monday is a court holiday, and then we would expect you to be

8    the following Tuesday and Wednesday."  And then I'll ask for any

9    hardships once we go there.

10    The next question is, "Does anyone have any special needs

11    that the court can accommodate to ensure your full participation

12    in the trial?"  And we'll see if there's any of that.  Usually

13    they want to know about breaks and being able to stand up, and

14    we'll accommodate that.

15    So anything else anybody wants to say about the voir dire

16    questions?

17          MR. WAMPOLD:  No, Your Honor.

18          MR. HARRIS:  No, Your Honor.

19          THE COURT:  Okay.

20    Once again, you-all did a wonderful job on your jury

21    instructions, but No. 32 caused a little hiccup here, and that's

22    the damages instruction.  I just saw that Mr. Gahan sent over a

23    corrected one, and, I don't know, Mr. Harris, have you had a

24    chance to look at that to see if you have any difficulty with

25    that one?

```
 1          MR. HARRIS:  We have, Your Honor.  I think the

 2   corrected 32 is the right one.

 3          THE COURT:  Okay.

 4          MR. HARRIS:  I would add that I think it needs an

 5   explanation.  The damages that are being sought in that

 6   instruction only relate to the 2016 accident.

 7          THE COURT:  I think that's what it says right at the

 8   beginning.

 9          MR. HARRIS:  Yeah, that's it.  That version is the one

10   that we're okay with.

11          THE COURT:  Okay.  Then that is the one that -- let me

12   read this instruction as it came in.

13       Well, what it says is the value of plaintiff Hopkins' claim

14   for insurance benefits.  Did you want additional language to

15   that, Mr. Harris?

16          MR. HARRIS:  No, that's fine, Your Honor.

17          THE COURT:  Okay.  Then that will be the 32 -- the

18   corrected 32 will be substituted in, and Ms. Pernell will send

19   you -- I renumbered your set, as you can see.  I just shuffled

20   some things around in different places.  I renumbered the set,

21   and we'll sign it, date it for Monday, October 5th, and it will

22   be sent out.

23       Now, I'm hoping that somebody on my team knows how to put

24   the jury instructions up in front of the jury so that I can read

25   them.  I'll read from a hard copy.
```

1    Yes, Mr. Harris?

2         MR. HARRIS:  Yes, I've got a couple of issues on the

3    jury instructions I'd like to bring up, the other ones other

4    than 32, if that's okay.

5         THE COURT:  Oh.  All right.  I didn't realize that.  I

6    thought this was an agreed set, but go ahead.

7         MR. HARRIS:  Yes.

8    Number 2, Your Honor, the way it's worded, it says, "You'll

9    be asked to determine the value of each of these claims."  I

10   think that should go behind the sentence that follows it.  So it

11   should say, "If you find for the plaintiff, then you'll be asked

12   to determine the value for each of those claims."

13        THE COURT:  Oh, I see.  On my page, it's the very last

14   sentence.  It says, "You'll be asked to determine."  So you're

15   saying it needs to say, "If you find for the plaintiff, you'll

16   be asked to determine."

17        MR. HARRIS:  There's a second page of No. 2.

18        THE COURT:  Okay.

19        MR. HARRIS:  And so I think it should go after the

20   sentence that says, "Plaintiff Daniel Hopkins claims that."  I

21   think it should follow -- "you will be asked to determine the

22   value of each of these claims" should follow that.

23        THE COURT:  Mr. Wampold, any problem with moving that

24   sentence back?

25        MR. WAMPOLD:  I think that's fine.  I mean, the jury

1    has to determine the 2016 claim for benefits.  They have to

2    determine that.  So -- but I think for a preliminary

3    instruction, that's fine, I guess.

4         THE COURT:  Okay.  Ms. Pernell, I want you to put the

5    sentence, "You'll be asked to determine the value of each of

6    those claims" after the sentence "Plaintiff Daniel Hopkins

7    claims that as a result of defendant Integon General Insurance

8    Corporation's conduct, he suffered damages."

9         All right.  Mr. Harris, anything else?

10        MR. HARRIS:  Number 21, Your Honor.

11        THE COURT:  All right.

12        MR. HARRIS:  Bullet Points No. 4 and 7 are

13   duplicative.

14        THE COURT:  It appears that that's the case,

15   Mr. Wampold.

16        MR. WAMPOLD:  Yeah, it does, so I think 7 should come

17   out.

18        THE COURT:  Okay.  We'll knock off 7.

19        Next, Mr. Harris?

20        MR. HARRIS:  Number 23, Your Honor.  This is the CPA

21   injury instruction.

22        THE COURT:  Okay.

23        MR. HARRIS:  I think we need to add an explanation of

24   the fact that injury to business and property does not include

25   injuries that are personal injuries, such as physical injury to

1   a person's body or pain and suffering, those sorts of things.

2            THE COURT:  Well, it does say, "The injury element is

3   met if the insured's property, interest, or money is

4   diminished."

5            MR. HARRIS:  And I agree, and I think that's a correct

6   statement of the law.  I think it needs to be clarified that it

7   doesn't include bodily injuries, personal injuries, things like

8   that.

9            THE COURT:  So is this the pattern instruction?

10           MR. WAMPOLD:  Yes.

11           THE COURT:  Mr. Harris, it says, to me, what they

12  consider.  We usually don't -- we don't usually give negative

13  instructions.

14           MR. HARRIS:  Okay.

15           THE COURT:  In other words, we tell people what to

16  include; we don't tell them what not to include.

17           MR. HARRIS:  Understood.

18           THE COURT:  Okay.  Anything else?

19           MR. HARRIS:  Twenty-four, Your Honor.

20           THE COURT:  Okay.

21           MR. HARRIS:  Subsection 2 says, "The plaintiff was" --

22  you know what?  I'm, actually, going to skip that one.  That one

23  is fine with us, Your Honor.

24           THE COURT:  Okay.

25           MR. HARRIS:  That would be it.  Those are it.

1          THE COURT:  All right.  Well, Ms. Pernell will make

2     those changes and send out the most recent set with my signature

3     stamped for October the 5th.

4        Okay.  Anything left on that?

5          MR. WAMPOLD:  No.  I do -- I just want to say thank

6     you so much to the court for doing this.  You're the only judge

7     I've ever tried a case in front of that gets the instructions

8     done ahead of time, and it makes the trial so much more sensical

9     to everybody.  So thank you for your efforts.  It is a great way

10    to start a trial.

11          THE COURT:  It's self-protection.  I get two shots at

12    getting it right.

13          MR. WAMPOLD:  Right.  Yeah, that's good, good for all

14    of us.

15          THE COURT:  All right.  The next issue I'd like to

16    take up is the motion for reconsideration on witness Currie, and

17    I've had an opportunity to read Mr. Harris's brief, and I have

18    reviewed the rules that he cites.  I took a look at the

19    deposition and the interrogatory answers.

20        Mr. Wampold, is there more that you want to say about this?

21          MR. WAMPOLD:  Not unless Your Honor is inclined to

22    grant their motion for reconsideration.  If you're not, there's

23    nothing more we need to say.

24          THE COURT:  Okay.

25        Mr. Harris, what would you like to have me know beyond what

1   you wrote for me?

2          MR. HARRIS:  I think what we wrote and what we've

3   talked about before -- what we talked about last week, Your

4   Honor -- I think the court's got a good sense of what the issue

5   is.

6          THE COURT:  Okay.  Well, the real problem here is the

7   name of Ms. Currie was not disclosed.  And, obviously, if the

8   defense thinks that this is an important witness, the plaintiffs

9   would think that this is an important witness as well.

10         Rule 26, when it talks about lay-down discovery, the first

11  thing -- the first rule is that you announce the name, if you

12  know it.  And even lay-down discovery comes with an obligation

13  to continue to supplement.

14         So that's the first time the defense bypassed an

15  opportunity to identify who they wanted to call as their

16  representative.

17         I took a look at the interrogatories, and, you know, the

18  first two interrogatories, it would seem to me that Ms. Currie

19  would be properly identified in either of them, or both.  They

20  asked for who it is who was a representative on the file, and

21  it's my understanding that, at one point, she was a supervisor

22  here.  So unless you're going to take the position, Mr. Harris,

23  that she had nothing do with this file, she would have had to be

24  someone identified.

25         And then the second interrogatory asks for persons with

 1   knowledge, and, obviously, if you want to call her, she's a

 2   person with knowledge.  So that's three times that the

 3   opportunity to identify her was passed up.

 4       Then there's the deposition, where she is identified, and

 5   that would have been, last March, the perfect time to say, "Oh,

 6   and by the way, Ms. Currie is going to be our representative."

 7   That would have alerted the plaintiffs that they should be

 8   interested in Ms. Currie as someone to pursue, or, at least,

 9   have the opportunity to weigh and pursue whether they wish to

10   take her deposition.

11       So the defense tells me that there are nine different

12   places where her name comes up.  What that says to me is there

13   were nine different times when you could have said, "This is our

14   representative."  I don't think the plaintiff is required to

15   guess who it is that you're going to be bringing as a witness.

16       One of the things you've suggested in your materials, that

17   I should allow her to testify as a lay witness using 701, but,

18   actually, 701 I don't think supports your position.

19       The committee notes on the rules, basically, says this:

20   "Rule 701 has been amended to eliminate the risk that the

21   reliability requirements set forth in Rule 702 will be evaded

22   through the simple expedient of proffering an expert in lay

23   witness clothing.  Under the amendment, a witness's testimony

24   must be scrutinized under the rules regulating expert opinion to

25   the extent that the witness is providing testimony based on

 1   scientific, technical, or other specialized knowledge within the

 2   scope of Rule 702.  By channeling testimony that is actually

 3   expert testimony to Rule 702, the amendment also ensures that a

 4   party will not evade the expert witness disclosure requirements

 5   set forth in Federal Rule 26 and Federal Criminal Rule 16 by

 6   simply calling an expert witness in the guise of a layperson."

 7        Now, what that tells me is that vehicle that you suggest,

 8   701, what you're trying to do is exactly what the committee said

 9   you can't do, and that is convert a layperson into an expert

10   and, thereby, avoid identifying the individual and the subject

11   matter to which they are going to testify.

12        So I'm denying your motion for reconsideration.

13        All right.  That leaves us the issue of defense counsel's

14   motion in limine challenge to the plaintiff's expert.

15        Mr. Wampold, you have to help me with this name.

16             MR. WAMPOLD:  *Strez-leck.*

17             THE COURT:  *Strez-lick?*

18             MR. WAMPOLD:  *Strez-leck.*

19             THE COURT:  *Strez-leck?*

20             MR. WAMPOLD:  Yeah.

21             THE COURT:  What would you like to tell me in response

22   to the motion in limine?

23             MR. WAMPOLD:  Oh, you're asking me?

24             THE COURT:  (Nods.)

25             MR. WAMPOLD:  Yeah.

1       Your Honor, going back and looking at the motion, it

2   appears they really are trying to exclude him completely, which

3   is what I had remembered, and the reality is -- I think we laid

4   this pretty well out in our briefing.  But the courts have held

5   that, in bad-faith cases, this is something that is not familiar

6   to jurors, so it's useful to have an expert in insurance claims

7   handling.

8       And he, basically, does a very good job of testifying

9   because he's testified in cases of mine for -- a couple of times

10  now, one in front of Your Honor.  He does a good job of

11  explaining that his opinions are based on the standards in the

12  industry and this is how things are done, and it's quite helpful

13  to the jury to hear those standards.

14      And that's the overall response.

15      Now, there is some picky things that counsel argued that we

16  addressed in our briefing that I'm happy to get into the weeds

17  on, but that's the overall motion.  I think it's just -- it's --

18  it's a motion that he's, basically, not helpful and he's

19  testifying to the law.  Well, he's not testifying to the law,

20  and it is helpful.

21          THE COURT:  All right.  Mr. Harris, what else would

22  you like to have me know?

23          MR. HARRIS:  Yeah.  I -- I disagree.  The motion is

24  really after the concept of a bad-faith expert.  We have Bill

25  Hight testifying.  Bill Hight has testified numerous times in

1    similar cases.

2         It's not a motion to say that someone coming in to talk

3    about industry standards and customs shouldn't be allowed.

4    We're bringing an expert in ourselves to do that.  It's really

5    the way that Strzelec does it and the way he presents it.

6         He presents it in terms of an opinion that he states as a

7    standard.  "This is an industry standard because I say so."

8    "This is what is required because I say so," without, actually,

9    equating it to some sort of standard that we can look up and

10   say, "This standard applies because it's been recognized in the

11   industry, and here is the authoritative source for that."  It's

12   not just me, somebody who used to work in insurance, telling you

13   this is how it is because that's what I think.  That's not a

14   proper expert opinion.  It has to be grounded in some sort of

15   basis.  Mr. Strzelec's opinions just aren't grounded in that

16   basis.

17            THE COURT:  All right.

18        Well, Mr. Harris, your objection here to me sounds more

19   like an attack on how well he articulates his opinions and what

20   he did in order to check his opinions.  That's no different than

21   any other expert; in other words, that attack comes in

22   cross-examination.  And you're certainly free to, basically,

23   attack the expert and say, "Is there any place you look?  Is

24   there any standard that you consulted?  Is there something that

25   has been tested in the industry?"  All of those kinds of

```
 1   questions would be appropriate, but I don't think it means that
 2   you get to knock the witness out, or even the witness's opinion.
 3   How well it is supported is the subject of cross-examination.
 4        Now, Mr. Wampold, your expert is not going to be able to
 5   testify to a different standard than the one I've given you in
 6   your jury instructions, and if he starts to, you can expect that
 7   Mr. Harris is going to object, and I will rule in his favor.  So
 8   you need to be careful as to how you word your questions.
 9             MR. WAMPOLD:  Understood.
10             THE COURT:  And we'll take it a question at a time.
11        All right.  I think that that is what I needed to cover
12   today.
13        Now, let me ask you this:  Are you familiar with the
14   platforms that we're asking you to use?
15             MR. WAMPOLD:  Are we familiar with the platforms?
16   From the plaintiff, we are, yeah.
17             THE COURT:  Do you feel like there's any more Zoom
18   training that you need?
19             MR. WAMPOLD:  I don't think there is any more Zoom
20   training we need.  There are a few logistical things about it
21   that I wanted to talk about when it's the right time.
22             THE COURT:  Okay.  Well, now is the right time.
23             MR. WAMPOLD:  Okay.
24        One of the things that we wanted to discuss is, we've,
25   actually, been practicing with the platform, to make sure it
```

 1    works well.  And during voir dire, it makes sense for all the

 2    jurors to have this gallery view, where they see everyone.  But

 3    what we found is, during opening and close, and probably the

 4    directs and crosses, once we get into trial -- voir dire is

 5    over -- we found that it works much better, from the jury's

 6    perspective, if they put it in speaker view.  Because when --

 7    and we can show you, Your Honor.  We, actually, wanted to test

 8    the PowerPoints.  But if they keep getting gallery view and see

 9    everyone, then the PowerPoint becomes quite small.  And it's

10    better to have the person -- it looks better if they're in

11    gallery view, the jurors.

12        And so our hope is that you'll agree and that we can then

13    give some instructions to the jurors that, once voir dire is

14    over, that they should put it into speaker view, and there's an

15    adjustment to the PowerPoint that, I think, will work well.

16            THE COURT:  Actually, that's one of the things that

17    the committee talked about, Mr. Wampold.

18            MR. WAMPOLD:  Oh.

19            THE COURT:  Here was the rationale:  That if the

20    jurors were in the courtroom, they would be able to look at

21    anybody that they wanted, and they would be able to look at the

22    reaction of defense counsel or the plaintiff, and if they want

23    to do that, we didn't see any reason why they had to be focused

24    on you alone.  So that was the rationale.

25        They certainly will be trained on how to go back and forth.

```
 1              MR. WAMPOLD:  Okay.
 2              THE COURT:  And they may very well decide that they
 3    only want to be focusing on the speaker (inaudible), but they
 4    could decide that they wanted to see what the reaction was.
 5              MR. WAMPOLD:  Yeah.
 6              THE COURT:  Anything that happens in the courtroom is
 7    something that they can take into account for.
 8         Now, I do wish that we could figure out a way for me to not
 9    look like I've got a terrible sunburn.
10              MR. WAMPOLD:  There is a touch-up feature you can do,
11    where it will touch you up.  If you click on -- yeah, if you
12    click on the buttons on the right, and you go to "advanced
13    settings," it's got touch-up function.
14              THE COURT:  Okay.  I'll have my staff do that.  What
15    I'm really hoping for is younger and thinner.  I don't imagine
16    you can do that.
17              MR. WAMPOLD:  Actually, I was clicking on it, and if
18    you click down at the bottom -- this is for your staff -- but if
19    you click down at the bottom under "video" and then go to "video
20    settings," there is a function there that says "touch up my
21    appearance."
22              THE COURT:  Okay.
23              MR. WAMPOLD:  So --
24              THE COURT:  Well, maybe I'll come back looking like
25    I've had a little work.
```

1          MR. WAMPOLD:  You'll look great.

2      So I'm wondering if -- we can do it after you drop off, but

3  I would like to try out the PowerPoint and just see how it

4  looks.

5          And, I guess, one thing, Your Honor, while you're still on,

6  is, if you would indulge us after you've read the jury

7  instructions and before opening statement, just to make sure the

8  jurors are all set with where the PowerPoint is and that they

9  can see -- Mr. Gahan is going to do the opening -- but where

10  they can see Mr. Gahan and the PowerPoint.  Does that work?

11          THE COURT:  Sure.  I mean, we'll check in with the

12  jurors all the way along the line and make sure they're all with

13  us --

14          MR. WAMPOLD:  Okay.

15          THE COURT:  -- and ready to go.  And speak up any time

16  if that's something that you want to take some time to do,

17  because in the courtroom we would do that as well.  We'd make

18  sure that the camera was set up and that everybody could see.

19          MR. WAMPOLD:  Okay.  Great.

20          THE COURT:  So that's not a problem.

21          MR. WAMPOLD:  Okay.  Great.

22          THE COURT:  Are you going to be using Box, or are you

23  using your own presentation platforms?

24          MR. WAMPOLD:  Yes.  So speaking for the plaintiffs,

25  we've uploaded all the exhibits to Box, but we will be using

1   PowerPoint to display the actual exhibits.

2          THE COURT:  Okay.  Mr. Harris, are you using your own

3   platform?

4          MR. HARRIS:  We'll be using our own platform, Your

5   Honor, yes.

6          THE COURT:  Okay.  Can I have both of you certify that

7   the exhibits that you loaded into Box are identical to the ones

8   that you are intending to display?

9          MR. WAMPOLD:  They are.

10         MR. HARRIS:  Yes, Your Honor.

11         THE COURT:  Okay.  Any other questions?

12         MR. WAMPOLD:  Yeah, I had a couple.  One is, will we

13  get the, kind of, bio sheets we normally get for jurors?  Will

14  we get that ahead of time so we can start tracking?

15         THE COURT:  You should.  In other words, the jurors

16  are going to report to the virtual jury room orientation

17  program, and so they are going to see Judge Martinez for a

18  couple of minutes, ahead of time, explaining why we are doing

19  this by Zoom.  There will also be the standard orientation

20  program that we always show, you know, Sandra Day O'Connor

21  talking about jury trials, et cetera, and then they'll also see

22  the eight-minute implicit bias video.

23      So they won't be coming into our sphere probably for about

24  45 minutes, and I would expect, by that time, Jeff Humenick will

25  have randomized our pool and then transferred up, and, perhaps,

1    Ms. Williams or Mr. Cogswell, can you tell us how the lawyers

2    are going to get the information on our jurors?

3            THE CLERK:  Jeff has not told me that, but I can

4    certainly email it to everybody.  I'm in contact with his group.

5            THE COURT:  All right.  Then you can expect that

6    you're going to get it by email.

7            MR. WAMPOLD:  Great.  That's great.

8        And then, Your Honor, I know Your Honor indicated that we

9    should deal with exhibits outside the presence of the jury so

10   that we don't -- you know, especially because of the platform,

11   we don't want to waste time fighting over exhibits.

12       Maybe you want to see -- maybe we could carve out some

13   time -- if we're going to wait 45 minutes, maybe we can come on

14   early on Monday and get some of that done Monday morning.  Is

15   that possible?

16           THE COURT:  Certainly.  That's fine.

17           MR. WAMPOLD:  Okay.

18           THE COURT:  I don't expect that they're going to be

19   ready to come -- literally, if we had an elevator, up the

20   elevator --

21           MR. WAMPOLD:  Yeah.

22           THE COURT:  -- until about 9:45.

23           MR. WAMPOLD:  Okay.  So should we just plan on

24   starting at 9:00?

25           THE COURT:  Well, it depends.  If you've got 15

1  exhibits for me to rule on and take a look at.  If you've got

2  two, you know, that makes a difference.

3           MR. WAMPOLD:  My feeling is we should start at 9:00,

4  and then if we could take a little break, great, but it may take

5  45 minutes.

6           THE COURT:  Okay.  All right.  Everybody be ready to

7  go at nine o'clock, and we'll take it up at that time.

8           MR. WAMPOLD:  Great.

9           THE COURT:  Anything else?

10          MR. WAMPOLD:  No.

11     We provided the court with a calendar of all of our

12  witnesses, so hopefully the court received that.  But we've got

13  the order that, at least, tentatively, we plan on going in.

14          THE COURT:  That reminds me.  There's one other thing

15  that I'm going to ask you to do.

16     Can one of the lawyers, when I tell them, in the voir dire

17  questions, take a look at this list of witnesses, can you

18  provide a list of witnesses with the witnesses' names, and be

19  able to load it up so they can actually read it off the screen?

20          MR. WAMPOLD:  We can take care of that, Your Honor.

21          THE COURT:  Okay.  I'd like to have the jury see it in

22  print rather than me simply trying to read off the names,

23  because it's easier to recognize if you can see the spelling.

24          MR. WAMPOLD:  Exactly.  We'll come up with the list,

25  and then we'll load it into Box, and then we can just show it to

1    the jury when you're ready.

2              THE COURT:  Okay.  All right.

3         Anything else, Mr. Wampold?

4              MR. WAMPOLD:  Not from us, Your Honor.

5              THE COURT:  Okay.  Mr. Harris, do you have any other

6    issues that you want to talk about?

7              MR. HARRIS:  No, Your Honor.  Thank you.

8              THE COURT:  Okay.  Then I will leave you and let you

9    work with the courtroom deputies on anything else you want to

10   practice.

11        I like to try cases.  I don't care whether you settle this

12   or not, but if you do, would you please make sure that you know

13   how to get ahold of my courtroom deputy?  Because there is work

14   over the weekend that will be done, and I'll be spending time

15   reviewing the materials, and if I don't have to do that, I'd

16   appreciate not having to.  So if you settle it, don't celebrate

17   before the judge knows that you're out celebrating.

18             MR. WAMPOLD:  Okay, Your Honor.  We won't do that.

19             THE COURT:  Okay.  Very good.

20        All right.  Then have a nice weekend.  We'll get ready.

21   I'm looking forward to seeing how this works on Monday.  And

22   what I would say is, we all need to take a deep breath and

23   relax, and we will work through this, and we are cutting edge.

24   This is the first federal court in the nation to do this.

25             MR. WAMPOLD:  Wow.  That's very exciting, actually.

```
1           THE COURT:  Yeah.  So, anyway, have a nice weekend.

2           MR. WAMPOLD:  Thank you, Your Honor.  You, too.

3           MR. HARRIS:  You, too, Your Honor.  Thank you.

4               (Proceedings concluded at 2:10 p.m.)
```

C E R T I F I C A T E

        I, Nancy L. Bauer, CCR, RPR, Court Reporter for the United States District Court in the Western District of Washington at Seattle, do hereby certify that I was present in court during the foregoing matter and reported said proceedings stenographically.

        I further certify that thereafter, I have caused said stenographic notes to be transcribed under my direction and that the foregoing pages are a true and accurate transcription to the best of my ability.

        Dated this 8th day of April 2021.

        /S/  Nancy L. Bauer

        Nancy L. Bauer, CCR, RPR
        Official Court Reporter